# EXHIBIT 2

Discovery Resource
713-223-3300

1 (Pages 1 to 4)

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                HOUSTON DIVISION
 3  SHELLY PHEIGARU,          )
          Plaintiff,          )
 4                            )
       V.                     )  C.A. NO. 4:16-CV-03228
                              )  JURY TRIAL DEMANDED
 5                            )
    SHELL EXPLORATION AND      )
 6  PRODUCTION COMPANY,        )
          Defendant.           )
 7
 8
 9
10
11  ........................................
       ORAL AND VIDEOTAPED DEPOSITION OF
12
            SHELLY PHEIGARU
13
           MARCH 14, 2017
14
    ........................................
15
16
17
18
19  ORAL AND VIDEOTAPED DEPOSITION of SHELLY PHEIGARU,
    produced as a witness at the instance of the Defendant,
20  and duly sworn, was taken in the above-styled and
    numbered cause on the 14th of March, 2017, from
21  9:00 a.m. to 5:33 p.m., before Wendi Broberg, CSR in and
    for the State of Texas, reported by machine shorthand,
22  at the Law Offices of Porter & Powers, P.L.L.C., 5900
    Memorial Drive, Suite 305, Houston, Texas 77007,
23  pursuant to the Federal Rules of Civil Procedure.
24
25
```

**Page 3**

```
 1       A P P E A R A N C E S (Continued)
 2
    ALSO PRESENT:
 3
       Mr. Eric Payton - Videographer
 4
 5
    REPORTED BY:
 6
       WENDI BROBERG, CSR 7091
 7    Contracted by:
       Discovery Resource
 8    1511 West 34th Street
       Houston, Texas  77018
 9    Ph. (713) 223-3300
       Fax (713) 228-3311
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1       A P P E A R A N C E S
 2
    FOR THE PLAINTIFF SHELLY PHEIGARU:
 3
 4    MR. J. ROBERT MACNAUGHTON
       PORTER & POWERS, P.L.L.C.
 5    5900 Memorial Drive
       Suite 305
 6    Houston, Texas  77007
       Ph. (713) 621-0700
 7    Fax (713) 621-0709
       E-mail: robert@porterpowers.com
 8
 9
    FOR THE DEFENDANT SHELL EXPLORATION & PRODUCTION
10  COMPANY:
11
    MS. FAZILA ISSA
12  NORTON ROSE FULBRIGHT US, L.L.P.
       1301 McKinney
13    Suite 5100
       Houston, Texas 77010-3095
14    Ph. (713) 651-5151
       Fax (713) 651-5496
15    E-mail: fazila.issa@nortonrosefulbright.com
16    and
17  MS. CYNTHIA GLASS BIVINS
       SR. LITIGATION COUNSEL
18    SHELL OIL COMPANY
       910 Louisiana
19    OSP 4806
       Houston, Texas 77002
20    Ph. (713) 241-7100
       Fax (713) 241-1427
21    E-mail: cynthia.bivins@shell.com
22
23
24
25
```

**Page 4**

```
 1              INDEX
 2  Appearances ...............................2
 3  Index .....................................4
 4  Index of Exhibits .........................4
 5  SHELLY PHEIGARU
 6     Examination by Ms. Issa ................8
 7  Signature of Witness ....................375
 8  Reporter's Certification ................376
 9
10
11         INDEX OF EXHIBITS
    NUMBER    DESCRIPTION      MARKED/IDENTIFIED
12  1   Document entitled "Shell Equal      28
          Opportunity Policy" (Bates No.
13        SEPCo PHEIGARU - 000010)
14  2   SEPCo goals and performance         46
          documents for Shelly Pheigaru
15        2012 (Bates Nos. SEPCo PHEIGARU -
          000290 - 000293, 000298)
16
17  3   SEPCo goals and performance         52
          documents for Shelly Pheigaru
18        2013 (Bates Nos. SEPCo PHEIGARU -
          000294, 000295, 000299, 000301)
19  4   Shell Medical-Certification For     66
          Non-Occupational Injury or
20        Illness form for Shelly Pheigaru
          with attached Health Care
21        Provider Statement and Reed Group
          documents (Bates Nos.
22        Pheigaru0000449 - 0000457)
23
24
25
```

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

25

1  Q  And was that here in Houston, too?
2  A  Yes.
3  Q  And why did you leave there?
4  A  I was laid off as well as about more than half
5  of the company was laid off at that time.
6  Q  Okay.  Were you disciplined or demoted or
7  anything?
8  A  No.
9  Q  Okay.  And do you recall the years that you
10  were there?
11  A  2000 – 2008 to 2010.
12  Q  Okay.  And so DXP Enterprises, you were there
13  probably 2011?
14  A  2010 to 2011.
15  Q  Okay.  And where were you working prior to this
16  Geotrace?
17  A  I was at Shell.  I did an internship at Shell.
18  Q  And so did you do an internship while you were
19  in college or before?
20  A  It was right after college.  It was a temporary
21  assignment.
22  Q  And how long was the assignment for?
23  A  About eight months.
24  Q  And you were here in Houston, right?
25  A  Yes.

26

1  Q  Okay.  Do you remember what your title was just
2  intern or...
3  A  I'm not sure if they called me administrative
4  assistant.  I was working under the -- I believe her
5  title is event coordinator or it was in that department.
6  Q  Do you recall what your job duties were?
7  A  I helped with the opening of the new building,
8  the grand opening.  I helped with the Shell Houston
9  Open.  I did various marketing and admin duties as well.
10  Q  Okay.  And you were there for about eight
11  months you said?
12  A  Yes.
13  Q  Okay.  And why did you end up leaving?  Was it
14  just because the assignment finished?
15  A  Yes.
16  Q  Okay.  Were you disciplined or demoted at
17  all --
18  A  No.
19  Q  -- during that time?
20     Who was your supervisors?  Do you recall?
21  A  Jamie Lopez.
22  Q  Is that the only one?
23  A  That's the only supervisor I had, yes.
24  Q  Okay.  So have we covered all of your
25  employment before you began with Shell?

27

1  A  Yes.
2  Q  Okay.
3  A  Let me rephrase.  Except in college.
4  Q  Okay.  And what were you doing in college?
5  A  I worked for gymnastics.  I was a coach.
6  Q  Okay.  And do you recall when you began your
7  employment with Shell?
8  A  September 2011.
9  Q  Okay.  Now, was that your employment, or was
10  that when you were hired as an independent contractor?
11  A  I was a contractor at that time.
12  Q  Okay.  So when did you actually begin your
13  employment as an employee?
14  A  It was the summer -- I'm not exact sure of a
15  date -- of 2012.
16  Q  Okay.  So according to SEPCO's records, you --
17  your first day as an employee was June 4th, 2012.  Does
18  that sound right to you?
19  A  That sounds right, yes.
20  Q  Okay.  And do you recall when you began your
21  employment with SEPCO that you received copies of -- for
22  various copies of pol -- policies and procedures?  Do
23  you recall that?
24  A  Yes.
25  Q  Okay.  And do you recall receiving a policy

28

1  regarding their equal opportunity policy?
2  A  I don't recall at this time.
3  Q  Okay.  What I'll do is I'll show you a copy of
4  it, and let's talk a little bit about it.
5  A  Okay.
6     MR. MacNAUGHTON:  And while she's
7  preparing that, I've noticed something.  I just wanted
8  to help you here.  You're starting to talk over her
9  questions and that messes up the record so try to wait
10  for her to finish her questions.
11     THE WITNESS:  Okay.
12     MS. ISSA:  And I will try to do the same.
13     MR. MacNAUGHTON:  Are you -- you are.
14     MS. ISSA:  I'm sure I've been violating my
15  rule, too, so thank you, Robert.
16     (Exhibit 1 marked)
17  Q  (By Ms. Issa)  And I -- Ms. Pheigaru, I've
18  handed you what's been marked as Defendant's Exhibit
19  No. 1, and I'll represent to you that this is a copy of
20  the EEOC policy that you probably received during your
21  employment with -- with SEPCO.  Do you recall seeing
22  this?
23  A  I don't recall at this time.
24  Q  Okay.  And were you aware that you could access
25  policies and procedures during your employment with

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

**33**

1    A   -- or having the knowledge of that.
2    Q   Okay.  And so you never asked -- is it your
3    position today that you never asked for any sort of
4    accommodation during your employment with SEPCO?
5    A   That's my understanding, yes.
6    Q   Okay.  You -- I just want to make sure.  Is --
7    you never asked for any sort of accommodation during
8    your employment with SEPCO?
9    A   Can you rephrase as far as what I may have
10   asked?
11   Q   No, I just need to know.  You just said that
12   you were not aware that you could go ask for an
13   accommodation --
14   A   Right.
15   Q   -- correct?
16   A   Correct.
17   Q   Okay.  So if you weren't aware of that, I just
18   want to make sure I understand your testimony today.  Is
19   it your testimony that you never asked for an
20   accommodation at any point during your employment with
21   SEPCO?
22   A   Can you explain what kind of accommodation?
23   Q   No, I'm asking you.  You said you don't --
24   didn't know that you could ask for an accommodation,
25   right?  Do you understand --

**34**

1    A   Right.
2    Q   -- what an accommodation is?
3    A   Can you please explain?
4    Q   No, I'm not here -- I'm sorry, Ms. --
5    Ms. Pheigaru.  I'm not here to explain what an
6    accommodation is, but I'd like to know what is your
7    understanding of an accommodation?
8    A   My understanding of accommodation is needing
9    help in -- with, I guess, time off or -- I -- I guess
10   that's my understanding -- my understanding of it.
11   Q   And what do you mean by needing time off?
12   A   As far as maternity leave?
13   Q   Uh-huh.
14   A   Yes.
15   Q   Okay.
16   A   So I guess, yes, I did ask for that
17   accommodation of the time off.
18   Q   You did, right?
19   A   Yes, yes.
20   Q   So if you needed --
21   A   Okay.
22   Q   -- time off for your pregnancy, right --
23   A   Right.
24   Q   -- you knew you needed an accommodation, right?
25   You needed --

**35**

1    A   Okay.
2    Q   -- to take --
3    A   Yes.
4    Q   -- time off for your pregnancy.  So you knew
5    that if you needed some sort of accommodation that you
6    could ask for it, correct?
7    A   Yes.
8    Q   Yes.  Okay.  And you did get that, right?
9    SEPCO did accommodate you for taking maternity leave,
10   correct?
11   A   Yes.
12   Q   Okay.  So I just want to make sure I understand
13   your testimony.  So I just want to -- let's go back a
14   second.  So you did understand during your employment
15   with SEPCO that if you needed an accommodation at any
16   point that you could ask for it, correct?
17           MR. MacNAUGHTON:  Objection.  Form.
18   A   Yes.
19   Q   (By Ms. Issa)  Okay.  And other than the
20   example that you just now gave me -- and we will get to
21   this later, but I just want to make sure I kind of
22   understand it now.  So with regard to an accommodation
23   that you may have asked during your employment, the only
24   accommodation that you asked for was to take time off
25   for your leave; is that correct?

**36**

1    A   Yes, that's correct.
2    Q   Okay.  And we talked about that you became an
3    employee on June 4th, 2012, correct?
4    A   Yes.
5    Q   Okay.  And do you recall which position you
6    were hired for?
7    A   My mind has gone blank as to my job title.
8    Q   Does technical data management technician sound
9    right?
10   A   That sounds right now, yes.
11   Q   Okay.  And who hired you?
12   A   Hector Romero.
13   Q   Okay.  And do you recall which organization
14   that you worked in?
15   A   Well data management.
16   Q   Now, is that the team that you were on?
17   A   Yes.
18   Q   Okay.  So was the org -- and just please
19   clarify -- please correct me if I'm mistaken here.
20   Okay?  So my understanding is that the team that you
21   were on which is -- which was the well data management,
22   correct?
23   A   Yes, that's correct.
24   Q   Okay.  The department that you were in was the
25   data management group?

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

37

1    A   Yes.
2    Q   Okay.  And then the organization that you fit
3  under was the geophysics, geomatics and data management
4  organization?
5    A   Yes.
6    Q   Does that all sound right?
7    A   Yes, that's correct.
8    Q   Okay.  I just want to make sure that I'm
9  understanding it correctly and we're on the same page as
10  to where -- where you fit into the picture.
11        Did you always work as a data -- I'm
12  sorry -- as a technical data management technician?
13    A   Yes, when I was employed with Shell.
14    Q   Okay.  Can you please explain to me in general
15  what your duties were as a technical data management
16  technician?
17    A   From 2011 when I started --
18    Q   Okay.  So we're going to just focus on your
19  employment --
20    A   Employment.
21    Q   -- okay --
22    A   Okay.
23    Q   -- not when you were an independent contractor
24  because that -- you were not an employee at the time.
25  Okay?

38

1    A   Okay.
2    Q   Focus here is when you were an employee so
3  which starts at June 4th, 2012.  Is that okay?
4    A   Okay.
5    Q   All right.  So when you became an employee,
6  what were your job duties?
7    A   I was a data loader.
8    Q   And what does that mean?
9    A   I would get data from the wells that were spud
10  and drilled, and I would load it into different
11  repositories.
12    Q   And I'm sorry.  Different what?
13    A   Repositories.
14    Q   Okay.  And so is that the main thing you did
15  was data loading?
16    A   Until October 2014 when I started doing
17  surveillance work.
18    Q   Okay.  Can you tell me a little bit about what
19  the surveillance work entailed?
20    A   Surveillance, I would watch the wells that
21  Shell was a part of from spud to TD, and I would track
22  everything that Shell had any kind of interest in and
23  get it back to the vendors.
24    Q   Okay.  And I guess let's talk about the data
25  loading part.  Okay?

39

1    A   Okay.
2    Q   So would you agree with me -- and if you don't,
3  please let me know.  Would you agree with me that one of
4  the key things as part of your job was loading the data
5  in a timely manner?
6    A   Yes.
7    Q   Okay.  And so I think loading time was a key --
8  I think it was called a key performance indicator,
9  right, for your -- your team, and one of the key
10  performance indicators was the loading time of how
11  quickly individuals or employees loaded the data into
12  the repositories; is that correct?
13    A   Yes, that's correct.
14    Q   Okay.  And that basically entailed the number
15  of days that it took the employee to process the data;
16  is that right?
17    A   Yes.
18    Q   Okay.  And what was the goal, to achieve
19  shorter time frames?
20    A   The goal was to load the data within a ten-day
21  frame --
22    Q   Okay.
23    A   -- time frame.
24    Q   Got it.  And the ten-day time frame applied to
25  everyone, correct?

40

1    A   Yes.
2    Q   Not just you, but everybody?
3    A   Correct.
4    Q   Okay.  And what was the purpose of loading the
5  data in a ten -- ten-day time frame?
6    A   I believe it was to get back to the customers.
7    Q   And the users that would use --
8    A   The users --
9    Q   -- that data?
10    A   -- yes.
11    Q   Sorry.  We're interrupting each other.
12        Customers -- the purpose of the -- the
13  ten-day time frame was to have a short time period in
14  which the users or the customers could be able to
15  utilize that data, correct?
16    A   Yes.
17    Q   Okay.  And do you recall who your supervisors
18  were from June 4th, 2012, until your termination?
19    A   Hector Romero and then there was a transition
20  period in 2014 when Randy Petit became -- became my
21  supervisor.
22    Q   Okay.  And how do you pronounce his last name?
23    A   Petit.
24    Q   Petit.  Okay.
25    A   P-e-t-i-t.

EXHIBIT 2

Discovery Resource
713-223-3300

---

**41**

1  Q   And those were your two main supervisors,
2  correct?
3  A   Yes.
4  Q   Okay.  Do you know anyone by the name of David
5  Schewitz?
6  A   Schewitz, yes.
7  Q   Schewitz?  Sorry.  I mispronounced it there.
8  A   That's okay.
9  Q   Schewitz?
10  A   Yes.
11  Q   Okay.  Do you know him?
12  A   Not on a personal level.
13  Q   Do you know who he is?
14  A   I know of him, yes.
15  Q   Okay.  And who is he?
16  A   He was one of the managers.  I'm not quite sure
17  his exact title.
18  Q   Okay.  What about Karl Fleischmann?
19  A   Yes.
20  Q   Do you know who he is?
21  A   Yes.
22  Q   Who is he?
23  A   He was my supervisor's supervisor and the head
24  of well data management.
25  Q   Okay.  Did you get along with Hector?

---

**42**

1  A   Yes.
2  Q   Okay.  Did you have any problems with him?
3  A   No.
4  Q   Okay.  And did you feel comfortable -- if you
5  had any issues or anything like that, did you feel
6  comfortable going and talking to Hector about anything?
7  A   Yes.
8  Q   Okay.  And he hired you, correct?
9  A   Yes.
10  Q   Okay.  So he made that decision to bring you on
11  board because he thought you were -- that you were a
12  good performer at the time, correct?
13  A   Yes.
14  Q   Okay.  What about Randy, did you get along with
15  Randy?
16  A   Yes.
17  Q   Okay.  Any problems with Randy?
18  A   Not at all.
19  Q   Okay.  And did you feel comfortable -- if you
20  had any questions, problems, concerns, did you feel
21  comfortable that you could go to Randy and talk to him?
22  A   Randy lived in New Orleans --
23  Q   Uh-huh.
24  A   -- and so I never -- I didn't see him very
25  often.  He was in town maybe once a month.  So I

---

**43**

1  wasn't -- I didn't have a great relationship with him.
2  I had a good relationship with him.  I respected him and
3  got along with him very well, but I just -- I wasn't as
4  comfortable as I was with Hector because Hector was here
5  every day.
6  Q   Okay.  So mainly it was the distance --
7  A   Yes.
8  Q   -- between the two of you, correct?
9  A   Absolutely.
10  Q   Okay.  Nothing else, correct?
11  A   No, nothing else.
12  Q   Okay.  And I think he did meet with you, right,
13  if I'm not mistaken -- we'll get to it later -- but he
14  typically met with you at least once a month, correct,
15  in the beginning or he --
16  A   For the -- for the most part.
17  Q   Right.  Okay.  So would he traveled down here
18  once a month and meet with the people that were here in
19  Houston that reported to him?
20  A   For the most part.
21  Q   Okay.  And there was a point, right -- and
22  we'll talk about it later also -- but there was a point
23  where he would meet with you on a weekly basis and talk
24  to you and discuss things with you, correct?
25  A   Yes.

---

**44**

1  Q   Okay.  And he did meet with you, for example,
2  during -- when you were setting your goals, correct?
3  A   Yes.
4  Q   And when, for example, like a midyear review
5  happened, you would meet with Randy for that or Hector,
6  too, right?
7  A   Yes.
8  Q   And then also for end-year reviews, correct,
9  you would meet with them, sit down with them and discuss
10  things, correct?
11  A   Yes.
12  Q   Okay.  So there were other opportunities aside
13  from the monthly meetings where you did meet with them
14  and discuss your performance with them?
15  A   Yes.
16  Q   Okay.  Do you think Hector is an honest person?
17  A   Yes.
18  Q   Okay.  Do you think he would discriminate
19  against you for any reason?
20  A   I don't believe so.
21  Q   Okay.  What about Randy, do you think he's
22  honest?
23  A   Yes.
24  Q   Okay.  Do you think he would discriminate
25  against you for any reason?

---

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

45

1    A   I don't believe so.
2    Q   Okay.  What about David Schewitz, do you think
3  he's an honest person?
4    A   I don't know him.
5    Q   Okay.  And do you think he would discriminate
6  against you for any reason?
7    A   I don't know.
8    Q   I'm sorry?
9    A   I don't know.
10    Q   Okay.
11    A   I don't know him, so I can't --
12    Q   You can't --
13    A   -- make that assumption.
14    Q   One way or the other, right --
15    A   Right.
16    Q   -- you don't know?
17    A   Right.
18    Q   Okay.  What about Karl Fleischmann, do you --
19  do you think he's honest?
20    A   For the most part.
21    Q   Okay.  Is there any reason to disagree with
22  why -- his honesty?
23    A   I don't -- I don't think so, just I -- he
24  wasn't as personable --
25    Q   Okay.

46

1    A   -- as others.
2    Q   Okay.  Does personable equate to being honest
3  about something?
4    A   I guess not, no.
5    Q   Okay.  So do you think he would have any reason
6  to discriminate against you for any reason?
7    A   I don't know.
8    Q   You don't know one way or the other?
9    A   Not one way or the other, no.
10    Q   Okay.  Ms. Pheigaru, any time you need to take
11  a break, all right, please let me know.
12    A   Okay.
13        (Exhibit 2 marked)
14    Q   (By Ms. Issa)  Okay.  Ms. Pheigaru, I'm going
15  to hand you what's been marked as Defendant's Exhibit
16  No. 2.
17    A   Okay.
18    Q   Okay.  And I'll represent to you that -- that
19  these are documents related to your performance in 2012.
20  There is a goals and performance for 2012 you'll see on
21  the top.  Then on -- on -- what we'll do is we'll look
22  at the Bates label number at the bottom.  Okay?
23    A   Okay.
24    Q   So if you look at Pages 290, 291 and 292 and
25  293, those are all related to your goals and performance

47

1  appraisal for 2012.  Do you see that?
2    A   Yes.
3        MR. MacNAUGHTON:  Objection.  Form.
4    Q   (By Ms. Issa)  Do you see Page 298?
5    A   Yes.
6    Q   Okay.  That is a copy of your final appraisal
7  for 2012.  Do you see that on the top it says that?
8    A   Yes.
9    Q   Okay.  Do you recall seeing -- do you recognize
10  any of these -- and you may have seen them in a
11  different form.  Do you recall preparing like goal --
12  GPAs and seeing your final appraisal for 2012?
13    A   Yes.
14    Q   Okay.  And we'll go over each one, okay, so if
15  there's anything that you disagree with, let me know.
16  Okay?
17    A   Okay.
18    Q   Let's look at 2090 to 2090 -- I'm sorry -- 290
19  to 293.  Do you recall preparing your GPA for 2012?
20    A   Yes.
21    Q   Okay.  And what does GPA stand for?
22    A   Goals and performance assessment, I believe.
23    Q   Or appraisal?
24    A   Appraisal.
25    Q   Okay.

48

1    A   Okay.
2    Q   Can you describe to me a little bit about what
3  the GPA process is?
4    A   Each employee writes what their goals are for
5  the year as far as HSS&E, the business goals, and then
6  we would get supervisors' input as far as other things
7  maybe to work on or other goals to have for the year.
8    Q   Okay.  And so do you -- is this like a working
9  document throughout the year, or how does it work?  Do
10  you later go in there and say what you've accomplished
11  and what you've done per your goals?
12    A   Yes.  The -- the -- we do a midyear review to
13  see if you're on track --
14    Q   Uh-huh.
15    A   -- and then we would do an end-of-the-year
16  review to see that you accomplished all your goals.
17    Q   Got it.  Okay.  And then -- well, if you look
18  on Page 290, do you see that one of your business goals
19  that you've set in the -- it's around the middle of the
20  page under 2, "Business Goals," it says, "Ensure that
21  all wells assigned to me are properly archived and
22  attainable within ten business days"?  Do you see that?
23    A   Yes.
24    Q   And so that's one of the goals that you had
25  set, correct?

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

49

1   A  Yes.
2   Q  Okay.  And we talked about it earlier, right?
3  I mean, this is one of the more important job duties
4  that you have, it's one of the most essential parts of
5  your job is to make sure that the data that you load is
6  done within the time frame and in this case ten business
7  days, correct?
8   A  Yes.
9       MR. MacNAUGHTON:  Objection.  Form.
10   Q  (By Ms. Issa)  And then let's look at 298 at
11  the bottom, if you don't mind.  And this is the final --
12  I'll represent to you that this is the final appraisal
13  of your performance for 2012 that was prepared by Hector
14  Romero.  Do you recall seeing this at some point in --
15  during your employment?
16   A  Yes.
17   Q  Okay.  And did Hector meet with you to discuss
18  this final appraisal?
19   A  Yes.
20   Q  Okay.  And do you want to take a second to read
21  it?
22   A  Sure.
23   Q  Okay.
24   A  Okay.
25   Q  Okay.  Do you agree with me that this is a

50

1  fairly good final appraisal, correct?
2   A  Yes.
3   Q  Okay.  And do you disagree with anything in
4  this final appraisal?
5   A  No.
6   Q  Okay.  And do you recall what ranking you
7  received or performance ranking based on -- I'm sorry.
8  Do you recall what performance ranking you received for
9  2012?
10   A  A .9.
11   Q  And what did that equate with, a .9, do you
12  know?
13   A  Average.
14   Q  Average.  Okay.  And did you have any issue
15  with that performance ranking?
16   A  I don't believe so.  It was only based on
17  part -- six months of the year or from June to December.
18   Q  Okay.  So did you have --
19   A  So it wasn't a full year.
20   Q  Okay.
21   A  I'm sorry.
22   Q  Got it.  But other than being a full year, but
23  would you agree for the part year that you worked there
24  did you have any issue with the performance ranking that
25  you received?

51

1   A  No, I was pretty pleased with it.
2   Q  Okay.  Because it's average, correct?  I mean,
3  it's not below average?  It's -- it's -- it's an average
4  performance rating, right?  It's a good performance
5  rating?
6   A  I would say that it was good especially from
7  speaking with other employees on their first year.
8   Q  So it was a pretty -- I -- that's a good point.
9  I guess it was pretty consistent, right --
10   A  Yes.
11   Q  -- receiving a .9 given that you -- it was your
12  first performance evaluation with SEPCO?
13   A  Yes.
14   Q  Okay.  And other employees I think typically
15  receive a .9 their first year, correct?
16   A  Yes.
17   Q  Okay.  That -- that's what I wanted to make
18  sure.  Okay.  Thank you.  So any reason to dispute, you
19  know, his -- Hector's belief that, you know, you
20  deserved a .9, you know, he believed you deserved a .9?
21  Do you have any reason to dispute his belief that that's
22  what you should have gotten?
23   A  No.
24   Q  Okay.  And do you understand how the ranking
25  process works?

52

1   A  Not --
2   Q  I just want to get a yes or no.  We're going to
3  get to it --
4   A  Okay.
5   Q  -- in a sec.  We're going to get to it later
6  on.  But do you -- do you have an understanding --
7   A  Not completely.
8   Q  -- how -- I'm sorry?
9   A  Sorry.  Not completely.
10   Q  Okay.  But do you -- you do have some idea
11  that, you know, employees are ranked at the end of the
12  year relative to other employees and a number is given
13  based on, you know, an evaluation and performance
14  relative to other employees that they're compared with?
15  Do you understand that?
16   A  Yes.
17   Q  Okay.  And -- and we'll get into it a little
18  bit more, but I just wanted to make sure you at least
19  understand where that number is coming from.
20   A  Okay.  Yes.
21   Q  Okay.
22      (Exhibit 3 marked)
23   Q  (By Ms. Issa)  Okay.  Ms. Pheigaru, I'm going
24  to hand you what's been marked as Defendant's Exhibit
25  No. 3, and I'll represent to you that these are

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

14  (Pages 53 to 56)

**53**

1  documents related to your performance in 2013.  And,
2  here again, it's the same thing.  It's similar.  There's
3  one extra document here.  So if you'll notice on
4  Page 294 and 295 that is your GPA for 2013 that you
5  would have completed during your employment.  Do you see
6  that?
7      A   Yes.
8      Q   Do you agree that it's -- it's what I've
9  described it as?
10     A   Yes.
11     Q   Okay.  And then if you look at 299, this is
12 actually a final appraisal that was completed by Hector
13 Romero.  Do you recall seeing this during your
14 employment?
15     A   Yes.
16         MR. MacNAUGHTON:  Objection.  Form.
17     Q   (By Ms. Issa)  And then I will represent to you
18 that the last page, which is 301, do you see that?
19     A   Yes.
20     Q   Okay.  This is a 2013 individual performance
21 review feedback template that was completed by Hector
22 Romero, and you may not have seen this.  Do you recall
23 seeing something like this during your employment?
24         MR. MacNAUGHTON:  Objection.  Form.
25     A   I don't recall.

**54**

1      Q   (By Ms. Issa)  Okay.  All right.  So let's
2  start with the 2013 GPA, if you don't mind, which is on
3  Pages 294 to 295.  And do you agree -- I apologize if I
4  asked you this early.  Do you recall or do you agree
5  with me that this is a copy of your GPA for 2013?
6          MR. MacNAUGHTON:  Objection.  Form.
7      A   From what I can remember, this is what was
8  written, yes.
9      Q   (By Ms. Issa)  Okay.  And, again, would you
10 agree with me that one of the goals that you have set
11 here again is that ensuring that all of the wells that
12 are assigned to you are properly archived and attainable
13 within ten business days?  Do you see that?
14     A   Yes.
15     Q   Okay.  And that's one of the goals that you
16 would have put, correct?
17     A   Yes.
18     Q   Okay.  I'd like to look at 299.  And is this
19 Hector's final appraisal of your performance for 2013,
20 correct?  Does that sound familiar?  Does it look
21 familiar?
22     A   It looks familiar.
23     Q   Okay.  And does -- would he have -- you -- you
24 had ability to go look at it, right?  If a supervisor
25 did your final appraisal, you had access to it and not

**55**

1  only had access to it, but he would also discuss it with
2  you in person, correct?
3      A   Yes.
4      Q   Okay.  And can we go -- I'd like to go over it
5  a little bit, if that's okay with you.  Let's focus
6  on -- I'm going to read different things to you.  Okay?
7      A   Okay.
8      Q   And if there's something you disagree with,
9  Ms. Pheigaru, please let me know.  Okay?
10     A   Okay.
11     Q   So Hector here says that you achieved your
12 goals in 2013 as expected.  "She has been working very
13 diligently on managing her work load and keeping her
14 performance metrics" -- I'm going to -- I'm sorry.  I'm
15 going to kind of go here and there.  Okay?
16     A   Okay.
17     Q   Says in there that "She has been working very
18 diligently on managing her work load and keeping her
19 performance metrics within target.  There were some
20 challenges around dealing with multiple, staged delivery
21 of the same data types and how it affected her metrics,
22 but after the mid-year review the situation was
23 resolved.  During the performance conversations in the
24 summer, she requested to be included in a project beyond
25 her normal duties as a data technician.  We selected her

**56**

1  to support the process of documenting Log and Curve Data
2  Quality Business Rules to be used by RAVEN, an
3  application" specifically "designed to measure and
4  report quality on well content.  After some initial
5  struggles, she is in the path to deliver what is
6  expected by year end."  Do you see that?
7      A   Yes.
8      Q   Okay.  Do you disagree with anything he's
9  written here?
10     A   I'm unsure about the initial struggles.
11     A   Which one?
12     A   It says "after some initial struggles."  I'm
13 unsure as --
14     Q   Uh-huh.
15     A   -- at this time --
16     Q   Okay.
17     A   -- of what those would have been.
18     Q   Okay.  So you're not aware of what the initial
19 struggles were?
20     A   Correct.
21     Q   Okay.  So other than that is -- do you disagree
22 with anything else?
23     A   No.
24     Q   Okay.  But do you agree that it says here that
25 she is in the path to deliver what is expected?

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

57

1    A   Yes.
2    Q   Okay.  So "While Shelly is authentic and
3  exhibits strong values and belief" -- "and beliefs,
4  there are some opportunities to develop when it comes to
5  express her own views and opinions with consideration to
6  others.  She has a strong personality that could be
7  perceived as confrontational by teammates less vocal.  I
8  would like to see her stretching a little beyond her
9  role with more curiosity about what is done externally
10 in terms of innovation in our side of the business.
11 Also, I would like to see her embracing and dealing with
12 change more effectively, especially when we were dealing
13 with a lot of data that doesn't comply with delivery
14 standards for wells non-operated by Shell."  Do you see
15 that?
16         MR. MacNAUGHTON:  Objection.  Form.
17   A   Yes, I see that.
18   Q   (By Ms. Issa) Okay.  And -- and the document
19 will speak for itself if I misstated something --
20         MR. MacNAUGHTON:  Yes.
21   Q   (By Ms. Issa)  -- okay?
22         Is there anything on this document, not
23 what I said, but anything on this document that you
24 disagree with in this paragraph?
25   A   No.

58

1    Q   Okay.  And the same thing, she's, you know,
2  "fully committed to H" -- "HSSE and has joined the
3  safety team.  She participated in the Value Stream Map
4  Event and has collaborated in disseminating LEAN
5  concepts in the corporate data archival section."  Do
6  you disagree with anything here?
7    A   No.
8    Q   Okay.  So other than the comment that he made
9  after some initial struggles, there is nothing else that
10 you disagreed with, correct?
11   A   Yeah.
12   Q   Okay.  And he talked about this with you,
13 right?  Did he discuss some of the struggles and issues
14 that he had at the time?  I know it's been a long time,
15 but would you agree with me that he would have at the
16 time when he presented this to you talked to you about
17 some of the struggles that you may have had?
18         MR. MacNAUGHTON:  Objection.  Form.
19   A   I believe he would have talked to me about
20 these.
21   Q   (By Ms. Issa) Okay.  And y'all would have
22 probably discussed at the time, correct?
23   A   Probably.
24   Q   Okay.  And he would have explained to you what
25 he meant by struggles, correct?

59

1    A   Yes.
2    Q   Okay.  And let's look at the last page which is
3  301, and this is a individual review performance -- I
4  mean, I'm sorry -- "Individual Performance Review
5  Feedback" that was done by Hector at the time when the
6  managers and HR were getting together to determine what
7  your ranking was.  So this is -- I'll represent to you
8  that this is a form that's completed in preparation for
9  the ranking process.  Okay?  If you'll notice -- and
10 I'll take -- let you take a second, but if you notice
11 your final appraisal and if you notice the comments that
12 are put in this last page so if you look at 299 and then
13 if you look at 301, you'll notice that the comments are
14 the same, the -- exactly the same.
15         MR. MacNAUGHTON:  Objection.  Form.
16   Q   (By Ms. Issa) In terms of the comments that
17 are put in there.  So if you see the first paragraph in
18 299, you'll see it on Page 301.  If you look at the
19 comments, you know, in the second paragraph on Page 299,
20 you will also see them on Page 301, and then if you look
21 at the last paragraph, you'll also see those comments on
22 Page 301.
23   A   Yes.
24   Q   I just want to make sure you're understanding
25 that.  Do you see that?

60

1    A   Yes.
2    Q   And if you disagree with that, please let me
3  know, Ms. -- Ms. Pheigaru.
4    A   Yes.
5    Q   Okay.  Do you think there's anything different?
6    A   I think it looks the same.
7    Q   Okay.  Of course, you know the documents will
8  speak for themselves, so if there's any -- if there's a
9  typo, if there's any difference, you know, but for the
10 most part you agree that the -- the documents are very
11 similar, that whatever was in your final appraisal that
12 was used and conveyed to you was then used and
13 conveyed -- was then used in order to determine your
14 performance ranking?
15         MR. MacNAUGHTON:  Objection.  Form.
16   A   Can you rephrase?
17   Q   (By Ms. Issa) Sure.  The point being,
18 Ms. Pheigaru, that whatever was relayed to you in your
19 final appraisal by Hector was used then in his
20 individual performance review feedback in order to
21 determine what your ranking was?
22   A   As far as I know, that's how we were ranked --
23   Q   That's fair.
24   A   -- based on the --
25   Q   Based on the documents that you're seeing,

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

16 (Pages 61 to 64)

---

**61**

1  correct?
2  A   Yes.
3  Q   Okay.  And do you recall what ranking you
4  received in 2013?
5  A   I believe it was a .8.
6  Q   Okay.  Do you have any issue with that ranking?
7  A   I did not agree with it at the time and spoke
8  to him about that.
9  Q   And what did you tell him?
10  A   From what I can recall --
11  Q   Uh-huh.
12  A   -- based on the feedback that he gave, I was
13  unclear as to why it had gone down from the previous
14  year just based on what he had written.  I did not see
15  any huge red flags to me that would -- that would
16  indicate that I would have a lesser GPA.
17  Q   Okay.  And did he explain to you why you
18  received that ranking?
19  A   I don't recall --
20  Q   Okay.
21  A   -- right now.
22  Q   Did he -- sorry.
23  A   I don't recall right now.
24  Q   Okay.  So when you had that conversation it's
25  possible that he explained to you why you -- why you

---

**62**

1  were given that particular ranking, correct?
2  A   It is possible.
3  Q   Okay.  And did he by any chance -- and I know
4  we talked about it and we'll talk about it a little
5  later, too, but we agreed or you agreed that you
6  understood that your ranking is determined based on your
7  relative -- your ranking is based relatively and it's
8  compared -- you are compared to other peers who are
9  ranked in the same group that you're compared with.  Do
10  you recall that?
11  A   I do -- I do recall knowing that.
12  Q   Uh-huh.
13  A   I don't necessarily agree with the peer
14  statement because I did not have any peers that did the
15  exact same job that I did.
16  Q   Right.  Okay.
17  A   So I believe it was -- it should have been
18  measured differently.
19  Q   Okay.  So you believe that it should be rank --
20  that you should be compared -- I just want to make sure
21  I understand your testimony correct.  So you believe
22  that you should be compared to individuals that are
23  doing the exact same what as you?
24  A   Same role.
25  Q   Same role as you?

---

**63**

1  A   Yes.
2  Q   Okay.  And so same role in terms of in the
3  organization, correct?
4  A   Yes.
5  Q   Okay.  And if you are compared to individuals
6  that are in the same role or -- I guess let me take that
7  back.  Did you understand that you were compared to
8  individuals that would have been the same sal -- salary
9  grade as you?
10  A   Yes.
11  Q   Okay.
12  A   Salary grade, yes.
13  Q   Is that -- okay.  I just want to make sure I
14  understand that.
15  A   Yes.
16  Q   So you do agree with that, right --
17  A   Yes.
18  Q   -- that you should be compared to individuals
19  that are in the same salary grade as you?
20  MR. MacNAUGHTON: Objection.  Form.
21  A   Can you restate that?  I'm sorry.
22  Q   (By Ms. Issa)  Sure.  Let me rephrase it.
23  Would you agree with me that you -- I
24  guess would you agree that it is -- that you should be
25  compared to individuals that are in the same salary

---

**64**

1  grade as you?
2  MR. MacNAUGHTON: Objection.  Form.
3  A   I don't personally agree that that's how I
4  should have been ranked.
5  Q   (By Ms. Issa)  But do you understand that
6  that's how -- I guess let's -- let's rephrase that.  So
7  do you understand that Shell ranked you relative to
8  other peers that were in the same salary grade as you?
9  A   Yes.
10  Q   Okay.  And do you disagree with the way Shell
11  ranks employees?
12  A   I do, yes.
13  Q   Okay.  And how do you think they should be
14  ranked?
15  A   I believe that it should be based on job
16  descriptions and related that way --
17  Q   Okay.
18  A   -- as far as your peers.
19  Q   Okay.  And if the job description is correlated
20  with the salary grade, is that fine?
21  MR. MacNAUGHTON: Objection.  Form.
22  A   I'm not sure to say that it's fine or it's not.
23  Q   (By Ms. Issa)  Okay.  But if -- but if -- if
24  the -- if the salary grade corresponds with the person's
25  job that would be the same thing, right?  That would be

---

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

65

1  fine?
2         MR. MacNAUGHTON: Objection. Form.
3    A   I don't -- can you -- can you rephrase that
4  again?
5    Q   (By Ms. Issa) Okay. Actually, you know what,
6  let's -- let's get back to that in a second. All right?
7  We'll talk about the performance ranking in more detail.
8    A   Okay.
9    Q   All right. So you said that you had an issue
10  with the performance ranking of .8, right?
11   A   Yes.
12   Q   Okay. What do you think it should have been?
13   A   At least a .9.
14   Q   Okay. And you received the -- you were not
15  pregnant in 2013, correct?
16   A   Yes, I was.
17   Q   In 2013?
18   A   Yes.
19   Q   When were you pregnant?
20   A   I was pregnant --
21   Q   I guess you were. I'm sorry.
22   A   -- July.
23   Q   I apologize.
24        I'm sorry?
25   A   July.

66

1    Q   July. Okay. Do you have any reason to
2  dispute, you know, Hector's belief that you ranked .8
3  when compared to others with whom you were compared? I
4  mean, he believed, right, that you deserved a .8? Do
5  you have any reason to dispute his belief?
6    A   That's his own opinion, so I'm not sure.
7    Q   Okay. And when did you first inform anyone at
8  Shell that you were pregnant?
9    A   I believe it was October of 2013.
10   Q   And who did you tell?
11   A   Hector.
12   Q   Okay.
13        (Exhibit 4 marked)
14   Q   (By Ms. Issa) Ms. Pheigaru, I'm going to hand
15  you what's been marked as Defendant's Exhibit No. 4, and
16  I'll represent to you that these are records that we
17  received from your attorney that were subpoenaed from
18  Reed Group which is the third-party administrator for
19  Shell's leave.
20   A   Yes.
21   Q   Did you -- have you seen these documents
22  before?
23   A   Yes, I have.
24   Q   Okay. And these are --
25        MR. MacNAUGHTON: Did you --

67

1         MS. ISSA: I'm sorry?
2         MR. MacNAUGHTON: For a second. Clarify
3  it for the record. There was more than just the Reed
4  Group medical records delivered to you. Do you know
5  this is just the Reed Group you --
6         MS. ISSA: Yes, I know it's just the Reed
7  Group.
8         MR. MacNAUGHTON: Okay. Sorry.
9         MS. ISSA: Yeah. Yeah, I know this is
10  just the Reed Group.
11        MR. MacNAUGHTON: Okay.
12        MS. ISSA: Okay.
13   Q   (By Ms. Issa) And -- and these are related to
14  your FMLA leave, correct?
15   A   Yes.
16   Q   And do you agree that that's your signature on
17  Page 450?
18   A   Yes.
19   Q   And you signed it on January 23rd, 2014,
20  correct?
21   A   Yes.
22   Q   Okay. And did you complete the -- on the first
23  page you'll see on 449, did you complete the employee
24  section?
25   A   Yes.

68

1    Q   Okay. And you had requested leave from I
2  believe -- okay. So the Section B was completed by your
3  healthcare provider, correct?
4    A   I'm sorry. Say that again.
5    Q   Section B --
6    A   Section B, yes.
7    Q   -- on Page 449 was completed by your healthcare
8  provider?
9    A   Yes.
10   Q   And who was that at the time?
11   A   Dr. Todd Holt.
12   Q   Okay. And then your healthcare provider I
13  think filled out 451, 452 and 453?
14   A   Yes.
15   Q   Does that look right?
16   A   Yes.
17   Q   Okay.
18        MS. ISSA: And I guess let me clarify,
19  Robert, something you mentioned. So are there other
20  records related to Reed Group?
21        MR. MacNAUGHTON: There were other medical
22  records that she had that we made sure we produced.
23        MS. ISSA: Right, but I'm just talking
24  about Reed Group --
25        MR. MacNAUGHTON: No.

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

69

```
1        MS. ISSA: -- what --
2        MR. MacNAUGHTON:  We -- we delivered --
3        MS. ISSA:  Okay.
4        MR. MacNAUGHTON:  -- all of --
5        MS. ISSA:  That's --
6        MR. MacNAUGHTON:  Whatever Reed gave us we
7    gave it to you.
8        MS. ISSA:  Okay.  Perfect.  That what --
9    I'm just concerned right now about what was provided to
10   Reed Group.  So this is -- this is Reed Group's complete
11   record?
12       MR. MacNAUGHTON:  Correct.
13       MS. ISSA:  Okay.
14       MR. MacNAUGHTON:  Every -- whatever they
15   gave us.
16       MS. ISSA:  Perfect.
17       MR. MacNAUGHTON:  I don't know whether
18   they have a bigger record or not, but they gave us --
19   whatever they gave us you got.
20       MS. ISSA:  Okay.  Perfect.  That's what I
21   wanted to make sure.
22       Q   (By Ms. Issa)  Okay.  And if you'll see on
23   Page 453 at the bottom, do you see that?
24       A   Yes.
25       Q   Okay.  And you requested or your -- your
```

70

```
1    healthcare provider requested for you your beginning
2    leave beginning March -- I'm sorry -- March 8th, 2014,
3    and ending on April 18th, 2014; is that correct?
4        A   Yes.
5        Q   Okay.  And that's what was initially requested,
6    correct?
7        A   Initially, yes.
8        Q   Okay.  And when did you actually begin your
9    leave?  Do you recall?
10       A   I had the baby on March 3rd which was a Monday,
11   and I -- my last day of work was the Friday before so...
12       Q   February 28th, correct?
13       A   February 28th, yes.
14       Q   Okay.  So it's my understanding is that you
15   began your leave on March 3rd, 2014.  Does that sound
16   right?
17       A   Yes, that was the first day of my leave.
18       Q   Okay.  And then you ended up extending your
19   leave, correct?
20       A   Yes, I took vacation.
21       Q   Okay.  And you took leave until when, April 27,
22   2014?  I mean, I'm trying to figure out you keep -- you
23   kept extending it, correct?
24       A   No, I had eight weeks because I had a
25   C-section --
```

71

```
1        Q   Uh-huh.
2        A   -- and then I took three weeks vacation.
3        Q   Okay.
4        A   And I spoke to Hector about that.
5        Q   I'm sorry.  So what did you take -- what did
6    you take initially?  How many weeks for the delivery?
7        A   Eight weeks --
8        Q   Eight weeks.
9        A   -- for the C-section.
10       Q   Uh-huh.
11       A   And then I took an additional three weeks
12   vacation.
13       Q   Okay.  And when did you actually return back?
14       A   I don't know an exact date.  I know it was 11
15   weeks.
16       Q   Okay.
17       A   My baby was 11 weeks.
18       Q   Does May -- May 19th, 2014, sound familiar?
19       A   That sounds about right.
20       Q   Okay.  And the -- and the reason you requested
21   leave was for, what, your pregnancy, correct?
22       A   For extra, yes.
23       Q   Okay.  And do you see on Page 451 it says under
24   "Part A - Medical Facts" it says "Pregnancy:  Are there"
25   any "complications," it says no, correct?
```

72

```
1        A   Correct.
2        Q   Okay.
3        A   At the time of this document, yes.
4        Q   Right, at the time that it was created on
5    January 23rd, I think, right, 2014, there was no
6    complications?
7        A   Correct --
8        Q   Okay.
9        A   -- at that time.
10       Q   Okay.  And based on these documents that
11   were -- that -- that are Reed Group's records, is there
12   anything in here that indicates that there was any sort
13   of issue with your pregnancy, any sort of complication
14   with your pregnancy?
15       A   None in this document.
16       Q   None of these documents, correct?
17       A   Not in this document --
18       Q   Okay.
19       A   -- correct.
20       Q   And did SEPCO grant your request for leave?
21       A   Yes.
22       Q   Okay.  There was no issues with requesting any
23   sort of leave, correct?
24       A   No.
25       Q   There was no issues with taking the leave,
```

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

73

1  correct?
2  A  No.
3  Q  Okay.  And no one made any sort of negative
4  comments about you taking leave or requesting leave?
5  A  No.
6  Q  Okay.  And no one took any sort of action
7  against you for taking -- for requesting leave or taking
8  leave, correct?
9  A  Not that I'm aware of.
10  Q  Okay.  I apologize if I already asked you this,
11  but your leave dates -- and I just want to make sure I
12  pin that down -- is from March 3rd, 2014, to March -- to
13  May 19th, 2014?
14  A  That sounds right.
15  Q  Okay.
16     (Exhibit 5 marked)
17  Q  (By Ms. Issa)  Ms. Pheigaru, I'm going to hand
18  you what's been marked as Defendant's Exhibit No. 5 and
19  I'll represent to you that these are e-mails regarding
20  your pregnancy and your return to work during your
21  employment with SEPCO and we're going to go over these.
22  You may recognize some of these e-mails.  They were
23  between you and various employees.  Okay?
24  A  Okay.
25  Q  And do you recognize these documents as what

74

1  I've described them as?
2  A  Yes.
3  Q  Okay.  Let's look at 130, Page 130 at the
4  bottom, the first one.
5  A  130.  Okay.
6  Q  Uh-huh.  Do you recall sending this e-mail?
7  A  Not right now I don't.
8  Q  Okay.  But it is from your e-mail address?  Do
9  you --
10  A  Yes.
11  Q  -- agree with that?
12     And you sent it -- sorry.  We're
13  interrupting each other.  It's an e-mail that you sent
14  to various individuals on February 28th, 2014, correct?
15  A  Yes.
16  Q  Okay.  And you're basically thanking them for
17  all their support and kind words and prayers, right, for
18  the past few months and they threw you a baby shower and
19  they got you a gift card and that you were able to buy,
20  you know, various things for your -- your baby and that
21  you really appreciated all that they have all done for
22  you; is that correct?
23  A  Yes.
24  Q  I may have paraphrased it here, but is that the
25  gist of the e-mail?

75

1  A  That's the gist, yes.
2  Q  Okay.  And you thanked all of these
3  individuals, right, Hector as well as all the others for
4  all their support during your pregnancy?
5  A  Yes.
6  Q  Okay.  And so were they supportive during your
7  pregnancy?
8  A  I would say for the most part, yes.
9  Q  Yes.  In what sense were they -- were they
10  supportive?
11  A  Asking questions.
12  Q  I'm sorry?
13  A  Asking questions about how I was feeling and
14  whatnot.
15  Q  Okay.  Like what type of questions?
16  A  Just how are you feeling, any updates on the
17  baby --
18  Q  Okay.
19  A  -- that kind of thing.
20  Q  So they were concerned, you know, or not
21  concerned, but I guess they wanted to make sure that you
22  were okay, that, you know, there was -- that they were
23  basically, you know, supporting you, they were fine with
24  your pregnancy?  No one made any sort of negative
25  comments about your pregnancy?

76

1  A  I wouldn't think so, no.
2  Q  No one, right?
3  A  Not that I can recall.
4  Q  Okay.  And did anyone take any sort of negative
5  action or anything like that about your pregnancy?
6     MR. MacNAUGHTON:  Objection.  Form.
7  A  I'm not sure.  I don't believe so.
8  Q  (By Ms. Issa)  Okay.  No, I just want to make
9  sure because the e-mail that you've sent it seems like
10  that everyone was just very supportive about your
11  pregnancy, you know, making -- you know, sending you
12  a -- you know, throwing you a shower, getting you a gift
13  card, and you also appreciated that, correct?
14  A  Yes, I did.
15  Q  Okay.  Okay.  Let's look at 137.  And I guess
16  this is where I just wanted to clarify when your return
17  date was.  So this was an e-mail that you sent to
18  Stephen and Hector on April 23rd, 2014.  Do you see
19  that?
20  A  Yes.
21  Q  Okay.  And you -- you were supposed to be --
22  were you supposed to be back on May 12th at some point,
23  and then you decided to take some additional time off?
24  A  Yes.
25  Q  Okay.  So your return date was actually going

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

20  (Pages 77 to 80)

77

1   to be -- supposed to be May 12th?
2   A   Yes.
3   Q   Okay.
4   A   My initial return date was supposed to be
5   May 12, yes.
6   Q   Okay.  And you didn't return on May 12,
7   correct?
8   A   No.
9   Q   Okay.  And then if you look at the next one on
10  Page 139 --
11  A   Yes.
12  Q   -- you didn't return, and you also said then
13  you were going to return back on May 19, correct?
14  A   Yes.
15  Q   Okay.  And did -- did SEPCO have any issues
16  with you taking some additional time?
17  A   Not that I was aware of.
18  Q   Okay.  And no one made any sort of comments or
19  anything to you about requesting or taking some
20  additional time off, correct?
21  A   I can't recall.
22  Q   Okay.  And let's look at Page 140.  Did you
23  know that -- and I think you said that you had requested
24  vacation, correct?
25  A   Yes.

78

1   Q   Okay.  And do you see in this e-mail that was
2   sent to Hector saying that you had requested, you know,
3   vacation but according to the "personal leave policy, a
4   manager can grant an employee up to 5 days of personal
5   leave with pay."  Do you see that?
6   A   Yes, I see that.
7   Q   Is that what was -- happened instead, that you
8   got five days of personal leave with pay instead of
9   using your vacation?
10  A   I don't recall.
11  Q   But it's possible, correct?
12  A   It is possible.
13  Q   Okay.  And that would have been somebody who is
14  taking actions, right, to not really discriminate
15  against you, to make sure that, you know, you -- that
16  he's doing everything he possibly can to be supportive,
17  correct?
18     MR. MacNAUGHTON:  Objection.  Form.
19  A   I guess possibly, yes.
20  Q   (By Ms. Issa)  Okay.
21     (Exhibit 6 marked)
22  Q   (By Ms. Issa)  Okay.  Ms. Pheigaru, I've handed
23  you what's been marked as Defendant's Exhibit No. 6, and
24  I'll represent to you that these are e-mails between --
25  I'm sorry.  This is -- the top you'll see it's an e-mail

79

1   between Hector to Karl that was dated October 22nd,
2   2014.  Do you see that?
3   A   Yes.
4   Q   Okay.  And what I'd like to do is discuss this
5   e-mail a little bit with you.  Okay.  And do you see
6   your name there, Shelly, with a colon, and there's some
7   comments below that?  Do you see that?
8   A   Yes, I see that.
9   Q   Okay.  And do you agree that he has noted here
10  that your performance has been decreasing?  Do you see
11  that?
12  A   Yes.
13  Q   Okay.  And based on what Hector is saying here
14  is that they were suggesting a formal performance
15  discussion with you but did not at this time want to
16  place you on a PIP.  Does that seem right based on what
17  you're reading?
18  A   Based on what I'm reading, yes.
19  Q   Okay.  And it says in here that "It has been
20  discussed in front of the charts during her mid-year
21  review, but no further documentation."  Do you see that?
22  Do you see the sentence that says that?  I'm just
23  reading at the top under "Shelly."
24  A   Yes.
25  Q   Okay.  So do you recall -- so -- so basically

80

1   Hector is talking about your performance decreasing, and
2   he is saying that, you know, he's discussed this with
3   you during a midyear review.  Do you see that?
4   A   Yes, I see that.
5   Q   Okay.  Do you recall him discussing your
6   performance during a midyear review?
7   A   I know that we had a midyear review.
8   Q   Uh-huh.
9   A   I don't recall either way.
10  Q   Okay.  Is it possible that he talked to you
11  about your performance declining during a midyear
12  review?
13  A   Yes, it's possible.
14  Q   Okay.  And does -- when he discusses your
15  performance with you, does he typically show you like
16  charts and things to show you what your loading time is
17  and how you're progressing?  Does he show you that?
18  A   Certain times I did see that.
19  Q   Uh-huh.
20  A   Not every time.
21  Q   Okay.  But there are certain times where the
22  charts have been shown to you which shows like
23  specifically the loading times and -- and the fact that
24  you are not meeting it within the ten-day requirement,
25  right?

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

---

81

1    A  I know that in 2014 at one point I did ask to
2  see those charts, and they were never given to me.
3    Q  Okay. But I thought you said earlier your
4  testimony — so I just want to make sure I understand
5  your testimony correctly.  You earlier said that there
6  were some times where you were shown those charts,
7  correct?
8    A  Yes, there were — there — I would assume that
9  there — well, sorry.  I'm just trying to replay
10  everything.
11    Q  Uh-huh, sure.  My question to you is, you know,
12  when you had, for example, midyear reviews and you had
13  final reviews, okay —
14    A  Uh-huh.
15    Q  — and this e-mail we're talking about
16  specifically a midyear review, but during various times
17  during your employment were you shown charts that
18  showed, you know, loading times and the fact that you
19  were not timely in — in loading the data?
20        MR. MacNAUGHTON: Objection. Form.
21    A  I don't —
22    Q  (By Ms. Issa)  And not necessarily, Ms. —
23  Ms. Pheigaru, every single time, but is — were there at
24  least one time or so during your employment where
25  your — where the charts were shown to you?

---

82

1    A  I'm not sure at this time —
2    Q  Okay.
3    A  — but I'm —
4    Q  But it's possible?
5    A  It is possible, yes.
6    Q  Okay.  Do you agree with me at least that, you
7  know, Hector believes that your performance is
8  decreasing?
9        MR. MacNAUGHTON: Objection. Form.
10    Q  (By Ms. Issa)  Based on this e-mail.
11    A  Based on this e-mail, yes.
12    Q  Okay.  And do you agree with that or no?
13    A  No, I disagree.
14    Q  Okay.  So you think your performance was just
15  fine?
16    A  I believe as of this date and — and for how
17  long I took for maternity leave I don't believe that
18  they can properly say that my performance was decreasing
19  in that year.
20    Q  Okay.  And we'll get to your time of your
21  maternity leave because I think the — the crux of this
22  case — and I — and correct me if I'm mistaken, but the
23  crux of your case is that you feel that you were
24  penalized during the time that you were out on maternity
25  leave, correct?

---

83

1        MR. MacNAUGHTON: Objection. Form.
2    A  Can you rephrase that?
3    Q  (By Ms. Issa)  Yeah, I will.
4    A  I'm sorry.
5    Q  And penalized I mean that you believe — and
6  please, Ms. Pheigaru, correct me if I'm mistaken because
7  I need to understand what your allegations are.  My
8  understanding is that you believe that during the time
9  that you were on maternity leave that wells, okay, for
10  example, that were assigned to you continued — the load
11  times just continued to kind of accumulate and
12  accumulate and accumulate and you were penalized because
13  you were out on leave and the work was not getting done;
14  is that correct?
15    A  There was numerous times that that was the
16  case, yes.
17    Q  Okay.  During your maternity leave, correct?
18    A  During my maternity leave, yes.
19    Q  Okay.  That's what I want to make sure is that
20  I understand that your — your com — the crux of your
21  complaint is that during that time that you were on
22  leave that whatever, you know, untimeliness of those
23  data loads were — you were penalized for that?
24        MR. MacNAUGHTON: Objection. Form.
25    A  For certain wells, yes.

---

84

1    Q  (By Ms. Issa)  Okay.  And if I'm not phrasing
2  that correctly, Ms. — Ms. Pheigaru, please let me know.
3  Okay?
4    A  I — I would say that during my maternity leave
5  there were a few wells that were still assigned to me
6  that kept the counter going.
7    Q  Counter going.  And — and — and you were
8  personalized if it wasn't done within ten days, right?
9  It wasn't done within the ten days that you were
10  supposed to get it done, correct?
11    A  Right, if I was out for longer than that,
12  yes —
13    Q  Okay.  All right.
14    A  — it would be —
15    Q  And you were out — exactly.  Sorry.
16    A  Yes.
17    Q  We're interrupting each other.  I just want to
18  make sure I'm understanding it.  Okay?
19        Okay.  And if you notice at the bottom he
20  says that "I firmly believe that all these behaviors are
21  coachable." Do you see that?
22    A  I see that, yes.
23    Q  Okay.  So at this time, you know, they decided
24  that they were not going to put you on — based on what
25  this e-mail is saying they decided that they were not

---

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

85

1  going to put you on a PIP.  They felt like your
2  performance deficiencies were coachable, and they were
3  going to try to work with you.  Do you see that?
4     A  I see that —
5     Q  Okay.
6     A  — in the e-mail, yes.
7     Q  Okay.  Let's look at Page 160.  Okay.  Do
8  you — do you see the date of that e-mail was October,
9  correct, October 22nd, 2014?
10    A  Yes.
11    Q  Okay.  So it looks like what — I'll represent
12  to you what Hector has done is that he's done a snapshot
13  of the wells.  Do you see Page 160?
14    A  Yes, I do.
15    Q  Okay.  He sent a snapshot of the wells from
16  January until October and how — and the loading times
17  for those.  Have you seen one of these charts before?
18    A  No, I have not.
19    Q  You've never seen a chart like this that has
20  the loading times on it and shows how long it's taken to
21  load data?
22    A  Are you talking about this top?
23    Q  Yes.  Yeah, I'm sorry.  The — I'm sorry, yeah,
24  the top part.  Do you see where it says — it has like
25  "Row Labels," and then it has sum January, sum of

86

1  February, sum of March?  Do you -- have you seen a chart
2  like this before?
3     A  I have not, no.
4     Q  Okay.
5     A  Not that I can recall.
6     Q  Okay.  So I'll explain it a little bit to you
7  on this chart.  It basically shows different -- it
8  shows -- he's just captured the wells for Shell.  Do you
9  see where the source says "Shell" on the top?
10    A  Yes.
11    Q  So these are Shell wells that were assigned,
12  and what he's done is done a little snapshot.  Okay?
13  Now, do you see that in sum of January -- do you see
14  that row or that column?
15    A  Yes.
16    Q  Okay.  Do you see that there's load times in
17  there and there's -- the first one starts at 11 and the
18  last one ends at 29?
19    A  Yes, I see that.
20    Q  Okay.  And so those are the load times for
21  various data that was received.  Okay?  That's what I'm
22  representing to you.  Okay?  So do you see in January --
23  were you out on leave in January?
24    A  No, I was not.
25    Q  No.  And do you see that there are some -- some

87

1  of this data in here is over ten days?
2     A  Yes, I see that.
3     Q  Okay.  And so that would be more than the time
4  allotted of when you had to enter the data in, correct?
5        MR. MacNAUGHTON:  Objection.  Form.
6     A  That is over the time.
7     Q  (By Ms. Issa)  Correct?
8     A  Yes.
9        MR. MacNAUGHTON:  Objection.  Form.
10    Q  (By Ms. Issa)  Okay.  Okay.  Do you see in
11  February they're all under 10?
12    A  Yes.
13    Q  Okay.  Do you see any data in March?
14    A  No.
15    Q  Okay.  Were you out on leave in March?
16        MR. MacNAUGHTON:  Objection.  Form.
17    A  Yes, I was.
18    Q  (By Ms. Issa)  Okay.  Do you see any data in
19  April?
20    A  No.
21    Q  Okay.  Were you out on leave in April?
22        MR. MacNAUGHTON:  Objection.  Form.
23    A  No.
24    Q  (By Ms. Issa)  I'm sorry?
25    A  I'm sorry.  Yes, I was out on leave.

88

1     Q  You were out on leave, correct.  Yeah.
2        MR. MacNAUGHTON:  Objection.  Form.
3     Q  (By Ms. Issa)  And what about in May, do you
4  see that there's data in there that is over ten days?
5     A  Yes, I see that.
6     Q  Okay.  And you returned, right, at some point
7  in May from your leave, correct?
8        MR. MacNAUGHTON:  Objection.  Form.
9     A  Yes, I returned in May.
10    Q  (By Ms. Issa)  Okay.  And do you see after that
11  in June, July, August, September and October those are
12  the rest of those months, and you were not on leave,
13  correct, during those months?
14        MR. MacNAUGHTON:  Objection.  Form.
15    A  I was not on leave.
16    Q  (By Ms. Issa)  Okay.  Okay.  And based on what
17  you're looking at, okay, and what I've represented to
18  you, would you agree with me that if there was no data,
19  right, in March, do you see that, there was no data in
20  March, would you agree with me that you would have not
21  been personalized in any way for -- for being out on
22  leave in March?
23        MR. MacNAUGHTON:  Objection.  Form.
24    A  Can you rephrase that?
25    Q  (By Ms. Issa)  Sure.  And I'm looking at this

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

89

1  document, okay, so we can argue about that document
2  later, but based on what you are seeing on this
3  document, do you see that in the month of March when you
4  were out on leave, correct --
5          MR. MacNAUGHTON:  Object --
6      Q   (By Ms. Issa)  -- that there's -- there is no
7  data in the month of March, correct?
8          MR. MacNAUGHTON:  Objection.  Form.
9      A   There's no data.
10     Q   (By Ms. Issa)  Okay.  So if there was no data
11 in the month of March, would you agree with me that you
12 would not have been penalized for the month of March?
13         MR. MacNAUGHTON:  Objection.  Form.
14     A   I can't agree that I wouldn't be penalized, no.
15     Q   (By Ms. Issa)  Right.  But your contention,
16 Ms. Pheigaru, is that there were wells that were
17 assigned to you in the month -- while you were out on
18 leave and the time was ticking on those and you were
19 penalized for -- for that time period, correct?
20     A   That's not my only contention, but, yes.
21     Q   Okay.  We're talking about that contention
22 right now, right?  That's your contention that you were
23 penalized for the time that you were out on leave
24 because the wells that were assigned to you kept having
25 data added in there, and you weren't loading it because

90

1  you weren't there, correct?
2      A   Correct.
3      Q   Okay.  So based on what you're seeing, okay,
4  based on the document that you're seeing in front of
5  you, would you agree with me that since there was no
6  data in the month of March that you would not have been
7  penalized for being out on leave?
8          MR. MacNAUGHTON:  Objection.  Form.
9      A   I would agree that for the Shell wells, yes.
10     Q   (By Ms. Issa)  Okay.
11     A   But I don't see anything that says partner,
12 trade, farmout.
13     Q   And we will get to that in a second.  That is
14 fair --
15     A   Okay.
16     Q   -- Ms. Pheigaru.  That's very fair.  So -- and
17 we will get to those other wells very shortly, but
18 that's very fair.
19         So for month of March would you agree for
20 the Shell you would not have been penalized?
21         MR. MacNAUGHTON:  Objection.  Form.
22     A   According to this chart, no.
23     Q   (By Ms. Issa)  Okay.  And for the month of
24 April according to this chart, again, would you agree
25 with me that you would have not been penalized for being

91

1  out on leave?
2          MR. MacNAUGHTON:  Objection.  Form.
3      A   According to this chart, yes.
4      Q   (By Ms. Issa)  Okay.  And then from May it's --
5  and we'll get to this 21 days soon, but would you agree
6  with me that other than this 21 days, okay, that shows
7  up on here that you would have not been penalized for
8  the month of May while being out on leave --
9          MR. MacNAUGHTON:  Objection.  Form.
10     Q   (By Ms. Issa)  -- based on this chart.
11         MR. MacNAUGHTON:  Objection.  Form.
12     A   Based on this chart, I see the 21 days, yes.
13     Q   (By Ms. Issa)  Right.  Other than the 21 days,
14 you would have not been penalized, correct?
15         MR. MacNAUGHTON:  Objection.  Form.
16     A   I -- I don't know based on anything other than
17 based on this chart, no.
18     Q   (By Ms. Issa)  Okay.  And I just want to make
19 sure.  I know you're saying no but I want to make sure
20 that you're answering my question so I want to make sure
21 that you agree that you would have not been penalized
22 other than for that 21 days that appears on this chart?
23         MR. MacNAUGHTON:  Objection.  Form.
24     A   I don't know that I wouldn't have been
25 penalized.

92

1      Q   (By Ms. Issa)  I'm sorry?
2      A   I don't know that I would not have been
3  penalized.
4      Q   Well, it shows here, right?  There's no other
5  data on this chart for month of May other than the 21
6  days, right?  That's the only one that you really -- was
7  over the 10 days?
8      A   For the --
9          MR. MacNAUGHTON:  Objection.  Form.
10     A   -- Shell wells.
11     Q   (By Ms. Issa)  Is that correct?
12         MR. MacNAUGHTON:  Objection.  Form.
13     A   For the Shell wells.
14     Q   (By Ms. Issa)  Okay.  So let's -- let's
15 rephrase it then.
16         So other than the -- so for the Shell
17 wells, okay, would you agree with me that other than the
18 21 days, which you see here, you were not penalized at
19 all for any other data during your leave?
20         MR. MacNAUGHTON:  Objection.  Form.
21     A   According to this chart for the Shell wells,
22 it -- I -- I see the -- the 21 days.
23     Q   (By Ms. Issa)  Right.  Other than the -- and
24 that 21 days, other than that, do you agree with me that
25 you were not penalized other than the 21 days?

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

93

1         MR. MacNAUGHTON: Objection. Form.
2    A   Yes.
3    Q   (By Ms. Issa)  Okay.
4        (Exhibit 7 marked)
5    Q   (By Ms. Issa)  Okay.  Ms. Pheigaru, I've handed
6 you what's been marked as Defendant's Exhibit No. 7, and
7 I'll represent to you that these are documents related
8 to your performance in 2014.  They're very similar to
9 the other ones that we saw for 2012 and 2013, so I just
10 want to kind of go over them again with you.  Do you
11 recognize the documents as what I've described them as?
12   A   Yes.
13   Q   Okay.  Let's look at 296 and 297.  Do you agree
14 with me that this is a copy of your GPA for 2014?
15   A   As far as I know, yes.
16   Q   Okay.  And, again, Ms. Pheigaru, if you notice
17 under the "Business Goals" it says on there "Ensure that
18 all wells assigned to me are properly archived and
19 attainable within ten business days."  Do you see that?
20   A   Yes, I see that.
21   Q   Okay.  And this is one of the goals that you
22 had set for yourself, correct?
23   A   Yes.
24   Q   And let's look at Page 300.  And this -- I'll
25 represent to you that this is Randy's final appraisal of

94

1 your performance for 2014.  Do you see that?
2    A   Yes, I see that.
3    Q   Okay.  And do you recall seeing this during
4 your employment with SEPCO?
5    A   I think so, yes.
6    Q   Okay.  And Randy met with you, right, to
7 discuss this final appraisal, correct?
8    A   I believe so.
9    Q   Okay.  And I'll let you take a second to read
10 it, and let me know when you're done.
11   A   Okay.
12   Q   Okay.  And do you disagree with anything in
13 this final appraisal?
14   A   Yes.
15   Q   What do you disagree with?
16   A   It says that my workload is smaller than many
17 of my peers.  I didn't have peers that did the exact
18 same job as me, so I would disagree with that.  Saying
19 that my workload was smaller, I disagree.
20   Q   I'm sorry.  Which is the other thing?
21   A   My workload is smaller.
22   Q   Okay.  Is that the only thing?
23   A   Yes.
24   Q   Okay.  And --
25       MR. MacNAUGHTON: Can you clarify what

95

1 we're looking at?  We're looking at -- this is 300.
2       MS. ISSA:  Sorry.
3       MR. MacNAUGHTON:  Did we say that before?
4       MS. ISSA:  No, definitely.  Robert, I
5 appreciate that.
6    Q   (By Ms. Issa)  It is -- we're looking at Page
7 No. 300 which is the final appraisal for 2014.  So you
8 said you disagreed with the fact that your workload is
9 smaller than many of your peers, correct?
10   A   Yes.
11   Q   Okay.  So who did you consider -- you said that
12 you did not think that you had any peers, right?
13   A   Correct.
14   Q   Okay.  And so there was nobody else doing data
15 loading?
16   A   There were other people doing data loading, but
17 for the entire year as a whole, I didn't have one set --
18 one peer, per se.
19   Q   Okay.  And do you understand the peers could be
20 individuals that are under Randy, correct?
21   A   If you put it that way, yes.
22   Q   Right.  So people have -- so everybody under
23 Randy, right, are all your peers that are under him?
24 You don't necessarily need to be compared to doing the
25 same exact same task as somebody else.  He's talking

96

1 about just workload in general.  Do you understand that?
2    A   If that's how you put it, yes.
3    Q   Okay.  So it's possible that, you know, his
4 perception was that your workload compared to other
5 peers that were under him was definitely less than
6 others.  Would you agree with that?
7    A   He could perceive it as that, yes.
8    Q   Okay.  But you think -- I guess you disagree,
9 right?  I'm not talking about just data loading.  I'm
10 talking about just in general your workload.  Did you
11 think that your workload was the same as other
12 individuals that reported under Randy?
13   A   Yes.
14   Q   Okay.  Did you have what personal knowledge did
15 you have of the workload of other individuals under
16 Randy?
17   A   We could look in JTrac and see other people's
18 workload as far as what was assigned to who.
19   Q   And did you do that?
20   A   Occasionally.
21   Q   Okay.  But not all the time, correct?
22   A   No, not every day.
23   Q   Okay.  So you have no idea, right, what -- on a
24 day-to-day basis would you agree with me that you have
25 no idea what the workload was for each individual under

EXHIBIT 2

Discovery Resource
713-223-3300

97

1  Randy?
2          MR. MacNAUGHTON: Objection. Form.
3      A  No, I didn't look at everybody's work every
4  single day.
5      Q  (By Ms. Issa)  Okay.  So you don't have any
6  knowledge, correct?
7          MR. MacNAUGHTON: Objection. Form.
8      A  In that -- in that instance, no.
9      Q  (By Ms. Issa)  Okay.  Did you complete -- for
10  example, did you supervise any of these peers?
11     A  I did some training with new hires.
12     Q  No, I'm talking about the -- I'm talking
13  about -- I apologize.  Individuals under Randy, okay,
14  did you supervise, did you directly supervise any
15  individuals?
16     A  No.
17     Q  Okay.  Did you complete performance evaluations
18  for any of these individuals?
19     A  No, I did not.
20     Q  Okay.  And you told me earlier that on a daily
21  basis you did not have knowledge of their day-to-day
22  performance or their workload, correct?
23         MR. MacNAUGHTON: Objection. Form.
24     A  On a day-to-day basis I did not go and look at
25  their workload, no.

98

1      Q  (By Ms. Issa)  Right.  So you wouldn't have any
2  knowledge on a day-to-day basis of what their workload
3  was, correct?
4          MR. MacNAUGHTON: Objection. Form.
5      A  No.
6      Q  (By Ms. Issa)  Okay.  I guess no -- I want to
7  make sure your no is agreeing with me, correct?
8          MR. MacNAUGHTON: Objection. Form.
9      A  I -- I was not aware every single day of what
10  my peers were doing --
11     Q  (By Ms. Issa)  And you --
12     A  -- their workload.
13     Q  Okay.  You -- exactly.  Okay.  That's what I
14  want to make sure because sometimes I'm asking a
15  question, you say no and I think you mean to agree with
16  me, but I just want to make sure that we are -- we have
17  the testimony is -- is -- is -- is correct.  Okay?
18     A  Okay.
19         MR. MacNAUGHTON: Objection.
20     Q  (By Ms. Issa)  Okay.
21     A  And can we take a break after this one --
22     Q  Sure, definitely.
23     A  -- or this question?
24     Q  Of course.  If we can finish with this exhibit
25  and then --

99

1      A  Absolutely.
2      Q  Is that okay with you?
3      A  Yes.
4      Q  Okay.  Perfect.
5          Okay.  And if we can look at 302.  And
6  I'll represent to you that this is a 2014 individual
7  performance review feedback template that was completed
8  by Randy Petit.  I'm sorry.  How do you pronounce his
9  last name?
10     A  Petit.
11     Q  Petit.  I always pronounce it wrong.  Petit.
12         MR. MacNAUGHTON: I've been calling it
13  Petit ever since I've looked at it, too.
14     Q  (By Ms. Issa)  And I'll represent to you that
15  this is similar to -- there are some differences.  If
16  you compare this with 300 and 302 you'll notice that it
17  is similar but it's not exactly the same, but the gist
18  of it is the same ideas of what he's relayed in the
19  final appraisal have been inputted into the individual
20  performance review.  There are some differences, though.
21  If you want to take a look at it, that's fine.  Did you
22  want to take a second to look at it?
23     A  Yes, please.
24     Q  Okay.
25     A  Okay.

100

1      Q  Okay.  And do you agree that it's similar to
2  the final appraisal?
3          MR. MacNAUGHTON: Objection. Form.
4      A  From what I can see, it looks similar.
5      Q  (By Ms. Issa)  Okay.  And do you recall what
6  performance ranking you received as a result of 2014,
7  your performance?
8      A  I believe it's a .7.
9      Q  Okay.  And did you have any issue with that
10  ranking?
11     A  Yes.
12     Q  Okay.  What do you think that you should have
13  received?
14     A  At least a .8 or a .9.
15     Q  Okay.  You think you should have received a .8
16  or a .9, correct?
17     A  Yes.
18     Q  Okay.  And do you have any reason to dispute
19  Randy's belief that you, know, he believed that you
20  ranked a .8 when he compared you to others, right?  When
21  he did this you were -- when your ranking is determined,
22  you're compared to other people, and he believed that
23  when compared to other people that you deserved a .8 in
24  his -- that was his belief.  Do you have any reason to
25  dispute his belief?

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

**105**

1  was based on any sort of discrimination?
2        MR. MacNAUGHTON:  Objection.  Form.
3    A  I don't know if I said that or not.
4    Q  (By Ms. Issa)  I'm sorry?
5    A  I don't know if I said that or not to him.
6    Q  Okay.  And you don't recall at all what you
7  said to him regarding your performance ranking, correct?
8    A  I do recall being very upset about it, but I
9  don't -- I don't remember exact verbiage.
10    Q  Okay.
11        (Exhibit 9 marked)
12    Q  (By Ms. Issa)  Ms. Pheigaru, I'm going to hand
13  you what's been marked as Defendant's Exhibit No. 9, and
14  I'll represent to you that these are Randy's notes that
15  he took related to conversations and meetings that he
16  had with you during your employment with SEPCO.  Okay?
17    A  Uh-huh.
18    Q  And tell me, you know, my understanding is,
19  Ms. Pheigaru, that after that -- that ranking and that
20  discussion in January that you and Randy started setting
21  up weekly meetings in order to start discussing your
22  performance and make sure that you are -- you're getting
23  back on track; is that right?
24    A  Yes, we did have weekly meetings, yes.
25    Q  Okay.  And in response this, right, in

**106**

1  response --
2    A  I believe so.  I'm sorry.
3    Q  I'm sorry.  Yes, correct?  Okay.
4        MS. ISSA:  Yes, Robert, we're going to
5  try -- we're going to try not to talk over each other.
6  Sorry.  I know I'm violating it, too.
7    Q  (By Ms. Issa)  And typically I know we talked
8  about this earlier but, you know, you typically met with
9  him on a monthly basis and then you also met with him,
10  you know, during your midyear reviews and also your
11  final year reviews, but also now on top of that you and
12  he agreed to start meeting on a weekly basis in order to
13  address your performance, correct?
14    A  Yes.
15    Q  Okay.  And you do you recall weekly meetings
16  with him, right, in -- in part of January and
17  probably -- not in January.  I'm sorry.  So let's look
18  at -- actually, scratch that.  Let's -- let's go look at
19  the document.  Do you see on Page 162?
20    A  Yes, I see.
21    Q  Okay.  It seems like you met with him on
22  February 6th, 2015, or either -- either met with him in
23  person or discussed with him on the phone, right?
24        MR. MacNAUGHTON:  Objection.  Form.
25    Q  (By Ms. Issa)  Based on this document?

**107**

1        MR. MacNAUGHTON:  Objection.  Form.
2    A  Can you rephrase that, please?
3    Q  (By Ms. Issa)  Okay.  Based on this document
4  and what the notes that Randy is taking, he has -- he
5  has noted that on February 6, 2015, that he met with you
6  or he, you know, met with you in person or discussed
7  with you as part of your weekly meetings some of your --
8  the tasks and things that you were on top of?  I guess
9  let me make it simpler.  Okay?
10        Based on this document would you agree
11  with me that Randy met with you on February 6th, 2015,
12  either in person or over the phone to discuss your
13  performance?
14        MR. MacNAUGHTON:  Objection.  Form.
15    A  I don't see that on here.
16    Q  (By Ms. Issa)  Okay.  Do you see that he's got
17  a time stamp of 2/6/2015?
18    A  Yes.
19    Q  Okay.  So these are time stamps.  If you go
20  through them, he has dates and times, so the first one
21  on Page 162 is 2/6/2015.  Do you see that?
22    A  Can you repeat that?  I'm sorry.
23    Q  The first one is 2 -- well, the first one I
24  want to talk about in -- in -- in 2015 is dated
25  2/6/2015.  Do you see that?

**108**

1    A  Yes, I see that.
2    Q  Okay.  Then if you flip the page, you'll see on
3  2/11/2015 he has a date and a time -- time noted, but he
4  doesn't have any comments there.  Do you see that?
5    A  I see the date --
6    Q  Okay.
7    A  -- and time, yes.
8    Q  Okay.  And then on 2/12, I think he meant 2015,
9  he was -- he met with you on that particular day also to
10  discuss something.  Do you see that?  So these are times
11  when he has noted that he has met with you or, you know,
12  in person or over the phone to discuss your performance
13  issues?
14        MR. MacNAUGHTON:  Objection.
15    Q  (By Ms. Issa)  Do you have any reason to
16  dispute that?
17        MR. MacNAUGHTON:  Objection.  Form.
18    A  Yes.
19    Q  (By Ms. Issa)  Okay.  What -- what reason do
20  you have to dispute that?
21    A  These are just -- I don't see meeting notices
22  or anything like that, so these are just written out
23  times and dates --
24    Q  Okay.
25    A  -- that I'm not aware of.

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

28  (Pages 109 to 112)

109

1    Q   Okay. All right. But sitting here today,
2  okay, sitting here today do you have any reason to
3  dispute that these are Randy's notes as to days and
4  times that he met with you in person or over the phone
5  to discuss your performance?
6         MR. MacNAUGHTON: Objection. Form.
7    A   I don't believe that these are dates and times
8  that we discussed performance, no.
9    Q   (By Ms. Issa)  Okay. But you do agree that you
10  met with him on a weekly basis, correct?
11   A   Yes, we met on a weekly basis.
12   Q   Okay. And you discussed performance issues and
13  how to improve your performance?
14   A   Yes.
15   Q   Okay. Do you -- what days and times do you
16  think you met with him? Can you tell me?
17   A   I don't have dates and times, no. It varied
18  every week.
19   Q   Okay. But every week you met with him,
20  correct?
21   A   For the most part. I wouldn't say 100 percent
22  every single week for X number of days.
23   Q   So let's look at the first one on
24  2/6/2015. Okay?
25   A   Uh-huh.

110

1    Q   According to him y'all discussed various tasks
2  and things like that that you were -- you were doing.
3  Do you see that?
4    A   Yes.
5         MR. MacNAUGHTON: Objection. Form.
6    Q   (By Ms. Issa)  Okay. Do you recall during your
7  meetings with him that you were discussing different
8  tasks that you were doing at the time?
9    A   Yes, we talked about different tasks, yes.
10   Q   Okay. What else did you talk about other than
11  the different tasks that you were doing?
12   A   I believe that was it.
13   Q   Okay. Was he trying to make sure that you were
14  on track and trying to make sure your performance was
15  there?
16   A   I would assume that's what he was getting at,
17  yes.
18   Q   Right. He wanted to make sure that you started
19  improving your performance, right?
20        MR. MacNAUGHTON: Objection. Form.
21   A   I would assume that.
22   Q   (By Ms. Issa)  Okay. So let's look at the next
23  one. Here again he has noted here on 2/12/20 -- and I
24  think he's -- it's a typo, it should have been 2015 --
25  there's another day that he met with you to discuss

111

1  various, you know, tasks that you were responsible for
2  and trying to make sure that you were on track. Do you
3  see that?
4         MR. MacNAUGHTON: Objection. Form.
5    A   I see it on here, yes.
6    Q   (By Ms. Issa)  Okay. Do you have any reason to
7  disagree with what's he's written here?
8         MR. MacNAUGHTON: Objection. Form.
9    A   I don't disagree with any of these, no.
10   Q   (By Ms. Issa)  Does that sound right as to
11  things that you were working on, tasks that you were
12  working on?
13   A   Yes.
14   Q   Okay. And then if we go to -- and do you see
15  some of these charts that are on here?
16   A   Yes.
17   Q   Okay. Do you recall him discussing any of
18  these charts with you or showing you any of these
19  charts?
20        MR. MacNAUGHTON: Objection. Form.
21   A   I don't recall.
22   Q   (By Ms. Issa)  Okay. Do you recall discussions
23  about, you know, you not entering or loading things on
24  time?
25   A   I don't recall right now, no.

112

1    Q   Okay. But it's possible that he -- y'all
2  talked about that, correct?
3    A   It is possible, yes.
4    Q   Okay. Let's look at 166. This looks like he's
5  actually cut and pasted an e-mail that you sent to him.
6  Do you see that?
7    A   Yes.
8         MR. MacNAUGHTON: Objection. Form.
9    Q   (By Ms. Issa)  Okay. Does that sound like an
10  e-mail that you would have sent to him?
11        MR. MacNAUGHTON: Objection. Form.
12   A   It looks look a cut and paste, so I don't know
13  if the whole message is here.
14   Q   (By Ms. Issa)  But it's fair to say that this
15  is similar -- I mean this would -- do you have any
16  reason to dispute that he cut and pasted an e-mail that
17  you had sent to him and put it in here?
18        MR. MacNAUGHTON: Objection. Form.
19   A   I -- I don't know if -- if everything is here.
20  I would assume that everything is here.
21   Q   (By Ms. Issa)  Okay. And so, here again,
22  Ms. Pheigaru, with this e-mail you're telling him, you
23  know, your week has gotten away, and you just wanted to
24  make sure you update him on his -- in your progress this
25  week, right, in an e-mail; is that correct?

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

113

1      MR. MacNAUGHTON: Objection. Form.
2   Can we stop?
3      MS. ISSA: Sorry?
4      MR. MacNAUGHTON: Can we take a break?
5      MS. ISSA: I'm happy to read it directly.
6      MR. MacNAUGHTON: Can we take a break? Do
7   you want this on the record?
8      MS. ISSA: No, go ahead.
9      MR. MacNAUGHTON: Put it on the record?
10     MS. ISSA: Go ahead.
11     MR. MacNAUGHTON: Okay. You're testifying
12  from a document that you represent what it is and you're
13  speculating that it might be an e-mail that might have
14  been pasted and cut and paste and created by a person,
15  the only person who can testify to it. You're asking
16  her questions about a document that's speculative at
17  best is what it is and something she has no knowledge
18  of.
19     MS. ISSA: Okay. I'm representing to
20  her -- I appreciate that, Robert. I now think her --
21     MR. MacNAUGHTON: Okay. But I'm going to
22  continue to object --
23     MS. ISSA: Okay. That's fine.
24     MR. MacNAUGHTON: -- so we're going to go
25  through slowly.

114

1      MS. ISSA: That's fine.
2      MR. MacNAUGHTON: All right.
3      MS. ISSA: All right. Thank you.
4   Q   (By Ms. Pheigaru, I've
5   represented to you that these are notes that Randy took
6   during your employment with SEPCO and these are based on
7   weekly meetings that he had with you and you testified
8   earlier, right, that you did have weekly meetings with
9   him on a day -- on a weekly basis starting in -- in
10  January or February time frame, correct?
11     MR. MacNAUGHTON: Objection. Form.
12  A   We did have weekly meetings, yes.
13  Q   (By Ms. Issa) Okay. So one of the things that
14  I've represented to you is that Randy has taken -- cut
15  and pasted, okay, an e-mail that you sent to him and
16  pasted it into this -- I've represented that to you that
17  he has cut and pasted an e-mail and put it into this
18  document of his notes. Do you have any reason to
19  dispute that this is not an e-mail that you would have
20  sent to him?
21     MR. MacNAUGHTON: Objection. Form.
22  A   I -- I'm not quite sure how to answer that
23  question.
24  Q   (By Ms. Issa) Okay. And if you look all the
25  way through Page 170 on the bottom.

115

1   A   Okay.
2      MR. MacNAUGHTON: At least this one has
3   2015 on it.
4   Q   (By Ms. Issa) Do you see that?
5   A   Yes, I see that.
6   Q   Okay. And according to -- according to this
7   document, okay, seems like Randy started meeting with
8   you in around February on a week -- in 2015, okay,
9   started meeting with you on February 6th and met with
10  you all the way through March 11, 2015, based on
11  this document. Do you see that?
12     MR. MacNAUGHTON: Objection. Form.
13  A   I don't see that, no.
14  Q   (By Ms. Issa) Okay. So the first one is on
15  162. I'm just trying to get a time frame as to --
16  Ms. Pheigaru, the purpose of this conversation is trying
17  to get an idea of how often Randy met with you and also
18  from when until when. So that -- you can't -- unless
19  I'm missing something, you couldn't remember, right?
20  And so I'm trying to jog your memory to see if this
21  sounds right to you, and if it doesn't, it doesn't.
22  Okay? So just tell me if this doesn't seem accurate.
23  Okay?
24  A   Okay.
25  Q   So did -- does it sound accurate that Randy

116

1   started meeting with you around the February time frame,
2   around February 6th or so, and then met with you all the
3   way through March 11th on a weekly basis to discuss your
4   performance and how to improve your performance?
5   A   Yes.
6   Q   Okay. And if you think -- if you have any
7   other dates other than these sitting here today, please
8   do let me know because I want to make sure I understand
9   your testimony completely.
10  A   Okay.
11  Q   Okay. And why do you think that Randy was
12  meeting with you on a weekly basis?
13  A   I'm not sure. I -- I guess just to get an
14  update of what I was working on.
15  Q   Okay. And he wanted -- would you agree with me
16  that he wanted you to be successful as an employee, and
17  so he was trying to make sure that he was making sure
18  that you improved your performance?
19     MR. MacNAUGHTON: Objection. Form.
20  A   I don't know if that was what he was -- his end
21  goal. I'm not sure.
22  Q   (By Ms. Issa) Okay. But part of your -- I
23  guess what -- part of your goal was to meet with him on
24  a -- what was your goal to meet with him on a weekly
25  basis?

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

121

1    Q   (By Ms. Issa)  He's allowed -- he's allowed to
2   object, unfortunately.
3    A   I don't -- I don't know that this was
4   everything that was talked about.  I don't know that
5   this was actually all of my conversation, so I -- I
6   really -- I -- I'm unsure about that --
7    Q   Okay.  You're unsure about --
8    A   -- at this time.
9    Q   Okay.  I'm sorry to interrupt.
10       You're unsure about what is stated in
11  there whether you disagree or not disagree with
12  anything, correct?
13       MR. MacNAUGHTON:  Calls for speculation.
14   A   I'm unsure of -- of everything that was
15  discussed in those meetings --
16   Q   (By Ms. Issa)  Okay.
17   A   -- yes.
18   Q   So my question to you is based on what is
19  reflected on this document of what was discussed in the
20  meetings, do you have anything -- do you have any reason
21  to disagree with anything that's stated?
22       MR. MacNAUGHTON:  Objection.  Asked and
23  answered.  Calls for speculation and asks her to testify
24  from an unauthenticated document.
25   A   Some of these notes do not make sense to me, so

122

1   I just -- I don't recall these being true of the fact.
2    Q   (By Ms. Issa)  I'm sorry?
3    A   I don't recall these.
4    Q   Which one?
5    A   Some of --
6    Q   The last page?
7        MR. MacNAUGHTON:  Same objections.
8    A   I don't recall the details of all of these.
9    Q   (By Ms. Issa)  Okay.  So sitting here today you
10  don't -- do you have any reason to dispute anything?
11       MR. MacNAUGHTON:  Same objections.
12   A   Yes, my disputes are that I don't know that
13  this was the entirety of the meetings.
14   Q   (By Ms. Issa)  Okay.
15       (Exhibit 10 marked)
16   Q   (By Ms. Issa)  Okay.  Ms. Pheigaru, I've handed
17  you what's been marked as Defendant's Exhibit No. 10,
18  and I'll represent to you that this is an e-mail from
19  Randy to Karl on June 14th, 2015.  Okay?  I'd like you
20  to look at Page 20 -- I'm sorry -- 220.  Do you see
21  that?
22   A   Yes, I see it.
23   Q   Okay.  And do you see that your name is there,
24  "Shelly Pheigaru"?
25   A   Yes.

123

1    Q   Okay.  Would you agree with me that those
2   comments are related to you?  He's talking about you,
3   correct?  That's my question.
4        MR. MacNAUGHTON:  Objection.  Calls for
5   speculation.
6    A   I'm not sure that he -- I'm -- it says my name
7   on there.
8    Q   (By Ms. Issa)  Okay.  And do you recall seeing
9   this?  I think these were posted in your midyear review.
10  Do you remember getting a midyear review in 2015?
11   A   I'm sure I did.
12   Q   Okay.
13   A   Yes.
14   Q   And do you recall seeing these particular notes
15  in your midyear -- midyear review?
16   A   I don't recall.
17   Q   Okay.  Is there anything here that you disagree
18  with?
19       MR. MacNAUGHTON:  Objection.  Calls for
20  testimony from an unauthenticated document.
21   A   Can you rephrase the question, please?
22   Q   (By Ms. Issa)  Sure.  These are comments that
23  Randy noted in your midyear review and I'll represent to
24  you that these were posted in your midyear review, the
25  same notes, and y'all had a discussion about it because

124

1   we will get to an e-mail where you disagree with things
2   that he relayed in -- in a meeting.  But with regard to
3   these comments that Randy has made, my question is do
4   you disagree with any of his comments?
5        MR. MacNAUGHTON:  Objection.  Calls for
6   speculation, calls for testimony from an unauthenticated
7   document.
8    A   I do disagree with what is written here.
9    Q   (By Ms. Issa)  Which -- what do you disagree
10  with?
11       MR. MacNAUGHTON:  Same objections.
12   A   There's no details about the "Exceptions need
13  to be recorded in a timely manner."
14   Q   (By Ms. Issa)  Where does it say that?
15   A   In this last --
16   Q   "Exceptions need to be recorded in a
17  timely manner, without a reminder from" you, right?
18   A   Uh-huh.
19   Q   From him.  I'm sorry.
20       You disagree with that?
21       MR. MacNAUGHTON:  Same -- call -- same
22  objections.
23   Q   (By Ms. Issa)  Sure.  Ms. Pheigaru, do you
24  disagree with that sentence?
25       MR. MacNAUGHTON:  Same objections.

EXHIBIT 2

Discovery Resource
713-223-3300

32  (Pages 125 to 128)

---

125

1    A  I agree -- I disagree that there's no
2  supporting documents or information about that
3  statement.
4    Q  (By Ms. Issa)  Okay.  And is it your position
5  that you've recorded things in a timely manner?
6    A  I believe so.
7    Q  Okay.  So that is one thing that you disagree
8  with, right?  According to you -- I just want to make
9  sure I understand your testimony correct.  So Randy is
10  saying that you did not record your exceptions in a
11  timely manner.  Okay?  Is it your position that you
12  recorded things in a timely manner?
13    MR. MacNAUGHTON:  Same objections and
14  misrepresents the documents also.
15    A  Can you rephrase that, please?
16    Q  (By Ms. Issa)  Sure.  Let's read what the
17  sentence says.  Okay?  Randy says in here, one of his
18  comments is "Exceptions need to be recorded in a timely
19  manner, without a reminder from me."  Okay.  You said
20  you disagree with that sentence, correct?
21    MR. MacNAUGHTON:  Same objections.
22    A  Yes.
23    Q  (By Ms. Issa)  Okay.  Can you tell me what your
24  position is?
25    MR. MacNAUGHTON:  Same objections.

---

126

1    A  I have no -- I had no supporting documents to
2  back that statement up from Randy.
3    Q  (By Ms. Issa)  Okay.  Anything else?
4    MR. MacNAUGHTON:  Same objections.
5    A  No.
6    Q  (By Ms. Issa)  And he -- and there's a comment
7  that he made in here, "I have asked Angelica" -- can you
8  pronounce her -- I don't want to mispronounce her --
9    A  Medrano.
10    Q  -- "Medrano to mentor Shelly in 2015."  Do you
11  see that comment?
12    A  Yes.
13    MR. MacNAUGHTON:  Same objections.
14    A  Yes.
15    Q  (By Ms. Issa)  Okay.  And is that correct that
16  he assigned a mentor to mentor you in 2015?
17    MR. MacNAUGHTON:  Same objections.
18    A  All new hires were assigned or all younger
19  employees were assigned a mentor.
20    Q  (By Ms. Issa)  But this is in 2015.  Do you
21  recall --
22    A  Yes.
23    Q  Okay.  And what you mean by "younger"?  I'm
24  sorry.  And I interrupted you.  I apologize.  And what
25  were you saying?

---

127

1    MR. MacNAUGHTON:  Same objections.
2    A  Myself and the -- the three other new
3  employees, newest employees on the team --
4    Q  (By Ms. Issa)  Uh-huh.
5    A  -- were assigned mentors that year.
6    Q  In 2015?
7    A  Yes.
8    Q  Okay.  And was it in response to, what, trying
9  to make sure that you were on task and trying to improve
10  your performance?  Is that what the purpose was?
11    A  I have no clue.
12    Q  Okay.  Why do you think you were -- why do you
13  think you were assigned a mentor?
14    A  I'm not sure.
15    Q  Did you ask him?
16    A  I didn't have any reason to think anything
17  other than that we were just all being assigned
18  somebody.
19    Q  Okay.  And who else was assigned a mentor?
20    A  Luke Harkleroad and Osvaldo -- I can't
21  pronounce it.  Something with an O, Osvaldo.
22    Q  Okay.  So three of you were assigned a mentor?
23    A  I believe so, yes.
24    Q  Okay.  Do you have personal knowledge that they
25  were assigned a mentor?

---

128

1    A  That was what I understood from them, yes.
2    Q  Okay.  Because they relayed that to you?
3    A  Yes.
4    Q  Okay.  Did you personally observe a mentor
5  mentoring them?
6    A  No.
7    Q  Okay.  And do you know who their mentor was?
8    A  I can't recall at the time.
9    Q  Okay.
10    A  Right now.
11    Q  I just want to make sure I have your testimony
12  correct.  So on that -- those comments for your midyear
13  review, the only thing that you pointed out that you
14  disagree with were the "Exceptions need to be recorded
15  in a timely manner, without a reminder from me,"
16  correct?
17    MR. MacNAUGHTON:  Objection.  Calls for
18  speculation.  Asks for testimony from an unauthenticated
19  document and misrepresentation of what the document is.
20    A  Based on the -- the sheets that are here, yes.
21    Q  (By Ms. Issa)  Okay.
22    (Exhibit 11 marked)
23    Q  (By Ms. Issa)  Ms. Pheigaru, I've handed you
24  what's been marked as Defendant's Exhibit No. 11, and
25  I'll represent to you that this is an e-mail from Randy

---

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

133

1    Q   And what did you tell -- and what did he say?
2    A   I still never really got much clarity from that
3  meeting, and still to this day actually I -- I don't
4  recall ever getting much clarity from the difference of
5  the two meetings.
6    Q   Okay.  And did he say that the two are
7  different?  I mean, how did he -- I guess what did he
8  say during -- during the meeting?  How did he explain it
9  to you, if you can recall.
10    A   I don't recall.  All -- all that I can remember
11  was that it was different, and I remembered it being
12  pretty -- very different enough for me to want more
13  clarity --
14    Q   Right.
15    A   -- and not have the clarity that I was wanting.
16    Q   Okay.  So, again, I understand what you're
17  saying but I guess I'm just trying to figure out what
18  he -- did he explain to you the difference between the
19  two or what -- what exactly did he say?  I'm trying to
20  understand how you didn't get clarity, if that makes
21  sense.
22    A   I'm -- I'm not sure.  I'm not sure if he
23  thought that he clarified and I was not understanding or
24  if there was no clarity at all.  I'm not sure.
25    Q   Okay.  Did he -- did he say that there was an

134

1  inconsistency between the two, or did he say they were
2  the same?  Did he disagree with your conversation the
3  first time?
4    A   I don't recall.
5    Q   Okay.
6        (Exhibit 12 marked)
7    Q   (By Ms. Issa)  Ms. Pheigaru, I'm going to hand
8  you what's been marked as Defendant's Exhibit No. 12,
9  and I'll represent to you that these are some e-mails
10  between you and Randy.  Would you agree with me as the
11  way I've -- would you agree with the way I've described
12  these documents?
13    A   Yes.
14    Q   Okay.  I'd like to look at each one, if you
15  don't mind.
16        MS. ISSA:  Ow.
17        MR. MacNAUGHTON:  Sorry about this table.
18  It's rough.
19        MS. ISSA:  Sorry.  My foot -- my -- my --
20  I hit my knee the wrong way.  I apologize.
21    Q   (By Ms. Issa)  All right.  Let's start with the
22  first one on Page 179.  And do you see the bottom -- I'd
23  like to start with the bottom of each one, if you don't
24  mind, and work our way up from the string.
25    A   Okay.

135

1    Q   So let's start with the first one which is an
2  e-mail from Randy to you on November 3rd, 2014.  Do you
3  see that?
4    A   Yes.
5    Q   And subject is "Vacation."  Do you see that?
6    A   Yes.
7    Q   Okay.  And he says -- what does he say in
8  there?  Do you want to read it since Robert has an issue
9  with me reading -- me reading it the way, you know, it
10  says it.  So I'll let you read it.
11    A   It --
12    Q   He can object to your reading.
13    A   It says on here, "Shelly, is there a reason you
14  have not" -- excuse me -- "is there a reason you have
15  not recorded any of your vacation in August and
16  September?  According to the report, nothing was
17  recorded."
18    Q   Okay.  And let me -- and please correct me if
19  I'm mistaken.  My understanding is that this would be
20  some of the exceptions report that you're supposed to
21  record, correct?
22    A   Yes, I would assume so.
23    Q   Okay.  And so it is now -- sending this
24  Novem -- this e-mail to you in November and he is saying
25  that time from August and September has not been

136

1  recorded.  Do you see that?
2    A   Yes, I see that.
3    Q   Okay.  And what is -- how quickly are you
4  supposed to record your time?
5    A   I don't know that there was a set metrics for
6  that.
7    Q   What was your understanding, that you could
8  record time maybe a year later?  So if you took vacation
9  today, do you record your vacation a year later?
10    A   I wouldn't -- I wouldn't think a year.
11    Q   Okay.  What do you think is -- what -- what do
12  you -- what is your understanding of how you needed to
13  do it?
14    A   I think just in a timely manner.  I don't have
15  an exact time frame.
16    Q   Do you think that it's reasonable to ask you to
17  do it within the same pay period so that your paychecks
18  are recorded properly?
19    A   I was an employee -- an employed -- or a
20  salaried employee, so that didn't affect pay periods.
21    Q   Okay.  But don't you think it affects it if it
22  says -- so if you haven't recorded your vacation doesn't
23  it show that -- so let -- I -- strike that.  Let me --
24  let me start over again.
25        If you take vacation in August, for

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

35  (Pages 137 to 140)

137

1  example, okay --
2      A  Uh-huh.
3      Q  -- say if you had taken three days of vacation,
4  are you allowed -- strike that.  Sorry.  Let me rephrase
5  it.
6          How much vacation are you allowed in a
7  year?
8      A  I was given two weeks, and then you could roll
9  over previous vacation days from the year before.
10     Q  Okay.  So if you don't record your vacation in
11  the system, right, when you've taken vacation, wouldn't
12  that misrepresent how much vacation you have left during
13  the end of the year?
14     A  Possibly.
15     Q  Okay.  So do you think it's important to record
16  your vacation every pay period at least or at least by
17  that end -- by a certain time period in order to ensure
18  that you have accurately reported your vacation and it
19  reflects of how much time you have left?
20     A  Yes.
21     Q  Okay.  Do you -- would you at least agree with
22  me that if you took vacation in August and September
23  that it would -- it's unreasonable on November 3rd to
24  have not recorded it?
25          MR. MacNAUGHTON:  Objection.  Calls for

138

1  speculation.
2      A  Can you rephrase that?  I'm sorry.
3      Q  (By Ms. Issa)  Okay.  You said you don't -- you
4  think that it should just be done in a timely manner,
5  correct?
6      A  Yes.
7      Q  Okay.  What is the time frame do you think is
8  reasonable?
9      A  I would think that calendar year but --
10     Q  I'm sorry?
11     A  I would think within a month or two, yes.
12     Q  Okay.  And do you think it's reasonable that
13  you should do this on your own rather than having to be
14  reminded by your supervisor?
15     A  Yes.
16     Q  Okay.  So it's your responsibility to record
17  it, correct?
18     A  Yes.
19     Q  Okay.  So do you see in this e-mail that Randy
20  is reminding you?
21     A  Yes.
22     Q  Okay.  And do you think -- would you agree with
23  me that if you took vacation in August or September that
24  by November you should have recorded it on your own?
25     A  Yes.

139

1      Q  Okay.  Do you see the e-mail from you to Randy
2  on November 3rd?
3      A  Yes.
4      Q  Okay.  And you said that you looked -- "Never
5  mind.  I just looked at my calendar and I did take a
6  vacation day on August 29th.  I'll record that now.
7  Sorry about that."  Do you see that?
8      A  Yes.
9      Q  Okay.  And then do you see the e-mail from
10  Randy to you on November 3rd, do you see him reminding
11  you that "You need to improve your own tracking of this
12  as well as be timelier with reporting your exceptions"?
13  Do you see that?
14     A  Yes.
15     Q  Okay.  "This affects your paystubs and should
16  be done within a few days of recording the exception."
17  Do you see that?
18     A  Yes.
19     Q  Okay.  So that's SEPCO's expectation, okay,
20  that you record your exceptions within a few days of
21  recording them.  Do you see that?
22     A  Yes.
23          MR. MacNAUGHTON:  Objection.  Calls for
24  speculation.
25     Q  (By Ms. Issa)  Okay.  And he --

140

1          MR. MacNAUGHTON:  Assumes facts not in
2  evidence.
3      Q  (By Ms. Issa)  Okay.  And he asks you -- he
4  said that "you requested 2 ½ days."  Do you -- do you
5  see that?
6      A  I see that.
7      Q  Do you recall how many days vacation you took?
8      A  No, I don't recall.
9      Q  Okay.  So is it possible that instead of the
10  one day that you've reflected that it was possibly two
11  and a half days?
12     A  I'm not sure.
13     Q  Okay.  Let's look at the next one, 184.  Let's
14  start the bottom.  There's an e-mail from you on
15  December 2nd, 2014.  Do you see that?
16     A  December 2nd, yes.
17     Q  Okay.  And you state in here that "I'm going to
18  take today as a" date -- "as a sick day so hopefully I
19  can shake this thing."  Do you see that?
20     A  Yes.
21     Q  Okay.  There are other things said on that
22  also, but I'm just focusing on that, that you took a day
23  off.  And that e-mail is dated December 2nd, 2014,
24  correct?
25     A  Yes.

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

141

1    Q   Okay.  Here we have January 14th, 2015, do you
2  see that, the next e-mail from Randy?
3    A   Yes.
4    Q   Okay.  And it's still not recorded in HR.  Do
5  you see that?
6    A   Yes.
7    Q   Okay.  And then on January 15th you
8  acknowledge, right, "Randy, sorry about that.  I just
9  added it as well as my sick day from yesterday."  Do you
10  see that?
11    A   Yes.
12    Q   Okay.  Do you see again that you did not record
13  this in a timely manner?  Would you agree with that?
14    A   Yes.
15    Q   Okay.  And even though Randy had sent you a
16  prior e-mail saying that it had to do within a few days
17  of recording the exception and also it needs to be done
18  without reminding -- reminders.  Did you see that?
19    A   Yes.
20    Q   Okay.  Here again, Randy had to remind you,
21  correct?
22        MR. MacNAUGHTON:  Objection.  Calls for
23  speculation.
24    Q   (By Ms. Issa)  Correct?
25        MR. MacNAUGHTON:  Same objection.

142

1    A   I see in the e-mail, yes.
2    Q   (By Ms. Issa)  That Randy had to remind you,
3  correct?
4        MR. MacNAUGHTON:  Same objection.
5    A   That Randy said that he -- that Randy reminded,
6  yes.
7    Q   (By Ms. Issa)  Yes.  And you hadn't done it
8  in -- in a timely manner, correct?
9    A   Correct.
10    Q   Okay.  Let's go on to the next one which is
11  205.  Do you see the e-mail on -- this is 205.  Do you
12  see the e-mail at the bottom from you to Randy on
13  April 23rd, 2015?
14    A   Yes.
15    Q   Okay.  Do you see there that you took some time
16  off --
17    A   Yes.
18    Q   -- or you worked from -- I'm sorry.  I
19  apologize.  I think you said you were working from home.
20  Do you see that?
21    A   Yes, I worked from home.
22    Q   Okay.  And he confirmed in the next e-mail on
23  April 23rd, so you were taking half a day vacation and
24  the rest from home, correct?
25    A   That's what it looks like here, yes.

143

1    Q   Okay.  And you responded to him on April 27th
2  saying, "Yes, that's what I did.  I'm putting it in HR
3  now."  Do you see that?
4    A   I see that, yes.
5    Q   Okay.  And then that was April 27, 2015,
6  correct?
7    A   Yes.
8    Q   Okay.  Did you put it in HR by then?
9    A   I don't know.
10    Q   Do you see an e-mail from him to you on
11  April -- I'm sorry -- on May 11th, 2015?
12    A   Yes.
13    Q   Okay.  And as of that time, you still had not
14  recorded it, correct?
15        MR. MacNAUGHTON:  Objection.  Calls for
16  speculation.
17    A   That's what this e-mail says.
18    Q   (By Ms. Issa)  Right.  And then your next
19  e-mail to him on May 18th is "This should now be
20  recorded."  Do you see that?
21    A   Yes.
22    Q   Okay.  Would you agree with me that based on
23  this e-mail that Randy had to, once again, remind you to
24  record your exceptions?
25        MR. MacNAUGHTON:  Objection.

144

1  Mischaracterizes the document.
2    A   I see this on here.  I was out of the office
3  for some of that so...
4    Q   (By Ms. Issa)  Ms. Pheigaru, my question is do
5  you agree with me that Randy had to, once again, remind
6  you to record your exception?
7    A   According to this document, yes.
8    Q   Yes.  Do you have any reason to disagree with
9  that?  Your e-mail specifically says, you know, you were
10  out from April -- on April 23rd, yet, on May 18 you're
11  now telling him it should -- it was recorded.  Do you
12  have any reason to disagree with this?
13    A   Not that I know of.
14    Q   Okay.  And would you agree with me again that,
15  you know, you did not timely record your exception?
16        MR. MacNAUGHTON:  Objection.  Calls for
17  speculation.
18    A   According to this document.
19    Q   (By Ms. Issa)  Do you have any reason dispute
20  this document?
21        MR. MacNAUGHTON:  Objection.  Asked and
22  answered.
23    A   I -- I don't -- I don't recall, no.
24    Q   (By Ms. Issa)  No, I just want -- you don't
25  recall or you don't -- my question is do you have any

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

145

1  reason sitting here today to dispute this document?
2         MR. MacNAUGHTON: Objection. Asked and
3  answered.
4     A   I -- I don't remember.
5     Q   (By Ms. Issa) I'm sorry. You don't remember?
6     A   Based -- based on what is here, no, I --
7  this -- I have no reason to believe that it's different.
8     Q   Okay. But it's -- it's -- it's incorrect,
9  right?
10    A   Right.
11    Q   Okay. Okay. Let's flip to the next one which
12  is 214. Do you see an e-mail -- let's start with the
13  bottom one. Do you see an e-mail from you to Randy on
14  March 31st, 2015?
15    A   Yes.
16    Q   Okay. And based -- I'm just paraphrasing it.
17  If I'm mischaracterizing the e-mail, please let me know.
18  But this is, again, some time off that you took,
19  correct?
20    A   Yes.
21    Q   Okay. And this was on March 31st, 2015,
22  correct, that you've notified him?
23    A   Yes.
24    Q   Okay. And did you go on vacation during this
25  time period? Do you recall?

147

1  see the e-mail from Randy to you on June 10th, 2015?
2     A   Yes.
3     Q   Do you see here where he tells you "You have to
4  be more proactive recording your exceptions. Each month
5  I have to follow up to ask you to record missed time.
6  Please put a reminder on your calendar to do this
7  weekly. Going forward I expect all exceptions to be
8  recorded by the 1st or 2nd working day of the next
9  month." Do you see that?
10    A   Yes.
11    Q   Okay. And you acknowledge that, and you said
12  that everything is now up to date, correct?
13    A   Yes.
14    Q   Okay. Did you have some time that had not been
15  done?
16    A   I don't know.
17    Q   Okay. And I think, Ms. Pheigaru, we talked
18  about the midyear comments that were -- sorry. I'm
19  going to just sneak over here for a second.
20         MR. MacNAUGHTON: Exhibit 10.
21    Q   (By Ms. Issa) Okay. We talked about these
22  midyear comments on Exhibit 10.
23    A   Okay.
24    Q   And you said the one thing that you disagreed
25  with was the exceptions, the comment about the

146

1     A   Yes.
2     Q   Okay. It's May 6th to May 18th, correct?
3     A   I -- I went to Hawaii in May. I don't recall
4  the exact dates, but I'm sure that's correct, yes.
5     Q   Okay. And then on June 10th do you see an
6  e-mail from Randy to you telling you that none of this
7  is recorded?
8     A   Yes.
9     Q   Okay. Would you agree with me that you had to
10  be, once again, reminded to record your exceptions?
11    A   Yes.
12    Q   Okay. And you didn't do it on a timely basis,
13  correct?
14         MR. MacNAUGHTON: Objection. Calls for
15  speculation.
16    A   Can you rephrase that? I'm sorry.
17    Q   (By Ms. Issa) Sure, certainly. And I can go
18  back to the prior e-mail, but Randy had said that it
19  needs to be -- your exceptions need to be recorded
20  within a few days -- few days, correct?
21    A   Yes.
22    Q   Okay. Would you agree with me that you did not
23  record this within a few days?
24    A   Yes.
25    Q   Okay. Let's go to the next one on 215. Do you

148

1  exceptions. Do you recall that?
2     A   Yes.
3         MR. MacNAUGHTON: Object --
4     Q   (By Ms. Issa) Because you -- because you said
5  that there was no I think proof or something along those
6  lines. I'm mis -- misstating what you said, but do you
7  recall that?
8     A   Yes.
9     Q   Okay. Did you -- so we talked about Exhibit
10  No. 12 just now, right, with all of the examples of you
11  not recording things on time, right?
12    A   Yes.
13    Q   Okay. Do you see that there's proof that you
14  did not record things on time?
15         MR. MacNAUGHTON: Objection.
16  Mischaracterizes the document. She's testified and
17  mischaracter -- and asks her -- it calls for a legal
18  speculation.
19         You can answer the question.
20    A   I'm just thinking. Can you rephrase it? I'm
21  sorry.
22    Q   (By Ms. Issa) Sure, certainly. I think you
23  said you disagreed with that comment that Randy made in
24  that midyear review because you said that there was
25  no -- and I apologize, I don't remember the exact words,

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

149

1  but something along the lines that there was no proof as
2  to what -- or examples I guess as to showing --
3     A  Uh-huh.
4     Q  -- what was the basis for that. And if I'm
5  mischaracterizing that, please do tell me. So then I
6  said that, you know, in Exhibit No. 12 we saw several
7  examples of you not -- you're not recording your time in
8  a timely manner.
9     A  Uh-huh.
10    Q  Would you agree with me that I've just shown
11 you proof as to substantiate that comment that he made
12 about you?
13       MR. MacNAUGHTON: Objection.
14 Mischaracterizes the document. Calls -- assumes facts
15 not in evidence regarding midyear review, asks for
16 speculation and asks for a legal conclusion.
17    A  I guess I was unclear of the exceptions that
18 were mentioned right here.
19    Q  (By Ms. Issa) Okay. With regard to Exhibit
20 No. 12, would you agree that those were exceptions that
21 offered proof as to why he said those comments there?
22       MR. MacNAUGHTON: Objection. Calls for
23 legal speculation -- calls for speculation as to his
24 action, mischaracterizes Exhibit No. 10.
25    A  Exhibit 12 does show examples I guess of

150

1  vacation not being recorded in a timely manner.
2     Q  (By Ms. Issa) And to support that comment,
3  correct?
4        MR. MacNAUGHTON: Objection. Same
5  objection as the last one.
6     A  I still -- I still don't believe that I
7  understood the -- what he was meaning --
8     Q  (By Ms. Issa) Okay.
9     A  -- as far as in this documentation.
10    Q  Okay. So what did -- what did you think he
11 meant by that comment?
12       MR. MacNAUGHTON: Objection. Calls --
13 mischaracterizes the Exhibit 10 document.
14    A  I'm not sure exactly what I thought and I guess
15 needed more clarification.
16    Q  (By Ms. Issa) Okay. That's fair. Do you --
17 is it clear to you today what he meant?
18    A  Now seeing all of that, yes.
19    Q  Okay. Okay. I'd like to talk a little bit
20 about the -- the ranking process. Okay?
21    A  Okay.
22    Q  And what I'd like to understand is what your
23 understanding was of the ranking process. Okay?
24    A  Okay.
25    Q  So if you can kind of just kind of walk me

151

1  through of your understanding, that would be great. So
2  what I'd like to start with is -- you know, and I'm just
3  specifically talking about the -- the performance
4  ranking that was done. So, for example, in the first
5  year you got a .9, in the second year you got a .8 and
6  in the third year you got a .7. Okay?
7     A  Okay.
8     Q  I want to understand what you -- what is your
9  understanding of how that was calculated? Is that fair?
10 Is that a -- do you understand my question?
11    A  Yes.
12    Q  Okay.
13    A  My understanding was all of the managers -- and
14 I guess I was never formally told how the process
15 worked, but through other people talking that had been
16 there for years and years it was my understanding that
17 the managers would go in a room and kind of give details
18 as to why this person needed this ranking.
19    Q  Okay. And who are the managers that would go
20 in a room?
21    A  Karl. So he was the -- I guess his title would
22 be data management lead or some -- something of that
23 nature.
24    Q  Uh-huh.
25    A  Randy, Al Huber.

152

1     Q  And who is he?
2     A  He was a manager in Canada.
3     Q  Okay.
4     A  Dave Holland and Bob Meith, Robert Meith.
5     Q  And who is Dave Holland?
6     A  He was on the same level as Randy. He was just
7  another team lead.
8     Q  And Robert Meith?
9     A  He was another team lead as well.
10    Q  Okay.
11    A  Same level as Randy.
12       MR. MacNAUGHTON: Is it Meith? I'm sorry.
13       THE WITNESS: Meith.
14       MS. ISSA: Meith.
15       THE WITNESS: M-e-i-t-h.
16    Q  (By Ms. Issa) Anyone else you recall?
17    A  Al Huber.
18    Q  Okay.
19    A  And, yeah --
20    Q  Right.
21    A  -- I think -- think that was it.
22    Q  Okay.
23    A  I think those four.
24    Q  So let -- and if I'm mischaracterizing
25 something, just tell me. So it would be Karl who is

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

165

1    A   Yes.
2        MR. MacNAUGHTON:  Objection.
3    Q   (By Ms. Issa) Do you agree with that?
4        MR. MacNAUGHTON:  Objection.  Wait before
5    we go farther.  This is an unauthenticated document, ask
6    testimony from an unauthentication -- ask her to
7    identify -- authenticate it first.
8    A   I've never seen this document before so --
9    Q   (By Ms. Issa) Okay.  So I just want you to
10   verify -- I think we've already talked about it -- would
11   you agree with me that in 2012 you received a ranking of
12   .9?
13   A   Yes.
14   Q   Okay.  Would you agree with me in 2013 you
15   received a ranking of .8?
16   A   Yes.
17   Q   Okay.  And in 2014 you received a ranking of
18   .7?
19   A   Yes.
20   Q   Okay.
21       (Exhibit 14 marked)
22   Q   (By Ms. Issa) Okay.  Ms. Pheigaru, I'm going
23   to hand you what's been marked as Defendant's Exhibit
24   No. 14, and I will represent to you that this is a Excel
25   spreadsheet regarding the workforce reduction that

166

1    occurred in the data management group in 20 -- in
2    August 2015.  Okay?
3    A   Okay.  I -- can I --
4    Q   Uh-huh.
5    A   -- tell you something?
6        I forgot about Jenice Meek.  She was in
7    those meetings --
8    Q   Okay.
9    A   -- as well with Al, Dave, Bob and Randy.
10   Q   That's very good that you can read that without
11   glasses.  The rest of us are --
12   A   I have contacts.
13       And we tried to print this as large as we could
14   on one sheet, but this is unfortunately -- so you're the
15   best reader.  I'm going to have you read everything.
16   A   I have --
17   Q   I appreciate that.
18   A   I have contacts in.
19   Q   Okay.  I do, too, but I still need reading
20   glasses.
21       Okay.  When did you learn that SEPCO was
22   conducting a workforce reduction?
23   A   Sometime in the spring of 2015.
24   Q   Okay.  Do you recall by any chance which month?
25   A   I don't, no.

167

1    Q   Okay.  And how did you learn?
2    A   We had a town hall meeting of all the
3    employees.
4    Q   Okay.  And what do you recall that they said in
5    the town hall meeting?
6    A   I do remember that we spoke about .8 kind of
7    being the guideline and they were going to do an average
8    of a few years and .8 was kind of that threshold I would
9    say.  I remember that very clearly because if you
10   averaged out my three performance ratings I received a
11   .8, and so to me that was different, contradictory to
12   what -- I don't remember the speaker, if it was Dave
13   Schewitz or if it was -- what's his name.  I don't
14   remember the other manager who was I think above Dave
15   Schewitz that was speaking.
16   Q   Okay.  And so he -- you recall him saying that
17   the threshold was a .8?
18   A   Yes.
19   Q   Okay.  Is that per year or a total?
20   A   It was my understanding that it was an average.
21   Q   Okay.  And so -- and so what did that do?  The
22   .8, what did that mean to you?  What did they explain?
23   A   Anybody with an average under the .8 --
24   Q   Uh-huh.
25   A   -- would be let go as well as other

168

1    contributing factors, I'm assuming, but --
2    Q   Okay.  And so everyone over a .8 would remain?
3    A   That was my understanding.
4    Q   Okay.  And you don't recall when this town hall
5    was, correct?
6    A   No, I don't.
7    Q   Okay.  And did they address -- who -- who all
8    was present at the town hall?
9    A   I think it was all of Exploration maybe.  It
10   was a very large town hall, so I'm not exactly sure what
11   departments.
12   Q   Okay.  And you do understand, Ms. Pheigaru,
13   that at the time that these reductions were taking place
14   that, you know, in general and, you know, in Houston and
15   in Texas the oil and gas industry was facing a downturn?
16   Did you understand that?
17   A   Yes.
18   Q   Okay.  And not just, you know, SEPCO or Shell,
19   but there were other indus -- I mean there were other
20   companies also that were conducting significant layoffs,
21   right?
22   A   Yes.
23   Q   Okay.  And so this was not just targeted to
24   you, right?  I mean the company as a whole was
25   undergoing a workforce reduction, correct?

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

44  (Pages 173 to 176)

173

1         I'll represent to you that this is all I
2   have as a list of --
3       A   Okay.
4       Q   -- employees that were reporting to Randy at
5   the time.
6       A   Okay.  Yeah.
7       Q   Do you have any reason to disagree with this
8   list?
9       A   No, no, that sounds about right.
10      Q   Okay.  Okay.  So out of all of these employees
11  that we've identified, okay, that reported to Randy --
12      A   Uh-huh.
13      Q   -- who do you think would be the -- who do you
14  think would be comparable to you?
15      A   The most comparable.  Luke Harkleroad did
16  surveillance, and so that was part of my job when I was
17  laid off.  That was what I was under the assumption that
18  that was the majority of my job when I was laid off.  So
19  partially Luke and then partially Beth.  What did you
20  say, Edna Miller?
21      Q   We can call her Beth Hardin?
22      A   Beth, yes.
23      Q   Was Miller her maiden name?
24      A   One of those was.  At one point she switched
25  names.

174

1       Q   And why would you say they are the most
2   comparable?
3       A   Beth did all of the data loading.  That's all
4   she did.  That was her entire role as -- of my
5   understanding.  And Luke did, excuse me, surveillance
6   work.  And so I did -- it was -- it was my understanding
7   that I was supposed to do -- the majority of my time was
8   supposed to be spent on surveillance and partial time
9   with data loading as necessary and as needed.
10      Q   Okay.  So you're -- you're saying -- and
11  correct me if I'm mistaken, you're saying that you --
12  you would be most comparable to these two individuals
13  because you were doing similar work, right?
14      A   Yes.
15      Q   You were doing similar work like Luke in terms
16  of surveillance, and you were doing similar work like
17  Beth in terms of data loading?
18      A   Yes, that's correct.
19      Q   Okay.  Okay.  Do you have any personal
20  knowledge of Ms. -- am I pronouncing it wrong -- Leah's
21  last name, Camilli?
22      A   Camilli.
23      Q   Camilli?
24      A   Uh-huh.
25      Q   Do you have any personal knowledge of

175

1   Ms. Camilli's performance?
2       A   No, I don't.
3       Q   Okay.  Do you have any personal knowledge of
4   Mr. Hark -- Harkleroad's performance?
5       A   No, I do not.
6       Q   Okay.  Do you have any personal knowledge of
7   Heying, is that his --
8       A   Heying.
9       Q   Heying?
10      A   Yeah.
11      Q   Heying's performance?
12      A   No.
13      Q   Okay.  Do you have any personal knowledge of
14  Ms. Fan's performance?
15      A   No.
16      Q   Okay.  Do you have any personal knowledge of
17  Ms. Tassin's performance?
18      A   No.
19      Q   Okay.  Do you have any personal knowledge of
20  Ms. Medrano's performance?
21      A   No.
22      Q   Okay.  And you just didn't -- you didn't see
23  any of their goal -- GPAs, correct --
24      A   No, that wasn't --
25      Q   -- none of those people?

176

1       A   -- shared with anybody.
2       Q   Exactly.  You didn't see any of their final
3   reviews, correct?
4       A   No.
5       Q   Okay.  And you didn't see any of their
6   individual performance review feedbacks completed by
7   their supervisor, correct?
8       A   No, that was supposed to be all confidential.
9       Q   Confidential.  Okay.  And do you have any
10  personal knowledge of any of these individuals'
11  performance rankings?
12      A   Can you repeat that?  I'm sorry.
13      Q   Do you have any personal knowledge of any of
14  these individuals -- like let's just take everybody
15  under Randy.  Do you have any personal knowledge of
16  anybody who reported to Randy their -- their performance
17  ranking?
18      A   No.
19      Q   Okay.  Because it's all confidential, correct?
20      A   It is all confidential.
21      Q   Okay.  And do you have any reason -- I mean
22  sitting here today do you have any reason to dispute
23  whatever performance ranking that they had?
24          MR. MacNAUGHTON:  Objection.  Calls for
25  speculation.

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

45  (Pages 177 to 180)

| 177 | 179 |
|---|---|
| 1    A   I don't know either way. | 1    Q   Okay. |
| 2    Q   (By Ms. Issa) Okay. Do you have any idea who | 2        MR. MacNAUGHTON: I have a question. |
| 3   was the best performer in the group under Randy? | 3        MS. ISSA: Is it an objection? |
| 4    A   I don't know as far as actual performance. I | 4        MR. MacNAUGHTON: No. |
| 5   know who got special -- kind of special privileges kind | 5        MS. ISSA: No question. |
| 6   of thing, not special privileges but special projects. | 6        MR. MacNAUGHTON: Question -- |
| 7    Q   And who is that? | 7        MS. ISSA: Uh-huh. |
| 8    A   Angie, Angelica. | 8        MR. MacNAUGHTON: -- for you. |
| 9    Q   Uh-huh. | 9        How much longer? Do you want a break or |
| 10    A   Yanwen, Steve. They all got kind of -- but | 10   not a break or do you want -- do you have a lot to go or |
| 11   they had also been with the company for a while. | 11   just a little bit? |
| 12    Q   Okay. | 12        MS. ISSA: I can finish this exhibit -- I |
| 13    A   So I would assume that was part of the | 13   do have a lot to go. |
| 14   reasoning behind it. | 14        MR. MacNAUGHTON: Okay. |
| 15    Q   So they were with the company longer, and | 15        MS. ISSA: I mean, I can finish this |
| 16   you're saying that they got special projects? | 16   exhibit, though, and then we can take a break. |
| 17    A   I felt like -- I felt like they did. | 17        MR. MacNAUGHTON: Okay. Sounds -- |
| 18    Q   Okay. | 18        MS. ISSA: Is that fair? |
| 19    A   They got more projects. | 19        Is that -- |
| 20    Q   They got more projects? | 20        MR. MacNAUGHTON: Is that okay with -- |
| 21    A   Possibly, yeah. | 21        MS. ISSA: -- okay with you, Cynthia? |
| 22    Q   Okay. I guess I'm trying to understand the | 22        Okay. |
| 23   difference between special projects and more projects. | 23        MR. MacNAUGHTON: I'm sorry. I was going |
| 24   Can you clarify? | 24   to wait until after you were finished. |
| 25    A   Maybe I would say more projects, more | 25        MS. ISSA: Oh, no, no, no worries. I |

| 178 | 180 |
|---|---|
| 1   opportunities maybe. | 1   can -- I can definitely take a break after this, but, |
| 2    Q   Okay. And those were the three that you can | 2   no, I'm not done. |
| 3   recall that got more opportunities or more projects? | 3        MR. MacNAUGHTON: Okay. I figured there |
| 4        MR. MacNAUGHTON: There was three? I'm | 4   was more. I just didn't know how much. |
| 5   sorry. | 5        MS. ISSA: No, but I'm happy to take a |
| 6    Q   (By Ms. Issa) There were -- I'm sorry. There | 6   break after this one. |
| 7   were three, right? | 7        MR. MacNAUGHTON: Okay. |
| 8    A   Yes. | 8    Q   (By Ms. Issa) Let me know if you are -- let me |
| 9    Q   There was Steven, Yanwei -- Yanwen and | 9   know if this is your understanding that -- and I know |
| 10   Angelica, right -- | 10   you said that they had told you that the selection |
| 11    A   Uh-huh. | 11   for -- strike that. Did you understand that individuals |
| 12    Q   -- that you felt got more -- more projects or | 12   were selected for termination in the workforce reduction |
| 13   more opportunities than the others? | 13   based on specific performance rankings? |
| 14    A   Well, I would say so, yes. | 14    A   Can you rephrase that? I'm sorry. |
| 15    Q   Okay. And why do you think that they got more | 15    Q   Okay. Did you understand or were you aware at |
| 16   opportunities or projects? | 16   all that individuals were selected for termination based |
| 17    A   I'm not sure. | 17   on their specific performance rankings for particular |
| 18    Q   Do you think that maybe that they're better | 18   years? |
| 19   performers? | 19        MR. MacNAUGHTON: Objection. Asked and |
| 20    A   I don't know that I would necessarily say that | 20   answered. |
| 21   but I -- I don't know their performance -- | 21    A   I wasn't aware of actual reasoning behind |
| 22    Q   Okay. | 22   terminations. |
| 23    A   -- so -- I'm not in the room so... | 23    Q   (By Ms. Issa) Okay. But you did mention, |
| 24    Q   I'm sorry? | 24   right, that .8 exactly -- didn't you mention that your |
| 25    A   I was never in the room for those meetings. | 25   understanding was that they relayed to you that .8 of a |

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

46  (Pages 181 to 184)

181

1  ranking was like a threshold?
2      A   That's what we were initially taught --
3      Q   Right.
4      A   -- told.
5      Q   Okay.  So that's --
6      A   Yes.
7      Q   -- what I want to make sure.
8      A   Yes.
9      Q   So you understood --
10     A   Sorry.  Yes.
11     Q   -- right, that your selection for the
12  termination was based -- in part was based on your
13  performance ranking for particular years?
14     A   Yes, I -- I guess, yes.
15     Q   Okay.
16     A   Yes.
17     Q   So let me -- and if you didn't understand this,
18  let me --
19     A   Yeah.
20     Q   -- let me ask you.  Okay?
21         Did you understand that your performance
22  rankings for the years 2012, 2013 and 2014 were the
23  relevant performance rankings that were used to
24  determine whether individuals were selected for
25  termination?

182

1      A   Yes, that was my understanding.
2      Q   Okay.  Okay.  I'd like you to look at Exhibit
3  No. 14 if you can, and you'll see on there -- I think
4  you should be able to see your name, right?  It's the
5  second one from the top.
6      A   Oh, yes.  I'm sorry.
7      Q   Do you see that?
8      A   Yes.
9      Q   Okay.  And based on this, okay, would you agree
10  with me that you were the second lowest performer in
11  terms of your average IPF?  Do you see a column there
12  for "Average IPF"?
13     A   Yes.
14     Q   Okay.  And do you see on there that you are the
15  second lowest in terms of average IPFs?
16         MR. MacNAUGHTON:  Objection.  Calls for
17  speculation and asks her to testify from an
18  unauthenticated document.
19     A   I see that that's what this chart shows, yes.
20     Q   (By Ms. Issa)  Okay.  And let's go where it
21  says -- go in the -- in -- where it says on the top it
22  says "IPF Threshold."  Do you see that for each -- for
23  three years?  Do you see that?
24     A   Yes.
25     Q   Okay.  I'll represent to you that where it says

183

1  IPF-2 that's going back two years, okay, and that
2  threshold was a .9 for 2012.  Okay?
3         MR. MacNAUGHTON:  Object --
4      A   Yes.
5      Q   (By Ms. Issa)  Okay.  And I'll represent to
6  you --
7         MS. ISSA:  Objection?  Go ahead.
8         MR. MacNAUGHTON:  No, no.  And maybe if
9  you actually make another representation it might be
10  clear -- at least helpful in testimony --
11        MS. ISSA:  Sure.
12        MR. MacNAUGHTON:  -- even though we're on
13  a document that's unauthenticated.
14        MS. ISSA:  Sure.
15        MR. MacNAUGHTON:  There's one name in
16  here -- are all of these numbers her, or is the reason
17  that we're redacted there is its redacting out all of
18  the other employees in that group?
19        MS. ISSA:  That is correct.  It's
20  redacting all of the other employees because that --
21        MR. MacNAUGHTON:  Names?
22        MS. ISSA:  -- we -- yes --
23        MR. MacNAUGHTON:  So the two --
24        MS. ISSA:  -- names -- the two things that
25  were confidential were the names --

184

1         MR. MacNAUGHTON:  Were -- were --
2         MS. ISSA:  -- and the salary grade.  Okay?
3         MR. MacNAUGHTON:  Okay.  And so --
4         MS. ISSA:  And so those two things were
5  redacted.
6         MR. MacNAUGHTON:  And then column -- the
7  reason that that column is empty and has redacted to it
8  is -- is because of that, keeping that confidentiality,
9  and the only name here shown is hers, correct?
10        MS. ISSA:  That is correct.
11        MR. MacNAUGHTON:  Okay.
12        MS. ISSA:  That is correct.
13        MR. MacNAUGHTON:  Okay.
14        MS. ISSA:  Okay.
15     Q   (By Ms. Issa)  So it says IPF-2 Threshold .9.
16  Okay?
17     A   Uh-huh.
18     Q   So that was the threshold for the year 2012.
19  That's what I'll represent to you.  Okay?
20     A   Okay.
21     Q   The next one where it says IPF-1, the threshold
22  is .8.  I'll represent to you that that was the
23  threshold for 2013.  Okay?
24         And then IPF threshold -- the current one
25  which I'll -- without a dash or anything was the current

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

185

1  year that they were considering which was 2014, and the
2  threshold for that year was .8. So that was the
3  minimum, right, threshold what somebody -- what they
4  considered to be average. Okay?
5         And then we go to -- do you see where the
6  column is where it says "Average IPF"? Do you see that?
7     MR. MacNAUGHTON: All the way to the --
8   Q   (By Ms. Issa) On the right.
9   A   Oh, yes.
10  Q   Okay. Those are sortings of averages of all
11  the IPFs. Okay?
12  A   Uh-huh.
13  Q   So if you notice in there yours is what?
14     MR. MacNAUGHTON: Calls for speculation.
15  Q   (By Ms. Issa) What is your I -- average IPF as
16  reflected on this document?
17  A   .8.
18  Q   .8. Okay. And do you see that you are the --
19  based on this document do you see that you are the
20  second lowest?
21  A   Yes, I see that.
22  Q   Okay. And I know your counsel wants me to keep
23  saying based on this document, so, yes, based on this
24  document. Okay?
25         All right. And do you see that the

186

1  individuals in red, okay, these were other individuals
2  that were selected. Okay? And not necessarily all were
3  terminated. Okay? I'll make that represent to you --
4  representation to you. But these were ones at this time
5  that were selected for their positions to be eliminated.
6  Okay? That doesn't necessarily mean that that person
7  was actually terminated. Their position was eliminated
8  because as you I think had -- were aware there were some
9  individuals that were perhaps allowed to find another
10  position within the company, correct?
11  A   I can only think of one --
12  Q   Okay.
13  A   -- that was allowed.
14  Q   And who was that?
15  A   Robert Meith.
16  Q   Okay.
17  A   I -- I -- but I don't know the people --
18  Q   Don't --
19  A   -- in Canada.
20  Q   Exactly. Okay.
21  A   So.
22  Q   So do you know who in Randy's group was
23  terminated?
24  A   Yes, I do.
25  Q   Okay. And who?

187

1   A   Mike Millott.
2   Q   I'm sorry. Hold on a second.
3   A   Okay.
4   Q   Who? Mike?
5   A   Mike Millott.
6   Q   Uh-huh.
7   A   Terri Matthews.
8   Q   Uh-huh.
9   A   Myself.
10  Q   Uh-huh.
11  A   Beth Miller Hardin.
12  Q   Uh-huh.
13  A   I think that was it. Under -- under Randy,
14  yes, I believe that was it.
15  Q   Right, under Randy. Okay.
16  A   Yes.
17  Q   And do you see on here that individuals that
18  had like a .7 -- and I'm talking about the average,
19  okay --
20  A   Uh-huh.
21  Q   -- that had a .7 or a .8, you know, .85, .9 and
22  go on, so on and so on were -- were -- were flagged,
23  right?
24  A   Uh-huh.
25  Q   Right? And --

188

1      MR. MacNAUGHTON: Calls for speculation,
2  yes.
3   Q   (By Ms. Issa) And also -- you see them in red,
4  correct?
5   A   Yes, I see.
6   Q   Okay. And also do you see that there's a
7  person that had actually a 1 rating that was selected
8  for termination. Do you see that?
9      MR. MacNAUGHTON: Calls for speculation,
10  assumes facts not in evidence based upon this document.
11         The last red down.
12  Q   (By Ms. Issa) The last red one.
13  A   Yes, I see that.
14  Q   Okay. And so based on this document -- you
15  know, and I'll represent to you that these individuals
16  that are in red -- I apologize that I may have not
17  represented that before, but the individuals in red or
18  in blue also you see they were -- let's just say the
19  ones in red, okay, the ones in red were -- their
20  positions were selected to be eliminated. Okay?
21  A   Okay.
22  Q   All right. And so -- and I'm not necessarily
23  saying that that person was actually terminated because
24  I think one individual or one or two individuals
25  remained employed and went into different positions. So

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

48  (Pages 189 to 192)

---

**189**

1 purposes of positions only, these were eliminated.
2 Okay?
3    A  Okay.
4    Q  Do you see that there were individuals here
5 that were selected -- you know, that had 8 averages, 9
6 averages and there was even an individual here that had
7 a 1 average, correct?
8    A  Yes, I see that on here.
9    Q  Okay.
10       MR. MacNAUGHTON:  In the red --
11       MS. ISSA:  Yes.
12       MR. MacNAUGHTON:  -- to clarify.
13       THE WITNESS:  The red.
14       MS. ISSA:  That is correct, yes.
15    Q  (By Ms. Issa)  And I think you said earlier,
16 Ms. Pheigaru, that -- I asked you, you know, what
17 ranking do you think that you should have received,
18 right, on those rankings?
19    A  Uh-huh.
20    Q  And you said, you know, the first year you felt
21 that you should have gotten a .9, right, and you were
22 fine with that ranking, right?
23    A  Yes.
24    Q  Okay.  And in the second year you actually said
25 that, you know, instead of the .8 you felt that you

---

**190**

1 should have gotten a .9, right?
2    A  Yes.
3    Q  Okay.  And in the third year you said that you
4 should have gotten either a .8 or a .9, correct, in
5 2014?
6    A  Yes.
7    Q  Okay.  Let's say you got a .9, okay, which is
8 higher, the higher one of the one that you were
9 claiming.  Okay?  So I averaged all three of those,
10 Ms. Pheigaru, and I get a .9.
11    A  Okay.
12    Q  Okay.  I get a .9 average.  Okay.  So based on
13 the rankings that you believe, okay, that you should
14 have gotten while you were employed there --
15    A  Uh-huh.
16    Q  -- would you agree with me that based on this
17 document here where individuals had a .9 were
18 terminated -- do you see individuals that had a .9 that
19 were terminated?
20       MR. MacNAUGHTON:  Based on speculation.
21    A  I see a few, yes.
22    Q  (By Ms. Issa)  Okay.  And would you agree with
23 me that even if you had an average IPF of a .9 you would
24 have been terminated?
25       MR. MacNAUGHTON:  Objection.  Calls for

---

**191**

1 speculation.
2    Q  (By Ms. Issa)  Based on this document.
3       MR. MacNAUGHTON:  Same objection.
4    A  No, I don't -- I don't agree that -- with that.
5    Q  (By Ms. Issa)  Why not?
6    A  Because there's other .9s that are in black.
7    Q  I'm sorry?
8    A  There's other .9s that were not terminated.
9    Q  Okay.  And like who, for example?
10    A  I don't know the names but under Karl, under
11 those --
12    Q  Okay.  We're talking about Randy.  Okay?
13    A  Okay.
14    Q  Do you see anybody under Randy?
15    A  Yes.
16    Q  Who?
17    A  There's one person.
18    Q  Okay.
19       MR. MacNAUGHTON:  It doesn't have the
20 name.  You're going to --
21       MS. ISSA:  Okay.  That's fine.
22       MR. MacNAUGHTON:  -- have to assume.
23       MS. ISSA:  That's fine.
24       THE WITNESS:  Yeah.
25    Q  (By Ms. Issa)  Who else?  Well, you know

---

**192**

1 individuals that weren't terminated, right, under Randy?
2    A  Yes.
3    Q  Okay.  So let's talk about those individuals.
4 So other than this one person who had a .9, correct,
5 just one person, right?
6       MR. MacNAUGHTON:  Hold on.  Based on this
7 document, correct?
8    Q  (By Ms. Issa)  Based on this document, correct?
9       MS. ISSA:  Are you testifying, Counsel, or
10 is she?
11       MR. MacNAUGHTON:  I'm asking -- that was a
12 question.  I'm asking.
13    A  Based on this ques -- based on this document,
14 yes.
15       MS. ISSA:  I'll take your testimony, too,
16 because you agreed with me, so I'm fine with that.
17    Q  (By Ms. Issa)  So based on this document,
18 right?
19    A  Yes.
20    Q  Okay.  Okay.  So let's talk about the people
21 that were not selected for termination, okay, under
22 Randy.  Okay?  Let's talk about Leah.
23    A  Okay.
24    Q  Okay.  What evidence do you have that you are
25 better qualified than Leah sitting here today?

---

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

193

1    A  I think I have a better work ethic.
2    Q  I'm sorry?
3    A  Better work ethic.
4    Q  Okay.
5    A  As far as knowledge, I don't know, you know,
6    her background or anything of that nature but work ethic
7    definitely.
8    Q  Okay.  So you think you're better qualified
9    than Leah based on work ethic?
10   A  Yes.
11   Q  Okay.  Anything else?
12   A  No, no, I mean, not -- not offhand that I can
13   think of.
14   Q  Okay.  And -- and what in terms of work ethic
15   do -- would you say you have a better work ethic than
16   Leah?
17   A  Just as far as -- I just think in general.  I
18   don't -- I don't really have a specific example, I
19   wouldn't say.  I just think in general.
20   Q  Okay.  So in general you think you have -- you
21   have a better work ethic than Leah?
22   A  Uh-huh.
23   Q  But sitting here today you don't have any
24   specific evidence of better work ethic than Leah?
25   A  Well --

194

1    Q  If I'm mischaracterizing what you're saying,
2    please tell me because he'll object.
3    A  Okay.
4    Q  Is that correct?
5    A  Yeah, I mean, I have a specific that I can just
6    think of offhand.  There was -- the first year of my
7    son's life there was numerous times instead of taking a
8    vacation day or a sick day myself we have a lot of
9    family in town, so I called out family so I could be at
10   work.  So I thought that that was more important because
11   I had missed so much work because of having the baby.
12   That -- to me that -- that shows, you know, strong work
13   ethic as far as, you know, wanting -- needing to be
14   there and wanting to be there at the office and -- and
15   doing my work instead of taking that time off.
16   Q  Okay.  And do you know examples of Leah not
17   doing that because you're saying you have better work
18   ethic, right?  So can you give me specific examples --
19   do you have any specific examples --
20   A  No, no specifics.
21   Q  I'm sorry?
22   A  No specifics.
23   Q  Okay.  What about Luke, what evidence do you
24   have sitting here today that you are better qualified
25   than Luke?

195

1    A  I have a degree and he did not at the time.  I
2    don't know if he has since gotten one.  So I thought
3    that would put me above him.  And as far as extra
4    projects and kind of overall well-being, I -- I started
5    a safety team, which I know was a huge deal, on the
6    floor, so I think that was kind of something that would
7    have put me above that.
8    Q  Put you above Luke?  We're talking --
9    A  In some --
10   Q  -- about Luke.
11   A  Yes, in some instances, yes.
12   Q  Okay.  So why the safety team?  Did he not do
13   anything -- well, I guess I'm trying to figure out -- I
14   understand what you're saying.  Luke --
15   A  I was more proactive --
16   Q  Okay.
17   A  -- as far as safety, and I knew how important
18   that was to Shell as a whole.
19   Q  Okay.  And are you saying that Luke was not
20   proactive about safety?
21   A  I can't say one way or the other on that.  I --
22   I just know I was very proactive --
23   Q  Okay.  Right.
24   A  -- as far as -- I know -- I know we're trying
25   to compare it to Luke but --

196

1    Q  Yeah, and that's what we're trying to do
2    because I need to know exactly what evidence, specific
3    evidence that you have sitting here today that you were
4    better qualified than these individuals.  So with regard
5    to Luke, you're saying that you are better qualified
6    than Luke because you had a degree --
7    A  Uh-huh.
8    Q  -- and you are more proactive about safety.
9       So now I need to know -- you know, I can
10   understand degree because I can verify whether, you
11   know, Luke had a degree --
12   A  Right.
13   Q  -- to see whether you thought that that was --
14   you know, you were better qualified with that.
15   A  Uh-huh.
16   Q  But with regard to safety, sitting here today
17   do you have any evidence that, you know, Luke was not
18   proactive about safety?
19   A  I think he did the bare minimum as far as what
20   was required for us in -- in regards to HSSE, and I
21   think I went above and beyond in regards to that.
22   Q  Okay.  What about Steven, what makes you think
23   that you were better qualified than Steven?
24   A  I don't think I was.
25   Q  You don't think you were?

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

50 (Pages 197 to 200)

197

1    A  No.
2    Q  Okay.  You agree that Steven was better
3  qualified than you?
4    A  Yeah, he had 40 years with Shell and — yes.
5    Q  Okay.  What about Yanwen Fan, what --
6    A  Yanwen?
7    Q  How do you pronounce her name?
8    A  Yanwen.
9    Q  Yanwen?
10    A  Uh-huh.
11    Q  What evidence do you have sitting here today
12  that you were better qualified than Yanwen?
13    A  I don't.
14    Q  So she was better qualified?
15    A  Yes.  She had been with Shell for numerous
16  years and had lots of experience.
17    Q  Okay.  What about Jody Tassin?
18    A  Jody had been with Shell for numerous years and
19  had lots of experience.
20    Q  Okay.  So would you agree with me that Jody was
21  better qualified than you?
22    A  I think on a different level, yes.
23    Q  Okay.  What about Angelica, do you think
24  that -- what evidence do you have sitting here today
25  that you were better qualified than Angelica?

198

1    A  I wouldn't say that I had.  I had different
2  qualities than her, but I don't think any of them per se
3  are better.
4    Q  I'm sorry?
5    A  I wouldn't say that they're better or more
6  qualified --
7    Q  So in this lawsuit --
8    A  — based on her knowledge and her experience
9  within Shell.
10    Q  Okay.  So let me make sure -- let me make sure
11  I have the right answer or not.  Do you have any
12  evidence -- I'll ask it again.  I apologize.  I'm asking
13  it again.  But do you have any evidence sitting here
14  today that you were better qualified than Angelica?
15    A  No.
16    Q  Okay.  So Shell's position is that, you know,
17  you were terminated based on a reduction in force and
18  based on your performance rankings.  Okay?
19    A  Okay.
20    Q  Sitting here today do you have any reason to
21  believe that that's not the reason that you were
22  terminated?
23    A  I believe that my performance factor from 2014
24  was skewed, and I think in turn that led to the lower
25  rating and in turn led to a layoff.

199

1    Q  Okay.  And we'll get into those specifics later
2  but -- so I just wanted to clarify that.
3    MS. ISSA: Okay.  I think we can take a
4  break.
5    MR. MacNAUGHTON:  Absolutely.
6    MS. ISSA: Okay.
7    THE WITNESS: Okay.
8    THE VIDEOGRAPHER: Off the record,
9  12:56 p.m.
10    (Recess from 12:56 p.m. to 1:49 p.m.)
11    THE VIDEOGRAPHER: We're back on the
12  record, 1:49 p.m.
13    Q  (By Ms. Issa) Okay.  Ms. Pheigaru, we're back
14  on the record.  I just want to remind you that you are
15  still under oath.  Do you -- are you aware of that?
16    A  Yes.
17    Q  Okay.
18    (Exhibit 15 marked)
19    Q  (By Ms. Issa) Okay.  And, Ms. Pheigaru, I'm
20  going to hand you what's been marked as Defendant's
21  Exhibit No. 15, and I will represent to you that these
22  are -- these are documents that contain certain
23  information regarding wells to which you were assigned
24  in 2014.  Okay?
25    A  Okay.

200

1    Q  Okay.  So one of the things I want to go over
2  again is the time frame and I think we've already
3  established this but I just wanted to confirm before we
4  start reviewing these documents that the time that you
5  were out on -- out on leave was between March 3rd, 2014,
6  and March 19th, 2014, correct?
7    A  Yes.
8    Q  And you actually returned back to work on -- on
9  May 19th, 2014?
10    A  May 19th, yes.
11    Q  Okay.  So you'll notice on Page 303 this is a
12  summary of all -- there are about 15 wells.  If you go
13  through each row in here, you'll notice that there are
14  15 different rows that have your name on there.  Do you
15  see where it says "Data Loader"?
16    A  Uh-huh.
17    Q  Okay.  There are several rows underneath that,
18  and your name is there.  Do you see that?
19    A  Yes.
20    Q  Okay.  And I'll represent to you that there are
21  15 of those.  Okay?
22    A  Okay.
23    Q  I'm going to count it again.  Yes, there are 15
24  of those.  Okay.  So there's 15 of those, and these are
25  wells that were assigned, you know, to you during your

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

---

**201**

1 employ -- employment with SEPCO in 2014.  So we're just
2 looking at the 2014 time frame.  Okay?
3    A   Okay.
4    Q   Okay.  Let's flip to the next page which is
5 304, okay, and you will see specific data of the well.
6 Do you see where it's -- the number is on the top -- on
7 the second column do you see the number 1 -- it starts
8 with 1-0-0-0?
9    A   Yes.
10    Q   Okay.  That number corresponds with the first
11 one that's on the first sheet that we looked at on
12 Page 303.  Do you see that?
13    A   Yes.
14    Q   Okay.  So basically we're going to look at each
15 of these 10 wells, okay --
16    A   Okay.
17    Q   -- going one after the other.
18        All right.  So if you look at the first
19 page, which is 304, do you see that?
20    A   Yes.
21    Q   Okay.  And do you see any -- okay.  Have you
22 seen one of these before?
23    A   Yes.
24    Q   Okay.  Do you understand how to read it?
25    A   Yes.

---

**202**

1    Q   Okay.  So if I ask -- if I'm -- if I'm not
2 reading it correctly, please let me know.  Okay?
3    A   Okay.
4    Q   So would you agree with me by -- based on this
5 document that there was no data that was received during
6 the time frame of March 3rd, 2014, to May 19th, 2014, to
7 which you -- you would have been assigned?  Do you see
8 that?
9        MR. MacNAUGHTON:  Answer.
10    A   As far as it looks like on this sheet, yes.
11    Q   (By Ms. Issa)  Okay.  And you do -- you -- I
12 just want to make sure that you are -- if I -- I can
13 explain to you how this chart works, but if you are
14 familiar with it I'm going to make sure -- I mean, I'm
15 going to just take your testimony that you understand
16 how to read this chart.  Okay?
17    A   Yes.
18    Q   Okay.  And if at all --
19        MS. ISSA:  I'm sorry.  Go ahead.
20        MR. MacNAUGHTON:  No, go ahead.
21        MS. ISSA:  You're objecting?
22        MR. MacNAUGHTON:  No.
23        MS. ISSA:  Okay.
24        MR. MacNAUGHTON:  I don't -- that's why --
25 what I was trying to do is -- she clarified it but I was

---

**203**

1 going to object, but she clarified it anyway --
2        MS. ISSA:  Okay.
3        MR. MacNAUGHTON:  -- where you originally
4 say in this document, the documents pages --
5        MS. ISSA:  Yes.
6        MR. MacNAUGHTON:  -- this was as to this
7 page.
8        MS. ISSA:  This page, yes.  We're --
9        MR. MacNAUGHTON:  I'm trying to clarify --
10 yeah, I was just trying to make sure --
11        MS. ISSA:  Thank you.  I appreciate it.
12        MR. MacNAUGHTON:  -- as to that page.
13        MS. ISSA:  I appreciate that.
14    Q   (By Ms. Issa)  So we're going to go page by
15 page, okay --
16    A   Okay.
17    Q   -- based on the documents that I've provided
18 you and based on what you're seeing in front of you.
19 Okay?
20    A   Okay.
21    Q   Let's go to the next one.  Okay.  305.  Here
22 again, my same question.  Any data that was received,
23 you know, for you between the time frame during your
24 leave?
25    A   No, there's none.

---

**204**

1    Q   Okay.  Let's go to the next one, 306.  Same
2 question.  On 306 do you see any data that was
3 received --
4    A   Excuse me.
5    Q   -- during your leave -- bless you -- for you
6 for -- to load?
7    A   No.
8    Q   Okay.  Let's go to the next one which is 307.
9 Do you see anything here again during your leave that
10 was assigned for you?
11    A   No.
12    Q   Okay.  What about the next page, 308?  It's the
13 same question.  Okay?
14    A   No.
15    Q   Okay.  What about 309?
16    A   No.
17    Q   What about 310?
18    A   No.
19    Q   Okay.  What about 311?
20    A   No.
21    Q   What about 312?
22    A   No.
23    Q   Okay.  What about 313?
24    A   No.
25    Q   Okay.  What about 314?

---

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

52  (Pages 205 to 208)

205

1   A   No.
2   Q   What about 315?
3   A   No.
4   Q   What about 316?
5   A   No.
6   Q   What about 317?
7   A   No.
8   Q   What about 318?
9   A   No.
10  Q   What about 319 -- no, no, let's leave that one.
11  Okay. 319.
12  A   Okay.
13  Q   Okay.  So between 303 to 318, okay, what --
14  were these the -- my understanding is -- and correct me
15  if I'm mistaken -- these are the well -- the Shell
16  wells; is that correct?  If you look at the first
17  page --
18  A   Right.
19  Q   -- would that help?  Yeah.
20  A   As it looks like on this document, yes.
21  Q   Okay.  Okay.  Let's go to Page 319 and here is
22  another series of wells of the summary.  Okay?
23  A   Uh-huh.
24  Q   Do you see that?
25  A   Uh-huh.

206

1   Q   Okay.  And these appear to be the non-Shell --
2   Shell wells, correct?
3   A   Yes.
4   Q   Okay.
5   A   Well as --
6   Q   18.
7       Huh?
8   A   As far as I can tell, it doesn't say trade,
9   farmout.  It doesn't say the classification, but, yes, I
10  don't see any Shell, yes.
11  Q   Okay.  I just want to make sure because I know
12  one of the issues you raised earlier is that when I was
13  showing you that document and you said that these aren't
14  all the wells.  So I want to make sure that, you know,
15  I'm showing you all the wells that we have pulled,
16  that -- that Shell has pulled that -- to which you were
17  assigned during 2014.  Okay?
18  A   Okay.
19  Q   So -- so let's just go through these.  Okay?
20  A   Okay.
21  Q   Okay.  320, do you see anything that was
22  assigned -- I mean any data that was assigned for you to
23  load during your time that you were on leave?
24  A   I'm sorry.  On 319 there is something.
25  Q   Okay.  So 319 is a summary.  Okay?

207

1   A   Okay.
2   Q   Okay.  Yeah, there is something, exactly.  So
3   let's go through each one.  So we're going to go -- so
4   if you notice 319 is a summary, right?
5   A   Uh-huh.
6   Q   Okay.  So we're going to go through each well
7   separately --
8   A   Okay.
9   Q   -- and we're going to come across that one --
10  A   Okay.
11  Q   -- that you noticed.  Okay?
12      So let's go to 320.
13  A   Okay.
14  Q   And, if you notice, 320, the well number is the
15  same as the first one that's on Page 319.  Do you see
16  that?
17  A   Yes.
18  Q   And so now we're going to go through --
19  there's 18 of these wells.  Okay?  We're going to go
20  through each one separately.
21  A   Okay.
22  Q   Okay.  On 320 do you see anything?
23  A   No.
24  Q   What about 321?
25  A   No.

208

1   Q   What about 322?
2   A   No.
3   Q   What about 323?
4   A   No.
5   Q   What about 324?
6   A   No.
7   Q   What about 325?
8   A   No.
9   Q   What about 326?
10  A   No.
11  Q   What about 327?
12  A   No.
13  Q   Sorry.  Which one did I ask you about?
14  A   327.
15  Q   Okay.  So let's go to 328.
16  A   No.
17  Q   What about 329?
18  A   No.
19  Q   Okay.  What about 330?
20  A   No.
21  Q   Okay.  What about 331?
22  A   No.
23  Q   What about 332?
24  A   No.
25  Q   Okay.  What about 333?

EXHIBIT 2

Discovery Resource
713-223-3300

53  (Pages 209 to 212)

---

209

1   A   No.
2   Q   What about 334?
3   A   No.
4   Q   Okay.  What about 335?
5   A   No.
6   Q   Okay.  Let's look at 336.
7   A   No.
8   Q   So this is the one that had the data,
9   okay, that came in.  Do you see that in the May time
10  frame that we had looked on the sheet with Hector?
11  A   TD date.  Oh, it come on on 4/24?
12  Q   No.  So this was the one — do you recall that
13  we had looked at a sheet with Hector and there was some
14  data that had a time loading of like 21 days?
15  A   Oh, okay.
16  Q   Do you remember that?  I can show that to you.
17  It should have been No. 7.  No.  Oh, here it is.  Okay.
18  Do you remember we had looked at this Exhibit No. 6?
19  A   Okay.  Yes.
20  Q   Okay.  And we had looked at the fact that there
21  was some data that was untimely, that was loaded
22  untimely in the month of May.
23  A   Uh-huh.
24  Q   Did you see that, the 21 days?
25  A   Yes.

---

210

1   Q   Okay.  So if you look here on this chart, on
2   the well chart, you'll see that this — do you see on
3   the top where the images were loaded on the very top?
4   It says image — digital images and images were 21 days
5   late on the very, very top?
6   A   Yes.
7   Q   Okay.  So this is the same well.  Okay?  I'll
8   represent to you it's the same well.  Okay?
9   A   Okay.
10  Q   And if you look there was data that was
11  received in the month of May, right?
12  A   Uh-huh.
13  Q   Okay.  And would you agree with me that
14  data was received after you returned from maternity
15  leave?
16  A   It was on the 23rd of May, yes.
17  Q   Which was after you returned from —
18  A   After I returned.
19  Q   Okay.  Okay.  Let's look at Page 337.
20  A   But I still — I still have a concern about
21  that.
22  Q   With what?
23  A   With the 21 days.
24  Q   Okay.  We'll talk about it in a second.
25  A   Okay.

---

211

1   Q   Okay.  What about 337?
2   A   No.
3   Q   Okay.  So what concern do you have about this
4   one, the 21 days?
5   A   If I came back on the...
6   Q   19th?
7   A   Uh-huh.  I'm just doing some math.  Okay.  I'm
8   just trying to jog my memory.
9   Q   Sure.
10  A   Okay.
11  Q   Sorry?
12      The other thing I'd like to point — and
13  let me know if you disagree.  Okay?
14  A   Okay.
15  Q   Okay.  So the person's name that appears last
16  on this, right, logged by —
17  A   Uh-huh.
18  Q   — okay, which is Natalie Jackson, correct —
19  A   Uh-huh.
20  Q   — would you agree with me — and I don't know
21  if you know this or not — would you agree with me that
22  the person whose name is logged last, okay, right, is
23  that the person that would be — who would be — be
24  responsible if there's an untimely data loading or no?
25  Is it —

---

212

1   A   Not necessarily.
2   Q   Not necessarily.  Okay.
3   A   Not necessarily.
4       Okay.  So can you repeat your question?
5   Q   No, and you said — no, you said you had an
6   issue — you want to repeat the question?
7       MS. ISSA:  What — the question was?
8       No, before that, before that.
9       THE REPORTER:  Okay.
10      MS. ISSA:  Before that.
11  Q   (By Ms. Issa)  You said the other thing I would
12  like to point and let me know if you dis —
13      MR. MacNAUGHTON:  That was you.
14  Q   (By Ms. Issa)  No.
15      MR. MacNAUGHTON:  It was before that.
16      THE REPORTER:  Okay.
17  Q   (By Ms. Issa)  Okay.  So we talked about that
18  one and so you said that you still had a concern about
19  it so you said — and so I said, "So what" — I said,
20  "Okay.  So what concern do you have about this one, the
21  21 days?"
22  A   Uh-huh.  I think my con — excuse me.  My
23  concern is there's — on the same day —
24  Q   Uh-huh.
25  A   — it says — on 5/23 of 2014 it has my name

---

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

54  (Pages 213 to 216)

213

1 twice --
2    Q   Uh-huh.
3    A   -- as being logged by.
4    Q   Uh-huh.
5    A   And then to the right under wireline or WL
6 underscore OH digital, one says archived, then under the
7 images it says archived, and then it says received and
8 archived.
9    Q   Right.  So it was received -- there was some
10 data that was received on 5/23, correct?
11   A   That's -- that's the thing -- that's what I'm
12 unclear about.
13   Q   Okay.  Well, that's what it says, right, based
14 on this document?
15   A   Based on this document, yes.
16   Q   Okay.  So my question to you is, which I think
17 you said yes, during the time period of when you were
18 out on maternity leave, would you agree with me that
19 there was no data that was assigned to you to load?
20   A   As far as these documents state, that's
21 correct.
22   Q   Okay.  So what is -- so I just want to make
23 sure I understand.  What is your concern about 5/23
24 again?  What is your specific concern?
25   A   To me it looks like one of the flags was not

214

1 flipped which means somebody forgot to put received to
2 archived or vice versa.
3    Q   And is that something you're responsible for?
4    A   It could be myself.  It could be Johnny.  It
5 could be Rita.  Anybody that has touched this well --
6    Q   Uh-huh.
7    A   -- that -- so I'm unclear --
8    Q   Okay.
9    A   -- as to who it would be --
10   Q   Okay.  So someone --
11   A   -- at this time.
12   Q   So someone forgot to -- one of the flags was
13 not flipped, so someone forgot to do what again?  I'm
14 sorry.
15   A   Change it --
16       MR. MacNAUGHTON:  Objection.
17 Mischaracter -- mischaracterizes her statement.
18       Go ahead.
19   A   It -- if the flag wasn't flipped by somebody on
20 either team, it could have -- it changes the numbers.
21 So if a flag was not flipped but then reassigned to
22 another person, then that continues the counting.  So
23 that's what I'm confused about, why there's two names --
24 my name is twice here and it doesn't give a detail --
25   Q   (By Ms. Issa)  Got it.  So --

215

1    A   -- under that status.
2    Q   Got it.  So is your -- are you trying to say
3 that the 21 days may not be accurate?  Is that what
4 you're saying?
5    A   Yes.
6    Q   Okay.  But would you agree with me that
7 whatever the day and the time is, the loading time, it
8 was after your leave?
9    A   Yes.
10   Q   Okay.
11       (Exhibit 16 marked)
12   Q   (By Ms. Issa)  Okay.  Ms. Pheigaru, I'm going
13 to hand you what's been marked as Defendant's Exhibit
14 No. 16, and I'll represent to you that these are some
15 more wells during this time period that were -- to which
16 you were assigned and then they were assigned to
17 somebody else while you were out on leave.  Okay?
18   A   Okay.
19   Q   But these are, again, wells during the 2014
20 time frame.  Okay?
21   A   Okay.
22   Q   I'd like to go through these again also.  And
23 if you go to the first page, which is 338, okay, do --
24 here's the same questions over and over again.  Do you
25 see any data that was received during the time that you

216

1 were out on leave for which you were responsible to load
2 the data?
3    A   Yes.
4    Q   Sorry?
5    A   Yes.
6    Q   Do you understand -- is that a yes to the
7 question or --
8    A   Yes, I see -- I see something that was assigned
9 to me --
10   Q   Okay.
11   A   -- during that time period.
12   Q   And which is what -- which -- which one?
13   A   This first -- you're looking at 338; is that
14 correct?
15   Q   Huh?
16   A   You're looking at No. 338?
17   Q   Yeah, yeah.
18   A   Right here on the 19th --
19   Q   Right.
20   A   -- of March.
21   Q   Exactly.  So you -- that was data that was
22 received, right?
23   A   Uh-huh.
24   Q   Do you see the "Logged By, Katie" --
25   A   Uh-huh.

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

55  (Pages 217 to 220)

217

1    Q  -- right?
2        So somebody else is handling it, correct?
3    Somebody else is log -- logging it, correct, because
4    you're not there --
5    A  Right.
6    Q  -- right?
7    A  But it's still assigned to me.
8    Q  Right.  It's still assigned to you on that day,
9    correct?
10   A  Yes.
11   Q  Okay.  Do you see March 27th, 2014?  Do you see
12   it's assigned to somebody else?
13   A  Yes.
14   Q  Okay.  And do you see on April 7th, 2014, that
15   it's assigned to somebody else, to Ho, somebody by
16   the -- Melissa Ho?  Do you see that?
17   A  Uh-huh.
18   Q  Okay.  Would you agree with me that the person,
19   right, on this loader that it's assigned to last,
20   okay --
21   A  Uh-huh.
22   Q  -- is the one that's going to be respon --
23   that -- the one that's going to be affected by the load
24   time?
25   A  No.

218

1    Q  You don't agree with that?
2    A  No, I don't.
3    Q  Okay.  So you are -- you're -- so even though
4    somebody else is handling it here, right --
5    A  Uh-huh.
6    Q  -- and somebody else is the data loader at the
7    end, right, your position is that this would affect you?
8    A  I believe so because it was assigned to me
9    during this -- while I was out.
10   Q  Okay.  Now, do you remember we saw the charts
11   for March?
12   A  Yes.
13   Q  Do you -- do you remember that, March --
14   A  Yes.
15   Q  -- April and May?  Did you see that --
16   A  Yes.
17   Q  -- that I showed you on the -- on Hector's?  It
18   didn't affect you at all.  Did -- did you see that?
19   A  Yes.
20       MR. MacNAUGHTON:  Objection.
21   Mischaracterizes the statement -- the document.
22   Q  (By Ms. Issa)  Happy to go to this document
23   again.
24       MS. ISSA:  I think we need to keep that --
25   did we keep it out?

219

1        MR. MacNAUGHTON:  I think it was 7.
2    MS. ISSA:  Here it is.  Okay.
3        MR. MacNAUGHTON:  I think it was 7, right?
4    MS. ISSA:  Right.  No, 6.
5        MR. MacNAUGHTON:  6.
6    Q  (By Ms. Issa)  It's Exhibit No. 6.  Do you see
7    Exhibit No. 6?
8    A  Yes.
9    Q  Okay.  Do you see anywhere here that you were
10   penalized in the month of March?
11       MR. MacNAUGHTON:  Objection to use of a
12   non-authenticated document.  Objection to the document
13   itself as to how it was created.  Objection to her
14   testifying to something that she is not familiar with.
15   A  There's nowhere on here that says my name.
16   Q  (By Ms. Issa)  I'm sorry?
17   A  There's nowhere on this page that says my name.
18   Q  Okay.  I'll represent to you that this is your
19   loading that Hector printed off and submitted.  Okay?
20       MR. MacNAUGHTON:  Same objections.
21   Q  (By Ms. Issa)  Okay.  My question to you is do
22   you see -- do you see anywhere -- do you remember seeing
23   the 21 days?
24   A  Yes, I see that.
25   Q  Okay.  You know what, let's -- let's back up.

220

1    Do you see any numbers in the month of March?
2        MR. MacNAUGHTON:  Objection.  Same
3    objections that I raised before.
4    A  Yes.
5    Q  (By Ms. Issa)  Do you see --
6    A  I -- I don't see any numbers, no.
7    Q  Okay.  Let's move on to Page 339.  Do you see
8    any that were assigned for which you were responsible?
9    A  No.
10   Q  No?
11   A  I mean on March 3rd I was assigned, but then it
12   was reassigned.
13   Q  Right.  It was reassigned to somebody else,
14   correct?
15   A  Correct.
16   Q  Okay.  So do you think you would have been
17   affected if there was something that -- a load was
18   untimely?  Do you think you would have been affected?
19   A  I have -- I don't know.  I -- I wouldn't think
20   so but --
21   Q  Right.
22   A  -- I'm not sure.
23   Q  Based on this document, it was reassigned --
24   Q  Based on --
25   Q  -- to somebody else, correct?

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

56  (Pages 221 to 224)

**221**

1    A   Yes.
2    Q   Okay.  And so if that person submitted it
3    untimely, that wouldn't -- that should not affect you,
4    correct?
5    A   It should not, no.
6    Q   Okay.  And if you can see on this document from
7    Hector's on Exhibit No. 6, do you see any numbers here
8    on March -- in the month of March?
9        MR. MacNAUGHTON:  Same objection to the
10   use of Exhibit No. 6, unauthenticated, asking her to
11   speculate, asking her to testify from a document she is
12   not familiar with.
13   Q   (By Ms. Issa)  All I'm asking you is if you see
14   any numbers here on -- under March --
15       MR. MacNAUGHTON:  The same --
16   Q   (By Ms. Issa)  -- the column of March?
17       MR. MacNAUGHTON:  All same objections.
18   A   There are no numbers there --
19   Q   (By Ms. Issa)  Okay.
20   A   -- on that chart.
21   Q   All right.  Let's look at 340.  Here again the
22   same question.  Do you see any data that was assigned to
23   you during the time that you were out on leave?
24   A   No.
25   Q   Okay.  Let's go to 341.  Do you see any data

**222**

1    that was assigned to you during the time that you were
2    out on leave?
3    A   No.
4    Q   And the last one is on 342.  Do you see any
5    data that was assigned to you while you were out on
6    leave?
7    A   No.
8    Q   Okay.  And would you agree with me that where
9    it's -- on March 3rd it shows that data was reassigned
10   to somebody else on these documents on -- particularly
11   on --
12       MR. MacNAUGHTON:  The last three.
13   Q   (By Ms. Issa)  -- on 339, 340, 341 and 342?
14   Would you agree with that?
15   A   Yes.
16   Q   Okay.  And, Ms. Pheigaru, just sitting here
17   today, okay, I'm representing to you that these
18   documents are -- represent wells to which you were
19   assigned during the year 2014.  Sitting here today do
20   you have any reason to dispute any of these documents?
21   A   I don't know that these are all of the wells
22   that were assigned to me.
23   Q   Okay.  So do you think that there are other
24   wells -- I guess let's break it up.  So with regard to
25   what I've shown to you, do you have any reason to

**223**

1    dispute any of the information that I provided to you?
2    A   Yes, I have no documentation that's -- that
3    shows one way or another.
4    Q   Okay.  So -- so sitting here -- I just want to
5    make sure I'm understanding.  So sitting here today do
6    you have any documents to present to me that dispute
7    anything that I have presented to you today?
8    A   No.
9    Q   Okay.  Now, with regard -- you -- the other
10   point that you raise was that you are not sure whether
11   this is the universe of the wells, correct?
12   A   Correct.
13   Q   Okay.  So sitting here today do you have any
14   information as to other wells that may not be
15   encompassed here?
16   A   No.
17   Q   Okay.  And sitting here today do you have any
18   reason to dispute the accuracy any of these documents?
19       MR. MacNAUGHTON:  Which documents?
20   Q   (By Ms. Issa)  The wells.  We're talking about
21   the wells, Exhibit No. --
22   A   16?
23   Q   -- 15 and 16.
24       MR. MacNAUGHTON:  15 and 16.
25   Q   (By Ms. Issa)  15 -- 15 --

**224**

1        MR. MacNAUGHTON:  15 and 16.
2    Q   (By Ms. Issa)  And -- well, there's three,
3    right?
4        MR. MacNAUGHTON:  Well, yeah.
5    Q   (By Ms. Issa)  Yeah, 15 and 16.
6        MR. MacNAUGHTON:  15 and 16, right.
7    Q   (By Ms. Issa)  Sitting here today, Ms. --
8    Ms. Pheigaru, do you have any evidence to dispute the
9    accuracy of any of the -- any of the documents in
10   Exhibit No. 15 and 16 sitting here today?
11   A   Yes.
12   Q   You do?
13   A   Can you rephrase it --
14   Q   Sure.
15   A   -- so I can --
16   Q   Sitting here today, okay, do you have any
17   reason to dispute the accuracy of any of the documents
18   that I've shown to you in Exhibit No. 15 and 16?
19   A   I guess no.
20   Q   Okay.
21       (Exhibit 17 marked)
22   Q   (By Ms. Issa)  Ms. Pheigaru, I'm going to hand
23   you what's been marked as Defendant's Exhibit No. 17,
24   and I'll represent to you that this is an EEOC charge.
25   This is the EEOC charge or a copy of the EEOC charge

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

57  (Pages 225 to 228)

225

1  that you filed with the EEOC. Do you recognize this
2  document as what I've described it as?
3      A   Yes.
4      Q   Okay. And would you agree with me that you
5  filed a charge of discrimination on October 28th, 2015?
6      A   Yes.
7      Q   Okay. And I think you testified earlier that
8  other than this charge of discrimination you have not
9  filed any other charges of discrimination, correct?
10     A   Correct.
11     Q   Okay. And I'd like to focus a little bit on
12  the charge. In the charge you've checked off the boxes,
13  would you agree, for sex discrimination and disability
14  discrimination?
15     A   Yes.
16     Q   Okay. And are those the two bases of
17  discrimination that you're alleging in this lawsuit; is
18  that correct?
19     A   Yes.
20     Q   Okay. So it's sex — sex discrimination and
21  disability, correct?
22     A   Yes.
23     Q   Okay. And if you want to take a second, I'd
24  like you to read the narrative that you've written in
25  here —

226

1      A   Uh-huh.
2      Q   -- and then I just have a couple of questions
3  for you.
4      A   Okay. Okay.
5      Q   Okay. Do you — would you agree with me that
6  you did not complain anywhere in here that SEPCO failed
7  to accommodate you?
8      A   Yes, I do agree.
9      Q   You agree with me on that?
10     A   Yes.
11     Q   Okay.
12     A   Based on this documentation, yes.
13     Q   Okay. And it's two pages, too. There's a
14  second page.
15     A   Okay.
16     Q   Okay. And would you agree with me also that
17  there's nothing in here in which you allege a claim
18  based on disparate impact?
19     A   Can you explain?
20     Q   Sure. Would you agree with me that there is
21  nothing on this charge of -- for discrimination in which
22  you allege a claim for disparate impact?
23     A   Can -- can you explain what disparate impact --
24     Q   No, I cannot. Do you understand what -- what
25  the claims are in this lawsuit that you're alleging?

227

1      A   Yes.
2      Q   Okay. So one of the claims that you've brought
3  in this lawsuit is a disparate impact claim. Do you
4  understand what that claim is?
5      A   Maybe not the verbiage. I guess I'm just a
6  little --
7      Q   Okay.
8      A   I know what I'm claiming.
9      Q   Okay. So what are you claiming?
10     A   That I was discriminated against because of my
11  time out due to my pregnancy.
12     Q   Okay. Anything else?
13     A   And that I was — that I was — I was given a
14  poor performance review based on that time stating that
15  my production was down that year.
16     Q   Okay. Is that it? Is there anything else?
17     A   No, that's it.
18     Q   Okay. So these things that you are claiming
19  that -- are you claiming that they just happened to you,
20  that you were treated differently?
21     A   Yes.
22     Q   Okay. Anything else?
23     A   No.
24     Q   Okay. And why do you think that -- and
25  would -- is your allegation that these al — these

228

1  specific allegations that you've raised fall under
2  either sex discrimination or disability discrimination?
3      A   Yes, I think they fall under both.
4      Q   Okay. So I just want to make sure. So you're
5  not alleging that SEPCO failed to accommodate you then?
6      A   No.
7      Q   Okay. I want to make sure — you said no. I
8  want to make sure that's correct, right, you're agreeing
9  with me that you are not alleging that claim in this
10  lawsuit?
11         MR. MacNAUGHTON: Objection. Asked and
12  answered.
13     A   Can you — can you rephrase it, please?
14     Q   (By Ms. Issa) Sure. Because you said no but
15  my question was whether you agree with me and your
16  answer was no. So I just wanted to make that the record
17  is very clear.
18         MR. MacNAUGHTON: Then I missed your
19  question.
20         MS. ISSA: I'm sorry?
21         MR. MacNAUGHTON: I missed your question.
22  Go ahead.
23         MS. ISSA: Yeah, my question --
24         MR. MacNAUGHTON: Okay.
25         MS. ISSA: — was would you agree with me,

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

58  (Pages 229 to 232)

229

1  and then she said no.
2         MR. MacNAUGHTON: Okay.
3         MS. ISSA: So I just wanted to make sure
4  we have a clear --
5         MR. MacNAUGHTON: No, I said let's clear
6  it up.
7         MS. ISSA: -- clear record.
8  A  Uh-huh.
9  Q  (By Ms. Issa)  I want to make sure.  In this
10  lawsuit are you alleging that SEPCO failed to
11  accommodate you?
12  A  I'm claiming that -- I'm just trying to --
13  Q  Yeah, we can go --
14  A  -- word it --
15  Q  -- back to your testimony.  I want to --
16  A  -- properly.
17  Q  -- make sure it's clear.  Okay?
18  A  Yeah, I want to --
19  Q  Because you have not --
20  A  -- word --
21  Q  -- alleged that in the charge of
22  discrimination, so I just want to make sure we're clear
23  on your allegations.  Okay?
24  A  Okay.
25         MS. ISSA: Can you go back to -- I'm

230

1  sorry.  Can you go back to her testimony.  I just want
2  to make sure it's clear.
3         Keep going back.
4  Q  (By Ms. Issa)  See, here's the -- here's the
5  testimony, right?  So I just want to make sure that you
6  are not claim -- alleging that SEPCO failed to
7  accommodate you then.  You said no.  So I think you're
8  in agreement that you're not --
9         MR. MacNAUGHTON: Did -- did she just read
10  that correctly?
11         MS. ISSA: You can read it.
12         MR. MacNAUGHTON: Yes, that would be
13  appropriate.
14         MS. ISSA: Please read it.
15         (Requested portion was read)
16  A  Can you describe accommodations then, I guess?
17  Q  (By Ms. Issa)  No, I cannot.  This is your
18  lawsuit here, Ms. Pheigaru.  Unfortunately, I can't tell
19  you what your claims are in this lawsuit.
20         So we talked about the word
21  "accommodation" earlier, so I want to make sure that I
22  have your testimony clear, okay, because I need to make
23  sure that I understand all of your allegations and all
24  of your claims.  Based on the charge of discrimination
25  that you filed, as -- as you agreed --

231

1  A  Uh-huh.
2  Q  -- there was nothing in here alleging a failure
3  to accommodate?  And if I've misstated that, please let
4  me know.
5  A  Shell did not fail to accommodate my leave for
6  maternity. Shell failed to -- and I don't know parties
7  that were involved of -- of all of that -- of the
8  decision makers --
9  Q  Uh-huh.
10  A  -- but I don't believe that my time off for my
11  maternity leave was taken into account for my production
12  and the -- and the supposed decline of my production.  I
13  don't believe -- I believe that they ranked over the 12
14  months versus over the 9 and a half that I actually
15  physically worked.
16  Q  Okay.  So -- so what -- so what does that have
17  to do with an accommodation?
18  A  They accommodated my time off, Shell did, yes.
19  Q  Okay.  So they accommodated your time off,
20  correct?
21  A  Yes.
22  Q  Right.
23  A  I was given my maternity leave.
24  Q  Okay.  So please -- it's a very simple
25  question.  Are you alleging a failure to accommodate

232

1  claim in this lawsuit?
2  A  No.
3  Q  Okay.  And what you just explained to me about
4  how you felt was your claims, right?  It was because of
5  the -- and I may be paraphrasing here, okay, but the
6  time out due to the pregnancy and your poor performance
7  review during the time that you were in maternity leave
8  and your production being down during the year, those
9  are all reflected, right, in the -- in the charge of
10  discrimination?
11  A  Yes.
12  Q  Okay.  That's what I wanted to make sure
13  because it seems to be consistent -- what you're saying
14  in front of me right now seems to be consistent with
15  what your charge of discrimination claims?
16  A  Yes.
17  Q  Okay.
18         MS. ISSA: Do you need to take a break?
19         MR. MacNAUGHTON: No, I was -- keep going.
20         MS. ISSA: Okay.
21         MR. MacNAUGHTON: I'm just going to turn
22  the heat down now that it's hot.
23         (Exhibit 18 marked)
24  Q  (By Ms. Issa)  I'm going to hand you,
25  Ms. Pheigaru, what's been marked as Defendant's Exhibit

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

62  (Pages 245 to 248)

245

```
 1   Q   I'm sorry?
 2   A   I think that's it.
 3   Q   Okay.  We need to make sure that we have your
 4   claims, right?
 5   A   Okay.  Yes.
 6   Q   So this is your day to tell me your claims.
 7   A   Yes.
 8   Q   So the last thing I want is for you to tell me
 9   your claims today and then two months down the road you
10   have totally new claims.  Okay?
11   A   Right.
12   Q   So this is your day to speak --
13   A   No, that's --
14   Q   -- Ms. Pheigaru.
15   A   That's the majority.
16   Q   Okay.
17   A   That's it.
18   Q   Okay.  So the performance and then the
19   nursing --
20   A   Yes.
21   Q   -- right?  Okay.
22        Who do you believe at SEPCO discriminated
23   against you because of your gender and pregnancy?
24   A   I don't know.  I don't know who the decision
25   maker was.
```

246

```
 1   Q   So you don't know who discriminated against
 2   you?
 3   A   No.
 4   Q   Okay.  Can you tell me -- and we're going to
 5   get back to your specific allegations in a second, but I
 6   want to just cover a couple of other things.  Can you
 7   tell me each and every male employee or nonpregnant
 8   employee, okay, who you believe was treated better than
 9   you?
10   A   Sure.  Luke Harkleroad, Jody Tassin.
11   Q   Is Jody a male or female?
12   A   Jody is a female.
13   Q   Okay.
14   A   But she was not pregnant.
15   Q   Okay.
16   A   Beth Miller, Steve Heying, Angelica Medrano,
17   Yanwen Fan.
18   Q   Uh-huh.
19   A   I think that -- I think that's about it.  Leah
20   Camilli.  Yes.
21   Q   Anyone else?
22   A   I think that's it.
23   Q   Okay.  So how do you think Luke was treated
24   better than you?
25   A   He didn't have to -- I think they looked at his
```

247

```
 1   12-month period of -- of time and compared it to the
 2   year before, whereas, I feel like Shell looked at my
 3   9-month period and compared the numbers to the 12-month
 4   period the year before and I feel that way for all of
 5   them.
 6   Q   Okay.  So for all of these people are the
 7   same -- same type of -- how they were treated better?
 8   A   Yes.
 9   Q   Okay.  Can you explain that again because I
10   need to understand --
11   A   Okay.
12   Q   -- what you're saying.
13        Okay.  Go ahead.  So what did they -- they
14   looked at their 12 months, right?
15   A   To my knowledge --
16   Q   Uh-huh.
17   A   -- yes.
18   Q   Uh-huh.
19   A   To my knowledge everyone was based on their --
20   their 12-month period for 2014, and I was only able to
21   be judged based on my 9-month period for 2014.
22   Q   And is that the only way that you think
23   that these people were treated differently?
24   A   I feel -- I also feel like I wasn't able -- I
25   wasn't given any new projects or assignments because I
```

248

```
 1   was pregnant, whereas, somebody else in the same
 2   position that wasn't pregnant was given assignments.
 3   Q   Okay.  All of these individuals that you've
 4   named here, okay, and is there a person that was
 5   pregnant during this time period?
 6   A   No.
 7   Q   Really?  Out of all the individuals that you've
 8   named here, there was nobody in -- that was pregnant at
 9   the time that these decisions were being made?
10   A   The layoffs?
11   Q   Yes.
12   A   Oh, at the layoffs, yes --
13   Q   Yeah.
14   A   -- there was somebody --
15   Q   Yeah, exact --
16   A   -- that was on maternity leave.
17   Q   Exactly.  Who was that?
18   A   Leah Camilli.
19   Q   Leah?
20   A   Uh-huh.
21   Q   So she was on maternity leave, right?
22   A   When the layoffs happened, yes.
23   Q   Right.  Was she pregnant during the time when
24   the -- so when did she go out on leave?  Do you
25   remember?
```

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

63 (Pages 249 to 252)

249

1    A   July, August, towards that very end.  I know
2    she was still on maternity leave when I left because I
3    wasn't able to say bye to her.
4    Q   Right.  And so was the would you agree with me
5    that the -- the announcements about the layoffs
6    were made when she was pregnant, and she was still there
7    and not on maternity leave?
8    A   I don't -- I don't know the time frame for
9    that.  I don't believe so.  I believe she was already on
10   maternity leave, but I'm not sure.
11   Q   Okay.  So here's an example, Ms. --
12   Ms. Pheigaru, of an individual that took maternity
13   leave, correct?
14   A   Uh-huh.
15   Q   Right?
16   A   Uh-huh.
17   Q   And she -- did she -- did she get fired?
18   A   No.
19   Q   No.  She returned back from Shell, right?
20   A   Yes.
21   Q   Okay.
22   A   I believe so.
23   Q   Okay.  And so do you know if she's still
24   working there today?
25   A   I believe so.

250

1    Q   Okay.  So she continues to work there, right?
2    A   Uh-huh.
3    Q   Okay.  So we have an example of a female
4    employee who was pregnant around the time that these
5    decisions were being made, okay --
6    A   Uh-huh.
7    Q   -- and was not laid off and, in fact, returned
8    to work and continues to work today.  Okay?
9    A   Uh-huh.
10   Q   Can you tell me how she was treated better than
11   you?
12   A   I don't know.  I don't know why she was.  I
13   know she was, but I don't know why.  I have no reason
14   behind it.
15   Q   So why do you think she was treated better than
16   you?  You said that --
17   A   She was in a different job grade level as --
18   than I was.
19   Q   So you think that's why she was treated better?
20   A   I don't know.
21   Q   But this discri -- this case, Ms. --
22   Ms. Pheigaru, is about pregnancy, right?
23   A   Right.
24   Q   We're not talking about job grades right now.
25   We're talking --

251

1    A   Right.
2    Q   -- about pregnancy.  Okay?  We're --
3        MR. MacNAUGHTON:  Objection.
4    Mischaracterizes the last testimony.
5        Go ahead and finish the question.  Sorry I
6    spoke out of turn.
7    Q   (By Ms. Issa)  So your lawsuit here today is
8    you feel that you have been discriminated against
9    because of your pregnancy, correct?
10   A   Yes.
11   Q   Okay.  And I gave you an example, Ms. --
12   Ms. Pheigaru, of another employee that was pregnant and
13   went out on leave when these decisions were being made
14   and that employee returned back --
15   A   Uh-huh.
16   Q   -- and presumably she was also only evaluated,
17   right, during the 9-month period that she was working as
18   opposed to the 12 months, right, because she was on
19   maternity leave?  Would you agree with that?
20       MR. MacNAUGHTON:  Objection.  Calls for
21   speculation.
22   A   I -- yeah, I don't know.
23   Q   (By Ms. Issa)  Okay.  So I'd like to know how
24   you were that you were treated differently than another
25   female employee that was pregnant and was not terminated

252

1    and returned back to work?
2    A   I don't know why I was.  I just feel like I
3    was.
4    Q   Okay.  You have no -- other than your -- your
5    feeling and your belief, you have no evidence, correct?
6    A   I don't know her job -- her -- her performance
7    rating.  I don't know any of that.  I don't know -- she
8    was in a different role than I was, so she was scored
9    differently that is not as timely.  The -- the -- the
10   goal of the ten days, she didn't have that.  So I think
11   her -- her performance evaluation would be extremely
12   different than mine.
13   Q   Okay.  But sitting here today you have --
14   you -- I think we talked about this already, right, you
15   had no knowledge of their performance, correct?
16   A   Right.
17       MR. MacNAUGHTON:  Object --
18   Q   (By Ms. Issa)  You have no knowl --
19       MS. ISSA:  I'm sorry.  Go ahead.
20       MR. MacNAUGHTON:  Objection.  Asked and
21   answered.
22   Q   (By Ms. Issa)  You have no knowledge about
23   their performance ranking?
24       MR. MacNAUGHTON:  Same objection.
25   A   I was not in the room.  I don't -- I don't know

Shelly Pheigaru
Discovery Resource  713-223-3300

EXHIBIT 2

67  (Pages 265 to 268)

265

1  that your allegation?
2  A  I believe that would have -- with the amount of
3  people that were at Shell, yes.
4  Q  Okay.  So were other people nursing, too?
5  A  Yes.
6  Q  Okay.  So were other people -- so Shell had no
7  issue with you going out there and nursing, correct?
8     MR. MacNAUGHTON:  Objection.  Asked and
9  answered.
10  A  No, there was no issue.
11  Q  (By Ms. Issa)  Okay.  So did you go and
12  complain to anybody that you should have been provided
13  with a location within your building?
14  A  Yes.
15  Q  To who?
16  A  I believe I told Hector and Karl or at least
17  Hector.
18  Q  And what did you tell Hector?
19  A  That it was taking a long time to -- taking a
20  lot of time out of my day to do that.
21  Q  To nurse or actually walk to another building?
22  A  To walk to another building, nurse and then
23  walk back.
24  Q  Okay.  So let's forget the nursing part because
25  that's -- that's your choice, right, to nurse?  I'm

266

1  talking about the accommodation that was made, right?
2  So you said that it took about five minutes to go to the
3  other building?
4  A  Yeah, five to seven.
5  Q  Okay.  Five to seven to come back?
6  A  Uh-huh.
7  Q  So about ten minutes?
8  A  10 to 15, yeah.
9  Q  Okay.  And so you asked him that it was -- you
10  told him -- what -- tell me exactly the conversation
11  what you told him.
12  A  I don't know the exact conversation.  It was
13  along the lines of this is taking a lot of time out of
14  my day and I wished that there was something closer.
15  Q  Okay.  And what did he say?
16  A  He said that I think he would talk to Karl.
17  Q  I'm sorry?
18  A  I think he said that he would talk to Karl
19  about it, his -- his manager.
20  Q  Okay.  And did he talk to Karl?
21  A  I believe so, yes.
22  Q  Okay.  And so what happened?
23  A  There was another room on the floor that they
24  made that was kind of reserved for that for me but it
25  didn't have a lock or any privacy so my dad came and put

267

1  privacy glass or --
2  Q  Like a sign or something?
3  A  It was -- they were glass sliding doors, so he
4  put something above it to give a little bit of privacy.
5  Q  Okay.  So you did have privacy?
6  A  Not -- not what I would expect.
7  Q  Okay.  And so -- so one of the accommodations
8  you asked for for the room to be in the same building as
9  you, right?
10  A  Uh-huh.
11  Q  And -- and they provided that, correct?
12  A  Yes.
13     MR. MacNAUGHTON:  Objection.
14  Q  (By Ms. Issa)  But you were not satisfied with
15  that?
16     MR. MacNAUGHTON:  Mischaracterizes past
17  testimony.
18  A  It was -- it was not up to where I believe for
19  security and all of that should have been --
20  Q  (By Ms. Issa)  But was it --
21  A  -- because the door did not lock.
22  Q  Okay.  The door didn't lock.  But was -- was
23  there a sign or something you could put on the door
24  saying privacy or no?
25  A  Yes.

268

1  Q  Okay.  And so if you weren't satisfied with
2  this, did you go and complain again that you wanted
3  something else?
4  A  I don't believe so because I was about to stop
5  nursing, so no, I guess not.  I didn't.
6  Q  Okay.  And you did not go to complain to HR at
7  any point that the accommodations were not appropriate
8  for you?
9  A  I don't think so.  I don't remember.
10  Q  Okay.  And about how long do you think that you
11  used -- how long -- how many months do you -- how many
12  months did you nurse?  Sorry.
13  A  Six total.  I stopped in September.
14  Q  Okay.  And how many months do you think that
15  you spent nursing in the other building?
16  A  I don't know a time frame for that.
17  Q  Approximately.
18  A  I wouldn't say it was -- I was back to work
19  from May to September when I nurse was nursing so like four
20  months.  I don't know how long I was in the other
21  building.
22  Q  Just approximately how long?  I'm just trying
23  to get a --
24  A  A few weeks.
25  Q  A few weeks?

EXHIBIT 2

Discovery Resource
713-223-3300

68 (Pages 269 to 272)

269

1   A  Yeah.
2   Q  And so after a few weeks -- would you say less
3  than a month or less than two weeks?
4   A  Possibly less than a month.
5   Q  Okay.  So less than a month you were in the
6  other building, and then you were moved over to this
7  building?
8   A  Yes.
9   Q  Okay.
10       MR. MacNAUGHTON: Are you at a --
11       MS. ISSA: Do you want to stop for a
12  second?
13       MR. MacNAUGHTON: Can I run to the
14  restroom?
15       MS. ISSA: Sure, sure.
16       THE VIDEOGRAPHER: Off the record,
17  3:14 p.m.
18       (Recess from 3:14 p.m. to 3:27 p.m.)
19       THE VIDEOGRAPHER: We're back on the
20  record, 3:27 p.m.
21   Q  (By Ms. Issa) Okay.  Ms. Pheigaru, I'll remind
22  you that you're still under oath.
23   A  Okay.
24   Q  Okay?
25   A  Okay.

271

1  at some of the business goals here, correct?
2   A  Yes.
3   Q  Okay.  And the business goal here was ensuring
4  that all wells assigned to you are properly archived and
5  attainable within ten business days.  Do you see that?
6   A  Yes.
7   Q  Okay.  And would you agree with me that this
8  goal is based on not the number of wells that you're
9  assigned but, rather, on your ability -- for those that
10  are actually assigned to you on your ability to do them
11  in a timely manner?  Would you agree with that?
12   A  This goal right here, yes.
13   Q  Right.  So do you see any goals in here that
14  talk about the number of wells, okay, rather than the
15  timeliness of loading time for the well?
16   A  No.
17   Q  I'm sorry?
18   A  No, I do not.
19   Q  Okay.  Let's look at the next one, 2013.  Here
20  again, do you see that your performance goals, right,
21  your business goals are based on, here again, is the
22  timeliness, right, of how quickly you load the data; is
23  that correct?
24   A  Yes.
25   Q  Okay.  Do you see anything in this GPA where

270

1   Q  All right.  I'd like to go back a little bit to
2  talk a little bit more about your allegations
3  regarding -- where did they go, sorry -- these
4  production goals.  Okay?
5   A  Okay.
6   Q  I'm sorry.  Not production goals, but you said
7  that your production -- that Randy told you that you
8  were being terminated because your production was down;
9  is that correct?
10   A  Yes.
11   Q  Okay.  And he told you this after you were
12  terminated, correct?
13   A  As far as I can remember, yes.
14   Q  Okay.  And what I'd like to go back to is some
15  of your performance, your GPAs if we can.
16   A  Okay.
17   Q  Here's one.  Here we go.
18       MR. MacNAUGHTON: Exhibits --
19   Q  (By Ms. Issa) So we'll look at --
20       MR. MacNAUGHTON: -- 3, 7, 2.
21   Q  (By Ms. Issa) -- Exhibit No. 2 --
22       MR. MacNAUGHTON: 3.
23   Q  (By Ms. Issa) -- 3 and 7.  Okay?
24   A  Okay.
25   Q  Let's start with No. 2.  Okay.  And we looked

272

1  you're measured by your -- the number of wells assigned
2  to you rather than the loading time?
3   A  No.
4   Q  Okay.  Let's look at the next one, No. 7.  Do
5  you agree here also, Ms. Pheigaru, that in your goals --
6  your -- your goals and your performance, here again,
7  right, is measured that you've -- you've completed this,
8  right, is based on making sure that the wells to which
9  you are assigned, right, is properly archived within ten
10  days?  There's nothing in this goals that references the
11  number of wells that you are assigned; is that correct?
12   A  Yes.
13   Q  Okay.  So you saying that, you know, Randy told
14  you that your production was down, right, you're not
15  measured, Ms. -- Ms. Pheigaru, based on the number of
16  wells to which you are assigned, are you?  You are
17  measured by, as we saw in your goals, right, the goals
18  that you completed, you are measured by the timeliness
19  of how quickly you load those dat -- that data into the
20  wells that you are actually assigned?
21       MR. MacNAUGHTON: Objection.  Calls for
22  speculation and -- and mischaracterizes her prior
23  testimony.
24   A  I -- I don't agree with that being the only way
25  we're measured.

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

69  (Pages 273 to 276)

273

1    Q   (By Ms. Issa) Okay.  How else are you
2  measured?
3    A   I -- I believe and in one of my report
4  summaries it says that the amount of work or something
5  being different, so I don't believe that it's only about
6  the ten business days.
7    Q   Okay.  Show me where it says that.  Are you
8  talking about where he said your workload was smaller
9  than your peers?
10    A   Possibly.  Well, in 2014 --
11    Q   Which exhibit are you looking at?
12    A   I'm sorry.
13         MR. MacNAUGHTON: 7.
14    A   7.
15    Q   (By Ms. Issa) Uh-huh.
16         MR. MacNAUGHTON: It's Exhibit 7.
17    Q   (By Ms. Issa) Uh-huh.
18         MR. MacNAUGHTON: Third page.
19    A   Yes, 300.
20    Q   (By Ms. Issa) Okay.
21    A   It says, "Specific areas for improvement:  Be
22  more proactive in seeking training opportunities."  None
23  of these things listed in this last paragraph were
24  reasons for my termination that I was told, so I -- as I
25  understood the reason for my termination was because of

274

1  the -- the down -- the decline, I guess, in production.
2    Q   Okay.  And we've talked about, right, we talked
3  about -- we looked at the workforce reduction, right,
4  the sheet that talked about all the performance rankings
5  and everything, right, and, you know, we went through
6  all of those and how those were determined?
7    A   Uh-huh.
8    Q   What I want to know is sitting here -- and you
9  mean by production is that you weren't working for 12
10  years -- 12 months?  Is that what you're saying?
11    A   Yes.
12    Q   Okay.  So what evidence do you have that
13  you're -- you were terminated because of low production?
14    A   I don't have any today, but I can definitely
15  probably get some.
16    Q   Okay.  When are you planning on getting some?
17    A   I don't have a time frame.  I mean I don't -- I
18  don't know.  I -- I would assume that I could probably
19  figure something out.
20    Q   Okay.  And so sitting here today you have no
21  idea of any evidence that you have to show that you were
22  terminated because your production was low?
23    A   Nobody --
24         MR. MacNAUGHTON:  Objection.  Prior -- it
25  con -- contradicts her prior testimony.

275

1    A   I wasn't ever told anything otherwise.  I asked
2  for specific details and was not given any specific
3  details.
4    Q   (By Ms. Issa) Okay.  So my question to you
5  today is what evidence do you have that that's what
6  was -- what evidence do you have that you can show that
7  your production was low?
8    A   I don't have any.
9    Q   Okay.  I guess let me rephrase that.  What
10  evidence do you have that the reason for your
11  termination was because your production was low?
12    A   I don't have evidence.  I'm just going based on
13  what I was -- I believe I was told.
14    Q   Okay.  Okay.  And you testified earlier that
15  there were some comments that were made -- well, I guess
16  let me back up.  Were there any -- other than the
17  comments that you talked about about this group of
18  ladies about the nursing comment --
19    A   Uh-huh.
20    Q   -- and about the pregnancy, other than that,
21  okay, were there any managers or supervisors or anyone
22  else that made any comments to you based on your gender
23  or your pregnancy?
24    A   Did you say -- can you rephrase that question,
25  please?

276

1    Q   Sure.  And we're going to get to the specific
2  comments that you talked about earlier --
3    A   Uh-huh.
4    Q   -- about the nur -- do you -- do you remember
5  what I'm talking about?  You said there was a group of
6  mothers who were nursing that made comments about
7  pregnancy and -- do you remember that?
8    A   Not -- I didn't say member -- mothers that were
9  nursing.  I said mothers that had had babies.
10    Q   Okay.  So -- apologize.  Okay.  So mothers that
11  had had babies that you said there was a group of these
12  mothers --
13    A   Yes.
14    Q   -- that made negative comments about pregnancy,
15  right, about people getting pregnant, correct?
16    A   At Shell, yes.
17    Q   At Shell.  Okay.
18    A   Yes.
19    Q   Other than those people, was there anyone else,
20  other managers or supervisors, that made any comments to
21  you based on your -- on your gender or pregnancy?
22    A   There was a lot of comments about my size
23  during my pregnancy, yes.
24    Q   Okay.  In what sense?
25    A   Because I had a very large baby --

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

285

1   A   No, there was -- I believe HR was in the room.
2   Q   HR was in the room?
3   A   I believe so.
4   Q   Okay.  And so -- okay.  So roundtable
discussion with HR?
6   A   I believe so.  I believe the topic of the day
7   was something about discrimination --
8   Q   Uh-huh.
9   A   -- and if people felt like there was
10   discrimination that happened.
11   Q   Okay.  And you're saying HR was present at the
12   meeting?
13   A   I believe so, but I don't -- I guess I
14   shouldn't -- I don't know for a fact, so I guess I
15   shouldn't say.
16   Q   Okay.  And did anyone here at this meeting
17   offer like specific concrete examples of they all -- you
18   said that they felt discrimination, correct?
19   A   Uh-huh.
20   Q   Did anyone offer any sort of specific concrete
21   examples of discrimination?
22   A   Not that I can recall.
23   Q   Okay.  Okay.  Let's talk about An -- Angelica.
24   You said that she was on this meeting, right?
25   A   Uh-huh.  I don't know if she was at that one.

286

1   She went with -- with me to one of them --
2   Q   Okay.  And --
3   A   -- and I went by myself another time.
4   Q   And I guess she's an example, right, of a
5   female?
6   A   Yes.
7   Q   Do you know how many times -- how many kids she
8   has?
9   A   Two.
10   Q   She has two kids --
11   A   Uh-huh.
12   Q   -- not three?
13   A   No, two.
14   Q   She had two kids.  Okay.
15   A   Unless she's pregnant again.
16   Q   Okay.
17   A   I don't know.
18   Q   So do you know whether she had both of her kids
19   at Shell?
20   A   Yes, she -- she was working at Shell whenever
21   she had both of hers.
22   Q   Exactly.  And would you agree with me that
23   she's probably the best performer out of all the
24   employees that are under Randy?
25   A   Maybe, yeah.

287

1   Q   Right?
2   A   Maybe.  I --
3   Q   Okay.
4   A   I don't know, but yes.
5   Q   Okay.
6   A   She's a good performer.  I know that.  I don't
7   know the best.
8   Q   If Randy says that she's actually the best
9   performer in his entire group, would you have any reason
10   to disagree with that?
11   A   I -- no, I have no reason to think that.
12   Q   Okay.  And she's had two children at Shell,
13   correct?
14   A   Uh-huh.
15   Q   Do you think that her pregnancy affected her if
16   she's the best performer under Randy?
17   A   I don't know.  I can't -- I can't speculate on
18   that.  I don't know.
19   Q   Okay.  Okay.  Have we covered all the reasons
20   that you believe that you were dis -- and we're going to
21   get to the disability section in a second, okay, and the
22   accommodation, but for now we're just talking about your
23   discrimination claim based on your gender and your
24   pregnancy.  Okay?  And I know there's kind -- it's kind
25   of overlapping with the other, but I'm going to get --

288

1   A   Uh-huh.
2   Q   -- to disability in a second.
3       Have we covered all the reasons why you
4   believe that you were discriminated against based on
5   your gender or pregnancy?
6   A   And I don't know if this falls in that
7   category.  I believe -- and I -- I don't know the time
8   frame, but I believe that one of the managers went on a
9   medical -- a male manager went on a medical disability
10   for a heart condition of some sort and was gone for
11   several weeks, I don't know, a month, I don't know, six
12   weeks.  I -- I just remember it was a very long time --
13   Q   Uh-huh.
14   A   -- and he was not let go during this point.
15   Q   And who is that?
16   A   Dave Holland.
17   Q   Dave Holland?
18   A   Holland, yes --
19   Q   Okay.
20   A   -- like the country.
21   Q   Was he under Randy?
22   A   No.
23   Q   No.
24   A   He was -- he was Randy's peer, I guess.
25   Q   Okay.  So Randy is -- he was a team lead?

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

75 (Pages 297 to 300)

**297**

1  A  Yes.
2  Q  — you're claiming is a disability?
3  A  Yes.
4  Q  Okay.  What else?
5  A  I believe that's it.
6  Q  Nothing else?
7  A  Well, you're saying the maternity leave is not
8  a disability so —
9  Q  Disability is — what do you think is a
10  disability, Ms. — Ms. — Ms. Pheigaru?
11  A  Something that inhibits you from I guess being
12  able to do your job properly or in — in the workforce,
13  I guess.
14  Q  Okay.  Is it usually like a — you know, I
15  can't tell you your testimony, and that's the thing.  So
16  you need to be able to articulate what your disability
17  is.  And if you think your disability is nursing,
18  that's — I'm fine with that if that's your testimony.
19      Is there any other disability that you
20  had?
21  A  The pregnancy was the disability.
22  Q  Okay.  And what regarding the pregnancy, just
23  the fact that you were pregnant or —
24  A  No, I had — I had a large baby —
25  Q  Okay.  And what do you mean —

**298**

1  A  — and I was —
2  Q  — by "a large baby"?
3  A  I had an 8-pound baby —
4  Q  Uh-huh.
5  A  — and — and for — how my doctor described it
6  to me is I was most likely going to have a C-section.  I
7  was induced early because they were afraid that he was
8  going to be very large if I went to term.  I was induced
9  I think six days early.
10  Q  Okay.  So he was originally — when was the
11  baby originally due?
12  A  I think the 9th of March, I believe.
13  Q  He was originally due the 9th of March?
14  A  Uh-huh.
15  Q  And then you had him, I believe, on the 3rd of
16  March, correct?
17  A  The 3rd, yes.
18  Q  So six days early?
19  A  Yes, I was induced.
20  Q  And so he was 8 pounds, correct?
21  A  Yes.
22  Q  And so the doctors considered that to be a
23  large baby?
24  A  In the initial sonograms, yes.  When they were
25  doing the final sonograms, it looked like he was

**299**

1  measuring two weeks early.
2  Q  Okay.  And when were the final sonograms?
3  A  A week or two, two weeks before I had him.
4  Q  Okay.  So two weeks before —
5  A  I don't know an exact date —
6  Q  Okay.
7  A  — but I know we did it —
8  Q  So do —
9  A  — two or three weeks before.
10  Q  Okay.  Do you have any medical records to show
11  that it was a large baby?
12  A  There should be, yes.
13  Q  Okay.  And you've —
14  A  I've — I've submitted, yeah.
15  Q  Okay.  And it should have the date and the time
16  when it was determined —
17  A  Yes.
18  Q  — that you had a large baby, right?
19  A  Yes.
20  Q  Okay.
21  A  I was always measuring about two weeks early.
22  Q  Okay.  And would you agree with me in the — in
23  the documents that we saw for Reed Group, what was
24  provided to Reed Group, there nothing in there to
25  indicate that you had a large baby, correct?

**300**

1  A  Yes, because that was in January.  From Reed
2  Group that was in January.
3  Q  Right.  But that's all of Reed Group's records.
4  Okay?  Based on what your attorney is saying, those are
5  all of the records that Reed Group has.  Okay?
6  A  Okay.
7  Q  So based on all the records that Reed Group
8  has, would you agree with me that there's nothing in
9  there to suggest that you had a large baby?
10  A  Yes.  Based on those records, yes —
11  Q  Okay.
12  A  — from January.
13  Q  Okay.  And did you take any time off between
14  work and having your son?
15  A  The weekend.
16  Q  Just the weekend, right?
17  A  Yes.
18  Q  So no work time, correct?
19  A  No, no work time.
20  Q  Okay.
21  A  My last day of work was — I think I went home
22  at 3:45 or 4:00 o'clock on Friday, and I had him on — I
23  was induced Sunday night.
24  Q  Okay.  And when did you schedule the C-section?
25  A  I don't know an exact day on that.  Oh, I'm

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

309

1    A   Mieko, M-i-e-k-o, Rivas, R-i-v-a-s.
2    Q   Okay.  And so how do you know that Mieko sent
3  it to other people?
4    A   We got a few e-mails.  My mom got a few e-mails
5  from other people saying congrats, heard you're a new
6  grandma, hope Shelly is doing okay because of the
7  emergency C-section.
8    Q   Okay.  Do you know at all -- do you have any
9  evidence sitting here today that Hector or Steve knew?
10    A   Yes, I think -- I believe my mother -- I asked
11  her to tell Steve and Hector.
12    Q   Okay.  You asked her to do it, but do you have
13  any personal knowledge that she actually told them?
14    A   I want to say I've seen an e-mail.
15    Q   I'm sorry?
16    A   I believe I've seen an e-mail that states this.
17    Q   Okay.  But have you produced that e-mail to --
18  or do you have a copy of this e-mail?
19    A   I can look for it.
20    Q   Okay.  So how did your -- you -- you having a
21  large baby affect your ability to perform your job?
22    A   I wouldn't -- can you -- can you rephrase that?
23  I mean --
24    Q   How did having a large baby affect your ability
25  to perform your job?

310

1    A   I don't know that it did per se other than
2  having to do necessary checkups and whatnot and be out a
3  little bit because of that.
4    Q   Okay.  But actually performing your job, I'm
5  talking about your job, you didn't have any issue
6  performing your job, correct?
7    A   No.
8    Q   Okay.
9    A   I shouldn't have.
10    Q   Shouldn't have, right?
11    A   No.
12    Q   Okay.
13    A   I didn't think so.
14    Q   Were you prescribed any medication or anything
15  like that during your pregnancy?
16    A   Just prenatal vitamins.
17    Q   Okay.  And let's talk about the nurse because
18  you were saying that the nursing also was a disability,
19  right?
20    A   Yes.
21    Q   Okay.  So how did that nursing affect your
22  ability to perform your job?
23    A   I was away from my desk for the -- that time
24  frame, like we said, about an hour and a half a day.
25    Q   So you were basically not able to do your work;

311

1  is that right?  You were not able to perform your job?
2  That's how it affected you?
3    A   I was away from my desk, yes.
4    Q   Okay.
5    A   Away from my work.
6    Q   Okay.
7    A   There was many nights, though, that I would go
8  home because of that, go home and work from home to make
9  up some of the time that was missed while nursing.
10    Q   Okay.  So you were able -- so whatever at work
11  you did not get done at work because of the time you
12  missed you went home and did it?
13    A   I tried to unless --
14    Q   Okay.
15    A   Yes.
16    Q   So do you think -- so you were fine then,
17  right?  So if you were not able to get it done during
18  the daytime, you went home and you finished up your work
19  and so you were able to do your work?
20    A   If that was --
21    Q   Would you agree with that?
22    A   If that was possible, yes.
23    Q   Okay.  Do you think there was times where it
24  was not possible?
25    A   Yes.  I had a very sick child for a few months,

312

1  off and on for about four or five months.  He had
2  surgery, and we were in the doctor a lot because of
3  asthma and a lot of ear and -- and chest problems,
4  pneumonia, things of that nature.
5    Q   Okay.
6    A   So...
7    Q   Okay.  So I guess let me wrap it up then.  So,
8  I mean, I just want to make sure with regard to nursing.
9  So the times when, you know, you -- you were away say
10  about an hour and a half from your desk and you couldn't
11  do your work, you would come home, to the extent that
12  you could you finished up your work then, right?
13    A   For the most part, yes.
14    Q   For the most part.  Okay.
15        And can you remember specific instances of
16  work that didn't get done?
17    A   No, I can't think of anything specifically.
18    Q   That did not get done, correct?
19    A   No, no.
20    Q   Okay.  Why do you believe that SEPCO
21  discriminated against you because of your -- because of
22  your nursing and because of your large baby?
23    A   I don't know why that happened.
24    Q   You don't know why -- why they discriminated?
25    A   I don't know why, no.

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

80  (Pages 317 to 320)

317

1   Q   Okay.
2   A   -- something.
3   Q   And who was -- what was her title --
4   A   And these were all my friends, so I just took
5   it as a -- as a joke.
6   Q   Okay.  So these were basically friends --
7   coworkers that were friends that were making comments?
8   A   Yes.
9   Q   Okay.  Did you think your friends were
10  discriminating against you?
11  A   Not at the time, no.
12  Q   Okay.
13  A   No, I don't think so.
14  Q   What do you mean "not at the time"?  Do you --
15  do you now --
16  A   No, not --
17  Q   -- think your friends were --
18  A   No, I don't -- I don't believe so.
19  Q   Okay.
20  A   I think it was all in a light-hearted fashion.
21  Q   Okay.  And the comments that they were making
22  about the large baby was just like, oh, you're carrying
23  a large baby, right, things like that?
24  A   Yes.
25  Q   Okay.  Did -- did you request any sort of

318

1   accommodation for the fact that you were having a large
2   baby, larger baby?
3   A   I requested a rolling backpack for -- to carry
4   my laptop --
5   Q   Okay.
6   A   -- versus just a shoulder bag.
7   Q   Okay.  And when did you request this?
8   A   About halfway through my pregnancy, I would
9   say.
10  Q   Approximately when do you think?
11  A   December maybe --
12  Q   Okay.
13  A   -- when I started to get pretty big.
14  Q   Okay.  So around December 2013?
15  A   Yes.  I mean, I can't a hundred percent quote
16  that one, but I know it was mid pregnancy --
17  Q   Okay.
18  A   -- about.
19  Q   At some point, so you requested a rolling
20  backpack, right?
21  A   Yes.
22  Q   And --
23  A   Because my laptop was heavy --
24  Q   Okay.
25  A   -- to carry back and forth.

319

1   Q   Okay.  And -- and what was the response to
2   that?
3   A   I got one.
4   Q   Did anyone make an issue about that?
5   A   No.
6   Q   And who did you request the accommodation to?
7   A   Either Hector or Mieko.
8   Q   How do you spell her name?
9   A   M-i-e-k-o.
10  Q   Okay.  What's her last name?
11  A   R-i-v-a-s.
12  Q   Okay.  So you requested an accommodation from
13  either one of those --
14  A   Yes.
15  Q   -- and --
16  A   I can't remember who.
17  Q   Okay.
18  A   One of the two gave it to me?
19  Q   Okay.  And how quickly did you get it?
20  A   Within a couple of days.
21  Q   And was that reasonable for you?
22  A   Yeah.
23  Q   Okay.  Did you have any issue with requesting
24  the accommodation --
25  A   No.

320

1   Q   -- or receiving the accommodation?
2   A   No.
3   Q   Okay.  Other than that did you request any
4   other sort of accommodation for having a large baby?
5   A   Not during the pregnancy.
6   Q   Okay.  So was there another time that you
7   requested it?  And we talked about the nursing, right?
8   A   Uh-huh.
9   Q   Is that the other one that you're thinking of?
10  A   I requested a refrigerator in my room --
11  Q   Okay.
12  A   -- or in my office so I didn't have to leave
13  the milk in somebody else's and --
14  Q   Okay.  I'm sorry.  Let's back up a second.  So
15  you requested -- are these the only two -- I wanted to
16  kind of jot down all of the accommodations and then go
17  through each one, if you don't mind.  So it's the
18  rolling backpack, the refrigerator.  Is there anything
19  else that you requested?
20  A   There was a parking pass that the nurses gave
21  out to people that were in their third trimester that
22  was -- let you park a little bit closer.
23  Q   Okay.  What else?
24  A   I believe that was it.  I can't think of
25  anything else.

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

81  (Pages 321 to 324)

**321**

1  Q  Okay.  So let's -- we talked about the rolling
2  backpack.
3  A  Uh-huh.
4  Q  Let's talk about the refrigerator in the
5  office.
6  A  Uh-huh.
7  Q  So what did you ask for specifically?
8  A  Another -- Angelica told me that she had a
9  refrigerator in her office so that she could pump in
10  there and then put it in the -- put it in her office.
11  Q  So she had a specific refrigerator in her
12  office?
13  A  Yes --
14  Q  Okay.
15  A  -- she did.
16  Q  Okay.  And so what did -- what did you ask for?
17  A  I asked for the same accommodation.  They did
18  not -- I'm trying to think of the time frame.  I believe
19  we moved into cubicles and so I didn't have an office
20  anymore so I was never given the -- the refrigerator.
21  Q  Okay.  Did you have a refrigerator at some
22  point?
23  A  I don't -- I don't know for sure.  I can't
24  remember.  I don't believe so.  I can't -- I don't want
25  to say for sure because I don't -- I don't know --

**322**

1  Q  You don't remember?
2  A  -- for sure, no.
3  Q  Okay.  So -- so you requested -- is this like
4  soon after you came back when you came back from
5  maternity leave?
6  A  Yes.
7  Q  Okay.  And so who did you ask the accommodation
8  to?
9  A  I think our admin, Mieko.
10  Q  Okay.  So you asked the admin for a
11  refrigerator?
12  A  Uh-huh.
13  Q  And what was the response?
14  A  That's what I'm unsure if I did get one or I
15  didn't.  I can't remember the time frame because we
16  moved from having offices to being in cubicles, and I
17  know in the cubicle I did not have a refrigerator.
18  Q  Okay.  So in the office it's possible that you
19  had a refrigerator?
20  A  Possible but I don't remember being in the
21  office when I came back from maternity leave, but I
22  can't -- I can't remember --
23  Q  Okay.
24  A  -- 100 percent.
25  Q  Okay.  So -- but you said when you got into the

**323**

1  cubicles you did not have a refrigerator, correct?
2  A  No.
3  Q  Okay.  So what is the time frame?  I'm trying
4  to understand.  So how long during the time that you
5  were -- and you -- I think you said that you were
6  nursing for six months?
7  A  Yes, but that's --
8  Q  All right.
9  A  -- from his birth.
10  Q  Right.
11  A  So not from being back at work --
12  Q  Okay.
13  A  -- for six months.
14  Q  What is the nurse -- I guess what is the
15  nursing time -- thank you for clarifying.  What is the
16  nursing time during the time that you were actually at
17  work?
18  A  It was May 19th when I came back to work --
19  Q  Uh-huh.
20  A  -- and I stopped around September 3rd or first
21  week of September, something like that, so --
22  Q  So about four months?
23  A  Yes.
24  Q  Less than four months?
25  A  Less than four months.

**324**

1  Q  Okay.  So less than four months.  Okay.
2  So how -- how long were you in the cubicle
3  for during that time period?
4  A  That was during that time period.  I believe --
5  I can't remember if they moved from the offices to the
6  cubicles right after I came back or during maternity
7  leave, so that's the -- the hazy part --
8  Q  Okay.
9  A  -- that I'm --
10  Q  Okay.
11  A  -- not quite sure of the time frame of that.
12  Q  Okay.  So what was the response regarding the
13  refrigerator?
14  A  I believe it was denied.
15  Q  Okay.  I'm sorry?
16  A  I believe it was denied because they had a
17  refrigerator on the floor.
18  Q  Uh-huh.
19  A  And then they also had a refrigerator in the
20  pumping room.
21  Q  Okay.  In the pumping room?
22  A  Yes.
23  Q  Okay.  So you didn't have to keep your breast
24  milk in a refrigerator where everybody else was keeping
25  their food and stuff, right?

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

82 (Pages 325 to 328)

325

1    A   No, but that was also in another building.
2    Q   I'm sorry?
3    A   It was also in another building.
4    Q   What was, the pumping room?
5    A   The pumping room --
6    Q   Okay.
7    A   -- was in the other building.
8    Q   So where did you keep your breast milk?
9    A   In the pumping room in the other building.
10   Q   Okay. And that's where you were going every
11 day, too, correct?
12   A   Yes.
13   Q   Okay.
14   A   Numerous times a day.
15   Q   Okay. Did you have an issue with that?
16   A   Yes. I was nervous that it was going to get
17 switched for somebody else's which is a big health
18 concern for me and then also having to go back there at
19 the end of the day just to get that milk --
20   Q   Uh-huh.
21   A   -- and bring it home.
22   Q   Uh-huh.
23   A   So if it would have been on our floor or in our
24 office it would have been different.
25   Q   Okay. But you do agree that there was another

326

1 female employee, right, that had to nurse, Angelica --
2    A   Yes.
3    Q   -- you mentioned?
4        And she did get that accommodation,
5 correct?
6    A   She did.
7    Q   Okay.
8    A   It was a year, maybe a year or two before -- I
9 think her youngest is about a year older than my -- my
10 son.
11   Q   Okay. And do you know the reason why you may
12 not have gotten the accommodation?
13   A   No, I don't.
14   Q   Okay. Did they tell you why?
15   A   No.
16   Q   Okay. Did you go complain -- so you dealt
17 primarily with the admin, correct?
18   A   I believe so.
19   Q   Okay. So if the admin didn't accommodate you,
20 did you go to HR or anyone else to complain?
21   A   No, I think the reason it may have been denied,
22 I -- like I said, I can't remember the time frame. I
23 can't visualize in my office having the the --
24 refrigerator but I -- I -- that was three years ago so
25 or -- yeah, three years ago, but I think because we were

327

1 moving to the cubicles is why it was denied.
2    Q   Okay. Okay. And Angelica had her own private
3 room, correct?
4    A   Yes.
5    Q   Private office. Okay.
6        Do you think that's reasonable?
7    A   Yes.
8    Q   I'm sorry?
9    A   Yes.
10   Q   That's a reasonable reason that she got it
11 versus you didn't get it?
12   A   It was also a year or two before me, but, yes.
13   Q   Okay. And -- oh, yeah, I had asked you -- I
14 don't think you answered my question. I apologize if
15 you did. Did you say that you did or you did not
16 complain to anybody at HR?
17   A   I don't believe I did.
18   Q   Okay. And the last one is the parking pass.
19 Okay. And so what is this accom -- did you ask for an
20 accommodation for a parking pass?
21   A   It was given. I just -- I asked the nurse how
22 all of that worked because somebody told me in your last
23 trimester when you're real big and, you know, trying to
24 get to places they gave certain parking passes for
25 closer parking.

328

1    Q   Okay. And you asked for it, and you got it,
2 correct?
3    A   Yes.
4    Q   There was no issue with that?
5    A   I just had to provide documentation from my
6 doctor --
7    Q   Okay.
8    A   -- so, no.
9    Q   Any other accommo -- I think we've covered all
10 of them. Is there --
11   A   Yes.
12   Q   -- anything else?
13   A   Not that I can think of.
14   Q   Okay. So I just want to make sure have we've
15 covered all the reasons why you believe that you've been
16 discriminated against because of your disability and
17 that being the nursing as well as the -- the large baby?
18   A   Yes.
19   Q   Okay. Okay. We're coming to your last claim.
20 We're almost wrapping up here. Let's talk about one of
21 the last claims that you allege in this lawsuit is on
22 Page 8 and 9. Do you see that? Here you go.
23   A   Oh. Thank you.
24   Q   Actually, before we get there -- I'm sorry.
25 I'm sorry. Hold on a second. Can we go back to Page 8

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2

Discovery Resource
713-223-3300

85  (Pages  337  to  340)

---

337

1  question again.
2          THE WITNESS: Okay. Yes.
3          MR. MacNAUGHTON: Does that help rec --
4  your memory there?
5          THE WITNESS: Yes.
6          MS. ISSA: Sure, sure.
7      Q  (By Ms. Issa) Let's talk about the -- after
8  the -- okay. Isn't it -- isn't it this one here,
9  Exhibit No. 8?
10         MR. MacNAUGHTON: Where am I. 2, 18,
11  Exhibit --
12         MS. ISSA: Are these it, too, or no?
13         MR. MacNAUGHTON: No, those are -- no,
14  those are --
15         MS. ISSA: There should be an Exhibit 8.
16         MR. MacNAUGHTON: 15. Let me just get
17  them in order. 9; 10; no, 6.
18         THE WITNESS: Is this it?
19         MS. ISSA: No.
20         THE WITNESS: No?
21         MR. MacNAUGHTON: That's 9.
22         THE WITNESS: That's 9.
23         MS. ISSA: No, that's not it. Yeah, 8 is
24  missing.
25         THE WITNESS: This is 19.

---

338

1          MR. MacNAUGHTON: 13. Okay. I don't see
2  14 either.
3          MS. ISSA: 8 is missing, right? Are you
4  sure you haven't grabbed it?
5          MR. MacNAUGHTON: Yeah, I have --
6          MS. ISSA: Are you sure it's not because
7  you have two stacks down here?
8          MR. MacNAUGHTON: Well, look -- yeah, I
9  know. One is flipped over from the other.
10         MS. ISSA: Okay.
11         MR. MacNAUGHTON: Should be in order.
12  This is what it should look like.
13         MS. ISSA: Yeah.
14         THE WITNESS: It's a single page?
15         MR. MacNAUGHTON: Yeah, it's a single
16  page.
17         THE WITNESS: Did it get stuck in there?
18         MR. MacNAUGHTON: It got stuck --
19         MS. ISSA: Oh, here we are.
20         MR. MacNAUGHTON: -- in the back.
21         MS. ISSA: Okay. Perfect. Thank you,
22  Robert.
23         MR. MacNAUGHTON: You bet.
24         THE WITNESS: Thank you.
25     Q  (By Ms. Issa) Here you go. I think that's it

---

339

1  right there. Is that the one you're talking about?
2      A  Yes. Yes, this was the -- the follow-up after
3  our end of the year review --
4      Q  Okay.
5      A  -- in January, yes.
6      Q  Okay.
7      A  Thank you.
8      Q  All right. So did you specifically complain to
9  him here about being evaluated on 9 months as opposed
10  to 12 months?
11     A  Not according to this e-mail but I know that we
12  had a meeting before this obviously, a discussion that
13  morning so I -- I don't know if I specifically.
14     Q  I'm sorry?
15     A  I don't know if I specifically did. I would
16  assume that I did just based on what I'm saying here,
17  I'm very upset with outcome of our meeting, trying to
18  improve --
19     Q  My question --
20     A  -- et cetera.
21     Q  Sorry to interrupt. My question to you is
22  specifically do you recall discussing with Randy the
23  specific issue of being evaluated on 9 months as opposed
24  to 12 months?
25     A  I don't recall.

---

340

1      Q  Okay.
2          MR. MacNAUGHTON: Let's do this.
3          THE WITNESS: Okay.
4      Q  (By Ms. Issa) And do you recall Randy at all
5  saying during this meeting that you were evaluated for
6  that year based on your production?
7      A  I don't recall.
8      Q  Okay. All right. Let's go to the disparate
9  impact claim. Sorry. Yeah, it's that one that you have
10  in front of you --
11     A  Okay.
12     Q  -- there. Perfect.
13         So one of the allegations -- another
14  allegation that you have in this lawsuit is that -- it's
15  on Page 8, and it says that you were -- you're alleging
16  a disparate impact claim. Do you understand that claim?
17     A  Can you just give me a second? I'll read it --
18     Q  Sure.
19     A  -- again.
20     Q  Uh-huh.
21     A  Yes.
22     Q  I'm sorry?
23     A  Yes, I understand this claim.
24     Q  Okay. What is this claim that you're alleging?
25     A  This is about the -- the disability related to

---

EXHIBIT 2

Discovery Resource
713-223-3300

341

1 my maternity leave --
2    Q   Uh-huh.
3    A   -- or during my pregnancy --
4    Q   Uh-huh.
5    A   -- setting goals and about the loading time and
6 goals that were set for me during my time out.
7    Q   So this is -- okay.  Just to make sure I
8 understand, do you mean goals or do you mean the loading
9 time that was counted against you according to you
10 during the time that you were out on leave?
11    A   I believe both.
12    Q   So what do you mean by "goals"?
13    A   Goals in my GPA.
14    Q   Okay.  What do you mean by that?
15    A   I was told at the beginning to put -- I was
16 told by Hector at the beginning of my GPA at the first
17 of the year to put -- about the HSS&E.
18    Q   Uh-huh.
19    A   And I said, "Well, you know I'm going to be out
20 on maternity leave, so I won't be able to go to one a
21 quarter."  You're supposed to go to one safety thing per
22 quarter.  So I said, "You know I'm going to miss at
23 least one, if not two.  It just depends where they
24 fall."
25        And he said, Put it in there, and then

342

1 we'll revise it later."
2    Q   Uh-huh.
3    A   So, yes, it was revised, but that plus the
4 loading times I think may have looked poorly on my part
5 which was out of my control.
6    Q   Okay.  And we saw the loading times, right?  We
7 talked --
8    A   Yes.
9    Q   We talked about all the wells, and you saw what
10 the -- what the documents showed, correct?
11    A   I saw what they showed, yes.
12    Q   Okay.  And you at the time -- okay.
13        Do you have any reason to keep -- okay.
14 Strike that.  Okay.  So one of the things in a disparate
15 impact is that you have to allege that there's some sort
16 of policy in place, right, that has a disparate impact
17 on employees, and so what is the specific policy that
18 you're referring to?
19    A   Policy in place?
20    Q   Uh-huh.
21    A   I believe it's about the loading time and
22 about -- and the -- the way the system works --
23    Q   Uh-huh.
24    A   -- and how I proved at other points that the
25 system was defective in different situations.

343

1    Q   Okay.  So you said it's -- you're claiming that
2 the policy that has dis -- disparate impact on employees
3 is the policy related to loading time?
4    A   As far as the well data management team, yes.
5    Q   Okay.  And so what exactly is the specific
6 practice, what exactly is it about the loading time
7 policy that has a disparate impact?
8    A   The goal of the ten days.
9    Q   And so you're saying that the specific practice
10 of having a goal for -- of ten days disparately impacts
11 certain employees?
12    A   Yes.
13    Q   Okay.  And who are the employees that it
14 disparately impacts?
15    A   Ones out on leave.
16    Q   And do you have any -- any sort of statistical
17 evidence, statistics to show that there is a disparate
18 impact on employees that take leave versus those that
19 don't take leave?
20    A   I don't have any statistics on that.
21    Q   Okay.  Tell me about the damages that you're
22 seeking in this lawsuit.
23    A   I was planning to work for Shell as long as
24 possible, pretty much the rest of my career so when I
25 left Shell I made roughly $65,000 and I would get --

344

1 that was not including bonus or raise.
2    Q   Uh-huh.
3    A   Every year that I worked for Shell I got a
4 bonus and a raise of -- I don't know the exact
5 numbers -- 2 percent, 5 percent maybe, so I was
6 expecting if -- even if I didn't advance as far as
7 monetarily I was expecting for -- you know, I'm 33 now
8 so for another 20, 30 years of making that same salary
9 plus benefits that a large corporation can provide,
10 benefits for my family, for my children, health
11 benefits, retirement benefits, et cetera.
12    Q   Okay.  So you're receiving -- seeking back pay,
13 I guess, compensation, right, the monetary damage that
14 you've lost, right?
15    A   Yes.
16    Q   So you're saying it's about 65,000 plus
17 whatever the bonus was plus benefits, right?
18    A   Yeah, I've had to pay an extreme amount of
19 money trying to get my own healthcare that would even --
20 doesn't even compare to what Shell offered.
21    Q   Okay.  So other than --
22    A   As -- and as far as retirement and -- and
23 planning for the future and things of that nature, both
24 my parents -- my mother still works there but my dad
25 retired from Shell and I saw the -- the family

Shelly Pheigaru
Discovery Resource 713-223-3300

EXHIBIT 2